UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X Docket#
UNITED STATES OF AMERICA,     : 02-cr-1188(JS)(ARL)
                              :
     - versus -               : U.S. Courthouse
                              : Central Islip, New York
CARLOS ARTURO PATINO RESTREPO,:
          Defendant           : February 19, 2009
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE ARLENE R. LINDSAY
UNITED STATES MAGISTRATE JUDGE

A   P   P   E   A   R   A   N   C   E   S:


**For the Government**:          **Benton Campbell, Esq.**
                             United States Attorney

                      BY:    **Allen Bode, Esq.**
                             Assistant U.S. Attorney
                             610 Federal Plaza
                             Central Islip, New York


**For the Defendant**:           **Todd Merer, Esq.**
                             41 Madison Avenue
                             New York, New York


**Official Transcriber**:        **Rosalie Lombardi**

                                 **L.F.**


**Transcription Service**:       **Transcription Plus II**
                             823 Whittier Avenue
                             New Hyde Park, N.Y.  11040
                             (516) 358-7352
                             Transcriptions2@verizon.net


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

### Proceedings

1          THE CLERK:  Calling United States of America v.

2   Patino Restrepo, 02-cr-1188.

3          Attorneys, can you make your appearance for the

4   record.

5          MR. BODE:  Allen Bode for the government.

6          Good morning, your Honor.

7          THE COURT:  Yes, good morning.

8          MR. MERER:  Todd Merer for Mr. Patino.

9          Good morning, your Honor.

10          THE COURT:  Yes, good morning.

11          MR. MERER:  Your Honor, would it be all right

12   if I moved the lectern so I can --

13          THE COURT:  Of course.  And I would like you to

14   remain seated and speak into the mic because that will

15   give us the best record.

16          Let's swear in the interpreter, please.

17   (INTERPRETER SWORN)

18          THE CLERK:  Please state your name for the

19   record.

20          THE INTERPRETER:  Maya Bray (phonetic),

21   certified Spanish federal court interpreter.

22          Good afternoon.

23          THE COURT:  Yes, good morning.

24          THE INTERPRETER:  Good morning.

25          THE COURT:  So as counsel are aware, the day

3

**Proceedings**

1    before yesterday Judge Seybert asked me to take a look at

2    these issues that have been raised by the defendant and

3    to report back to her on the question of how to resolve

4    how I would recommend she resolve some of these matters,

5    those being specifically whether the conditions of the

6    defendant's pretrial confinement are constitutional,

7    whether or not there was some requirement of an

8    exhaustion of administrative remedies in the first

9    instance before we can consider that issue, whether or

10   not the case was properly designated a Long Island case

11   and whether or not the defendants should be permitted

12   joint defense meetings.  I think those are the central

13   issues that have been referred to me for resolution, as

14   well as to hold any evidentiary hearings as may be

15   necessary to resolve those issues.

16          But there are a couple of preliminary things I

17   would like to understand first.  As I said, this matter

18   was just handed to me, so I have tried to familiarize

19   myself with the record up to this point, pulling some of

20   the transcripts of conferences before Judge Seybert but I

21   am confused about a couple of things.

22          Number one, up to this point, have both the

23   defendants appeared together in proceedings?

24          MR. BODE:  No, your Honor, separate -- on

25   separate days.

4

### Proceedings

1          THE COURT:  Okay.  So they have not been

2  brought in together.  So that there would be no reason

3  not to proceed in the -- with the application of the

4  defendant Patino first then, even though the issues may

5  be identical.

6          MR. MERER:  May I address that?

7          MR. BODE:  Yes.  And defense counsel for

8  Vallejo is also having some -- as your Honor may know,

9  some medical issues.

10          THE COURT:  Right, I understand that.  That's

11  why I am asking these questions.

12          Mr. Merer?

13          MR. MERER:  Your Honor, if I might.  I have

14  spoken to Mr. Testaverde.  He is, of course, well aware

15  of today's proceeding.  As the Court may be aware, he has

16  joined in my motions.

17          THE COURT:  I understand that.

18          MR. MERER:  He does have a status conference

19  scheduled before Judge Seybert I believe on the 23rd of

20  March.  We do not yet.  I suppose our status would be

21  pending your decision eventually but he understands that

22  I am here today.  He knows that he has filed jointly with

23  me and I suppose he understands that whatever

24  ramifications come from today's hearings will apply to

25  his client, as well.

5

**Proceedings**

1          THE COURT:  Right.

2          MR. MERER:  He had an accident, so he is unable

3   to articulate.

4          THE COURT:  I understand that.  So when you say

5   he understands, although the review will be limited to

6   your client.  It clearly is going to have some influence

7   on the process as to his client, as well.

8          MR. MERER:  Clearly, your Honor.  But I believe

9   that he submitted a motion in which he joins with my

10  motion and together with that motion he submitted

11  Mr. Vallejo's affidavit.

12          THE COURT:  Okay.

13          MR. MERER:  So I think these fulfill the

14  requirements procedurally.

15          THE COURT:  Of preserving his rights.

16          MR. MERER:  Yes.

17          THE COURT:  Yes.

18          MR. MERER:  Yes.

19          THE COURT:  I agree with that.  And I may be

20  mistaken but I was under the impression that

21  Judge Seybert may even refer that upcoming status

22  conference to me, given that it may relate to the same

23  issues.

24          MR. MERER:  That may be.  Your Honor, if I just

25  might touch on some of the things you just said.  As you

6

**Proceedings**

1  know, we had two rather lengthy status conferences

2  or/hearings dealing with these issues before the district

3  judge.  I was a little surprised, I suppose that at this

4  point it was referred to your Honor.  And I didn't really

5  learn about that and I amended my latest letter to

6  yourself yesterday.

7             THE COURT:  Yes.

8             MR. MERER:  What I did though, for the Court's

9  convenience, is put together a packet.  There's nothing

10  in it that the government doesn't already have.  It

11  consists not only of some of the motions and the

12  government responses but of some of the earlier letters

13  and correspondence and some of the other matters were

14  referred to in those motions, so that -- and I put an

15  index in front so your Honor can refer to it.

16             THE COURT:  That's very helpful because I have

17  been trying to pour through the record.

18             MR. MERER:  May I hand this up?

19             THE COURT:  But I don't believe I have a

20  complete understanding of what's occurred up to this

21  point.  But based on what I have reviewed, I have one

22  initial matter that I need to discuss with counsel and I

23  am not sure whether or not it prevents me from even

24  reviewing this whole issue and that is that in reviewing

25  the record that I was able to pull together, I noted that

7

**Proceedings**

1  the marshal who did the ex parte proffer before

2  Judge Seybert -- now it's my understanding that that

3  proffer after reading it was to report to Judge Seybert

4  what the US Marshals' investigation consisted of.  And

5  specifically, although it's ex parte, I think it's fairly

6  well understood that the marshal's proffer concerned

7  interviews of informants who were able to provide

8  information with respect to the threats that are the

9  subject matter of this hearing and the basis upon which

10 the government has insisted that the SHU is appropriate.

11         That marshal, you know, sitting here like, you

12 know, feeling funny about this, but that marshal is

13 dating my daughter, okay?  And, you know, it's not my

14 practice to -- I hate talking about this but I don't feel

15 I can't not talk about it.  I looked at it and I thought

16 well, my sense of this is and I'll -- you know, I need

17 some feedback from counsel on this, that I am not sure

18 what kind of reliance the government is going to place on

19 that, whether I have to make credibility findings with

20 respect to that marshal.  My sense is that the answer to

21 that question is no but I don't know that for a fact.

22         Based on the proffer that I read, the marshal

23 had spoken to several individuals and was simply

24 reporting to the judge what those individuals had

25 indicated with respect to the threats.  Ultimately, if we

8

### Proceedings

1  get to an evidentiary hearing, we have to get to the

2  source, not to the middle person so that as long as I

3  don't have to review the credibility of the marshal, I

4  feel I can go forward.  I also understand that this

5  marshal has been re-assigned and is not longer in the

6  threat assessment unit.

7          So I put that out there.  Again, I don't want

8  to start something that I can't finish or that anybody

9  feels uncomfortable with.  So I think that that has to be

10  reviewed.  I certain feel that I can address the issue as

11  to whether or not this is a Long Island case.  I could

12  help her in that regard but I would like some response

13  from counsel.

14          MR. BODE:  If I may, your Honor, first just the

15  scope of the referral doesn't -- wouldn't seem to

16  implicate this at this point.  I mean there may be

17  further proceedings but the scope of the referral at this

18  point, doesn't encompass the threat aspects of this.

19  It's whether the defendants should be permitted joint

20  defense meetings, whether defendants have standing to

21  challenge the conditions of their confinement absent

22  exhaustion of administrative remedies and if so, whether

23  their current conditions violate constitutional rights.

24          In terms of those questions, we don't have to

25  get to that aspect of the case, I submit.  But obviously,

9

**Proceedings**

1   I will leave it up to the --

2           THE COURT:  I am not sure that I agree with

3   that, Mr. Bode, because my -- if we get past the

4   exhaustion question, then the review of the Court is

5   going to be whether or not there is a rational basis for

6   the segregation.  And whether or not the segregation

7   really addresses what you say is the reason the

8   government has demanded this segregation.

9           So that review is, of course, going to require

10  the Court to go into the underlying claims.  Now that's

11  why I thought that you know, it's not going to be done

12  through the intermediary of a marshal.  It's going to

13  have to be the Court perhaps having its own ex parte

14  communication with the actual source.

15          But I don't see any need to call back the

16  marshal to ask him to repeat to me what he's already said

17  to Judge Seybert.  That part of it I am very clear about.

18          MR. BODE:  Well additionally, there are you

19  know -- I have my office investigator, Mr. Cox

20  (phonetic), who was also present for all those proffers

21  as well, so -- well actually, I take that back.  There

22  might be some things that the marshal was privy to that

23  we were not but I will have to look at that question.

24          THE COURT:  Okay.  So I mean it's something

25  that you need to explore and then I need to hear from the

10

**Proceedings**

1  defense.

2          MR. MERER:  Your Honor, I concur totally with

3  what you said.  It's quite clear that if we get past the

4  exhaustion issue and I am hoping we shall, that this will

5  relate more to Basciano which is a case I know your Honor

6  is well familiar with.

7          THE COURT:  Right.  And that's where I am

8  drawing my conclusions from.

9          MR. MERER:  Right.  And, you know, so quite

10  clearly the marshal comes into full play.  Having said

11  that, your Honor, if I just might digress and give you a

12  little bit of a history of how it came to be that the

13  marshal was present according to what I understand.

14          THE COURT:  Go ahead.

15          MR. MERER:  At the very first appearance when

16  Mr. Patino --

17          THE COURT:  And just so it's clear, we're

18  talking about Marshal Rosado (phonetic).

19          MR. MERER:  Apparently, yes.

20          THE COURT:  Yes.

21          MR. MERER:  That's the only marshal I know of

22  at this point; right.

23          THE COURT:  It wasn't Ms. McFarland (phonetic)?

24          MR. MERER:  No.

25          THE COURT:  I don't know, she's --

11

**Proceedings**

1          MR. MERER:  She's an attorney.

2          THE COURT:  She's the --

3          MR. MERER:  Yes.

4          THE COURT:  Okay.

5          MR. MERER:  I see your Honor has read the

6    transcripts; okay.  At the very first appearance when

7    Mr. Patino was arraigned, prior to that appearance, I had

8    had a dialogue with AUSA Klapper in which she made

9    comments that I found disturbing which I have outlined in

10   my letters and in my pleadings.

11          So I made a motion requesting a hearing because

12   I knew already that AUSA Klapper and/or other people in

13   the government had designated Mr. Patino to the SHU.  I

14   didn't know at that point about the bar against

15   co-defendant meetings but I did know about the SHU.

16          Her response was that it was an early juncture

17   in the case and that she understood this case was very

18   unusual because it was not only Mr. Patino having a

19   problem with the SHU, it was the government having a

20   problem -- I should say the eastern district having the

21   problem with Mr. Patino because he had filed an extortion

22   complaint against the case agent.

23          THE COURT:  Okay.

24          MR. MERER:  So that was complicated.  And

25   Judge Seybert made a Solomon-like decision.  She said it's

12

**Proceedings**

1  not going to be my choice.  It's not going to be up to

2  the ICE agents or the United States attorney, I am going

3  to delegate the marshal to investigate which --

4           THE COURT:  Which part though?  To investigate

5  the --

6           MR. MERER:  To investigate the threats

7  allegation which is why he was being put in the SHU.

8           THE COURT:  Okay.

9           MR. MERER:  That's what happened and that was,

10  I believe, on the 28th or 9th of October, on his first

11  appearance.  From that point forward, I heard nothing at

12  all about what the marshal was doing, although I had made

13  several informal inquiries.  I assumed he would reach a

14  point.  But I also knew having read the case law and

15  understanding the administrative aspect, that some time

16  had to go by before I became proactive if nothing

17  happened.  And indeed, we reached a point where we made

18  the motion, the first motion, which led us here today.

19           At the hearing, or at the status conference,

20  Mr. Bode stated and that was the first time I was aware

21  of it, that he had had an opportunity to proffer several

22  witnesses to this alleged threat and that as part of the

23  marshal's investigation, he had asked a marshal and that

24  was Mr. Rosado, Marshal Rosado, who was in court.  I

25  hadn't seen him before to sit in.

13

**Proceedings**

1         THE COURT:  Okay.

2         MR. MERER:  And it was my understanding, and I

3    may be wrong, you've read the transcript, at least it was

4    my understanding of what Mr. Bode said that the marshals'

5    process was not to ask questions but simply to observe

6    and draw conclusions.  I found that kind of strange

7    because I knew, being familiar with the way the

8    government does business, that Mr. Bode was not talking

9    to a witness who had not spoken to law enforcement

10   before.

11        And that disturbed me because one of the

12   allegations we're making that Agent Viola (phonetic) in

13   his own attempts at self-preservation, be they what they

14   may, that's a separate issue that we have no control

15   over, was very concerned about establishing his

16   innocence, I suppose if that's the word, or that these

17   allegations were false.  And we felt very strongly based

18   on knowledge we already had from other witnesses, that he

19   had spoken to these witnesses before or his brother

20   officers ha spoken to them before, and that therefore,

21   Mr. Bode was then talking to witnesses that had proffered

22   already to the government.  So they basically were

23   repeating what was already accepted and it was done for

24   the benefit of Marshal Rosado.

25        So if Marshal Rosado's input is simply based on

14

**Proceedings**

1  repeating what he observed, and I agree with your Honor

2  that it doesn't matter because we're not talking about

3  his credibility.  And I don't see how, in fact, his

4  credibility does come in unless there's some point where

5  your Honor or if it's ever available to the defense,

6  looks at it and says now wait a minute, here's something

7  that the marshal said that doesn't jive with what was

8  said earlier.

9       There's another aspect to that, your Honor.

10  And that is that there's been a disturbing pattern in

11  this case and I will refer to it later on as we go along.

12  But in this instance, the original two witnesses to this

13  alleged threat that Mr. Patino made well over a year ago

14  before he was extradited for which he was never charged,

15  for which he was never separated from his co-defendant,

16  but the original witnesses to the threats were both

17  represented by attorneys who happened to have defendants

18  in this case who, upon information and belief, are

19  cooperating.

20       There are also several other witnesses out

21  there that I suspect are going to verify or substantiate

22  that alleged threat who also are represented by counsel

23  in this case.  And again, this is something that if the

24  marshal was going to make a true evaluation about, he

25  certainly should have been apprised of, so he knew that

15

**Proceedings**

1   there was some back story to what was happening and he

2   certainly should have had the ability to totally cross-

3   examine.

4          Apparently he didn't. Apparently the government

5   felt that by him simply observing, he could draw a

6   conclusion.  And I would submit to the Court that that

7   conclusion could just as easily be reached by your Honor

8   by reading the transcript.

9          And I wold also submit that hopefully we'll get

10  to a point where if, in fact, the administrative remedy

11  exhaustion issue is overcome, that we can deal directly

12  with the witnesses and we don't have a problem.

13         So the answer to that is, I agree with

14  your Honor.  I don't think we have a problem.  I can't

15  imagine Marshal Rosado's integrity or judgment or

16  whatever he did in this case, coming into play.  But it

17  is possible.  It is possible.

18         Your Honor's read the ex parte statements.  I

19  don't know.  I am perfectly willing to go along with

20  your Honor's judgment on it.  I think -- in fact, I am

21  more than willing, I would ask to go ahead because this

22  is a matter that I think we have to expedite.

23         Mr. Patino has been not only put in the SHU,

24  he's been put in the highest priority in the SHU which

25  requires a lieutenant's presence whenever he is moved.

16

**Proceedings**

1   Apart from the problems that he's having, and your Honor

2   knows how the Basciano referred to that as the nuclear

3   option of the SHU, counsel has terrible problems.

4   Because there has to be a lieutenant present when we

5   visit, and I refer to myself, my paralegal or other

6   members of my office that may visit, we have to wait for

7   the lieutenant.  We have to wait for the lieutenant when

8   we leave.  It's not at all unusual that we'll get there

9   at 1 o'clock, finally get to see Mr. Patino at 3:00, when

10  four guards including the lieutenant escort him,

11  handcuffed behind his back, 50 or 60 feet from his cell

12  to the attorney interview room.  And then we have to

13  sometimes wait, a I have noted in my pleadings and my --

14  in the letters, three or four hours after we're done.

15        So it's six or eight or even nine hours to

16  visit him.  And this is inside of the process where his

17  mental capacity, I won't call it diminished, is

18  scattered.  He's totally isolated.  He gets 15 minutes

19  phone a month to his family.  The last such call, lasted

20  one minute.  Now AUSA Bode has just given me a letter

21  saying that he's looking into restoring that lost 14

22  minutes but this is three weeks later.

23        The man's totally isolated.  It's very

24  different for him to -- very difficult for him to

25  focus --

17

**Proceedings**

1        THE COURT:  Mr. Bode, sit down, please.

2        MR. MERER:  It's very difficult for him to

3    focus when we speak.  From what I gather, discovery

4    hasn't started yet, as least insofar as he is concerned

5    but I am fairly certain that when we go to trial, and I

6    believe we will, that the evidence against him

7    overwhelmingly will consist of eyewitness testimony.

8            And we have a good idea of who most of those

9    witnesses are and we are doing a lot of investigation to

10   counter what we expect we'll be hearing.  And it's

11   extremely important that we dialogue with Mr. Patino

12   regularly and we can't.

13           So his defense is suffering and I am truly

14   alarmed that he is deteriorating to the point where he is

15   becoming resigned to the fact there's nothing that could

16   be done.  He speaks Spanish, so when he's -- a unit

17   counselor knocks on his doors, they do once a day, you

18   okay, Patino?  And before he can answer, they're gone.

19   He asks for a blanket, it doesn't come.  He asks for

20   thermal underwear.  This is a minor issue but one that

21   came out in the last hearing where Ms. McFarland said,

22   but we got him his thermal underwear.  That's not true.

23   He never got it.  He never got it because it's not on his

24   commissary form.  And every time he asks for it, they

25   said don't worry about it.

18

**Proceedings**

1        It's just as he's never gotten any of the

2    administrative procedure requirement forms; BP-8, BP-9

3    and so on.  So it's not even a question of whether or not

4    we've exhausted our administrative remedies, they have

5    exhausted us.  And even were we to begin that process, it

6    would undoubtedly last, if it lasted, well past the time

7    where trial has begun, conducted and concluded.  And the

8    government will have had its way and we will have a

9    defendant with a diminished capacity to prepare for

10   trial, counsel unable to provide him with the assistance

11   he should have all because of a situation where the

12   government is refusing to make available whatever

13   witnesses they have against him.

14        And again, I should point out, your Honor, this

15   supposed threat that he made was not charged.  He wasn't

16   extradited for it.  He can't be tried for it.  So any

17   witnesses that the government might supply, so that the

18   Court and counsel can cross-examine them and conclude --

19   the Court can conclude whether or not, in fact that

20   threat is real, in fact whether it fits into the

21   parameters of <u>Basciano</u>, doesn't have any impact on the

22   trial.  The government isn't giving away something in

23   advance.  These are people that are here solely for that

24   purpose.

25        And I will point out to your Honor that some of

**Proceedings**

1  them, I am told, have already gotten cooperation

2  agreements based solely on their verification of that

3  threat and that's because Agent Viola has been active in

4  the jails in New York, in the jails in Washington, D.C.,

5  in the jails in Florida and throughout Colombia, even

6  though he is no longer assigned to the case according to

7  Mr. Bode's letter at the very outset.  He's out there.

8  He's talking to people.  He's saying tell me about the

9  threat.  Tell me how his wife is involved in the threat.

10  Tell me this and maybe you don't have a problem.  Don't

11  tell it to me and maybe you will have a problem.

12         That's what's going on your Honor and I am not

13  repeating hearsay.  I will supply that to the Court ex

14  parte if the Court so asks.  So having run on at length

15  at what I said would be a brief statement, your Honor,

16  the answer is I think we can overcome the Rosado --

17  Marshal Rosado problem and proceed.

18         THE COURT:  Mr. Bode, you hesitated as to

19  whether or not you were going to have to rely on

20  Mr. Rosado or Agent -- Marshal Rosado for whatever

21  presentation you -- the government might be required to

22  make.

23         MR. BODE:  Yes, your Honor.  Well, we have --

24  we've discussed this at length before Judge Seybert at

25  the last proceeding.  Judge Seybert -- and I don't know

20

**Proceedings**

1  if the referral's changed this but Judge Seybert talked

2  as proceeding as a bail hearing, in essence, at which

3  hearsay is admissible and I could use hearsay.

4           You know, these witnesses, you know, I have to

5  -- there's a very real worry that should a witness

6  testify that Mr. Patino will have their family murdered

7  in Colombia.

8           THE COURT:  Well, that's an issue that --

9           MR. BODE:  So, we've got to deal with --

10          THE COURT:  -- can be dealt with.

11          MR. BODE:  Yes.

12          THE COURT:  I --

13          MR. BODE:  So we've got to deal with those

14  issues.  So, you know, I -- if the situation's changed

15  since we were in front of Judge Seybert, you know, I will

16  accept that but obviously it's a little early yet to even

17  go down that road.

18          I would like to address, if I can, the comments

19  of counsel especially regarding the administrative stuff

20  because this is really the defense engineering a crisis,

21  your Honor.  The letters, which I gave to counsel this

22  morning and I handed up to the Court, are actually

23  letters that Mr. --

24          THE COURT:  You see, you're jumping ahead of

25  this because again, I wanted to resolve this question of

21

**Proceedings**

1   whether or not I am going to be involved in the decision

2   making process first before I hear all of the argument

3   about the merits.

4          MR. BODE:  Okay.

5          THE COURT:  Okay.

6          MR. BODE:  So just --

7          THE COURT:  There is one topic that I can

8   address with no problem at all and that's --

9          MR. BODE:  I will confine myself just to his

10  comments about the marshals then and I will get to the

11  other comments and some of his misstatements in a moment.

12          Regarding the marshal's -- counsel is incorrect

13  in that the marshals were investigating these threats

14  before the Court appearance.  This isn't an assignment by

15  Judge Seybert is my understanding.  As your Honor knows,

16  marshals investigate threats against AUSAs.  So they're

17  the agency that's tasked with that.  So that's -- my

18  belief is that and you can confirm that with the

19  marshal's service that that began --

20          THE COURT:  Well, hold on; your belief or you

21  know?

22          MR. BODE:  Well I was just talking to Agent Cox

23  about the time frame.

24          THE COURT:  Yes.

25          MR. BODE:  And it's both of our recollection

22

### Proceedings

1  that the marshals had already -- we had already spoken to

2  the marshals about the threat before the Court

3  appearance.

4          THE COURT:  Okay.

5          MR. BODE:  But, you know, I would double check

6  because it's been a few months, but I am sure that

7  happened before the Court appearance.

8          THE COURT:  All right.

9          MR. BODE:  Next, in terms of the --

10         THE COURT:  But did the government --

11         MR. BODE:  -- marshal's interactions --

12         THE COURT:  -- the United States Attorney's

13 Office initiate its own investigation; that is through

14 either my own or other --

15         MR. BODE:  We're investigating the threat

16 aspect of this case.  What was the question?

17         THE COURT:  The question was to the extent that

18 there was an allegation of threat against the United

19 States attorney --

20         MR. BODE:  Yes.

21         THE COURT:  -- you say that that matter was

22 referred to the marshal.  Was the matter of the threat

23 against the agent, who was also I understand the subject

24 of an alleged threat --

25         MR. BODE:  Yes.

23

**Proceedings**

1          THE COURT:  -- was that something that was

2  referred to the marshal's office or was that done --

3          MR. BODE:  The marshals don't -- will not

4  investigate --

5          THE COURT:  Correct.

6          MR. BODE:  -- threats against agents.

7          THE COURT:  So it is going to go to the agency

8  that Viola's attached to.

9          MR. BODE:  Yes, yes.  And --

10          THE COURT:  Did they undertake an

11  investigation?

12          MR. BODE:  Well, we have -- as part of this,

13  myself, Investigator Cox and a couple of agents from

14  Homeland Security, we have been investigating that aspect

15  of it.

16          THE COURT:  All right.

17          MR. BODE:  In addition, there's --

18          THE COURT:  So, that's a separate

19  investigation?

20          MR. BODE:  Yes.

21          THE COURT:  Undertaken about the same time as

22  the investigation by the marshals of the United States

23  attorney assistant, threat?

24          MR. BODE:  Yes.

25          THE COURT:  Okay.

24

**Proceedings**

1          MR. BODE:  I would say yes.

2          THE COURT:  So two simultaneous investigations.

3          MR. BODE:  Yes.  And there's a third

4    investigation which is the result of the defendant's

5    complaints, he got an Office of Inspector General

6    investigation going based upon a Colombian -- an

7    investigation that began in Colombia that -- the

8    investigation in Colombia since concluded that the

9    prosecutor in Colombia concluded there was no basis to it

10   and actually recommended an investigation of Patino,

11   Vallejo and Vallejo's wife be undertaken.

12          That Colombian prosecutor also publicly

13   released the findings.  She also made allegations of

14   corruption in her own agency against her bosses, et

15   cetera.  It's my understanding she was then promptly

16   fired from her agency.

17          But all that aside --

18          THE COURT:  All right.  So that was through the

19   office of the Inspector General?

20          MR. BODE:  Yes, that's the basis of what the

21   Inspector General began --

22          THE COURT:  All right.

23          MR. BODE:  -- an investigation of.  In terms of

24   the -- Marshal Rosado's interactions, I am really not

25   sure where counsel gets what he is claiming in terms of,

25

**Proceedings**

1   you know, Marshal Rosado was only able to observe and was

2   not able to ask questions, that's simply not the case.

3   And I really have no clue where counsel gets that from.

4           As I have noted at prior court proceedings,

5   he's -- Mr. Merer has a colorful way of speaking and

6   sometimes his words get away from him and he goes off on

7   tangents.

8           THE COURT:  You know, I don't want to hear

9   personal characterizations.  It's out of this.  Okay?

10          MR. BODE:  In terms of Marshal Rosado,

11  your Honor, that's the only thing I can address as to him

12  in terms of his interactions.

13          THE COURT:  So you --

14          MR. BODE:  I would like to address some of the

15  other things but we'll do that at a later point.

16          THE COURT:  It is my impression and I will be

17  perfectly candid with you, Mr. Bode, that if we get past

18  this exhaustion issue, that the Court is going to be

19  inclined, and this is my intention, I am going to either

20  go -- I am going to go to the source, okay?  That's my

21  aim.  I am not going to, you know, take a proffer.  I

22  think that the Court's responsibility in this regard,

23  given the severity of the confinement is to go to the

24  source.

25          MR. BODE:  And as I said --

26

### Proceedings

1      THE COURT:  Now that may not mean that

2  necessarily Mr. Merer's going to get a chance to cross-

3  examine.  It may be that we do that ex parte if I am

4  convinced that the risk of threat and death to the

5  witness is such that I can't take the -- you know, I

6  can't make him available publicly or her, whoever it

7  might be.

8      MR. BODE:  And as I said at the very outset

9  before Mr. Merer even spoke, you know, I had other folks

10 present.  Agent Cox was present.  I have to check, there

11 may be a witness or two that we were not aware of but

12 there's plenty on the threat that we could use if we were

13 going forward as discussed with Judge Seybert, but if

14 we're going forward with something else, I will roll with

15 it.

16     What counsel had proposed at the last

17 proceeding was I think an agent testifying without names

18 but if it's something ex parte, I will deal with it,

19 Judge.  I don't need Marshal Rosado for that.  So in

20 terms of that aspect of it, I think counsel and I are on

21 the same page.

22     THE COURT:  All right.  So I mean obviously if

23 things change, then you know we run the risk that at some

24 point in the middle of this, we find out that I can't

25 proceed, I don't know.  I just don't -- I certainly want

27

**Proceedings**

1  to put anybody through that situation but on the other

2  hand, Mr. Merer's expressed a desire to move this matter

3  forward.

4           MR. BODE:  And --

5           THE COURT:  And I am thinking right --

6           MR. BODE:  That's the aspect I would like to

7  address now, if I might and respond to his comments.

8           THE COURT:  Okay.

9           MR. BODE:  This is an engineered crisis by the

10  defense.  He's expressed a desire to move but it's a

11  desire only.  The letters that I handed out that he said

12  Mr. Bode just gave me a letter were letters that were

13  sent to Mr. Merer back in November.  When Mr. Merer

14  cross-examined the attorney -- the staff attorney from

15  the Bureau of Prisons who was the newly assigned staff

16  attorney about all his letters that were supposedly

17  unanswered, he didn't hand up to the Court, we didn't

18  discuss the fact that they had been responding to his

19  letters but by the prior staff attorney.  So I wanted to

20  hand those up to the Court.

21           It's my understanding that the Bureau of

22  Prisons is also preparing responses for the Court and/or

23  counsel that they indicated they would get in later this

24  week regarding some of the new claims being raised in the

25  last week or so.  But I wanted to proffer these to the

28

**Proceedings**

1  Court.

2          Obviously we first need to reach the question

3  of administrative remedies and I would note in the letter

4  of November 13, the staff attorney at that time discussed

5  how to begin this administrative remedy process, gave his

6  number, gave his extension, should Mr. Merer wish to --

7  wish assistance in that process.

8          What's happened is the defense has refused to

9  avail themselves of that process on purpose because

10  they're trying to engineer a crisis here, I submit.  And

11  that's the letter I just gave counsel.  It's actually a

12  letter that counsel had not provided at the prior

13  hearing, that had been left out in his cross-examination

14  of the -- Ms. McFarland.  And I thought I should call the

15  Court's attention to that because I was very surprised to

16  learn of these letters, obviously, when I was -- received

17  them.

18          THE COURT:  All right.  But let me just ask a

19  couple of questions and as I said, I --

20          MR. MERER:  Your Honor?

21          THE COURT:  -- don't have the same familiarity

22  with the record as you do but --

23          MR. MERER:  Your Honor?

24          THE COURT:  Yes.

25          MR. MERER:  I am sorry to interrupt.

29

**Proceedings**

1          THE COURT:  Go ahead.

2          MR. MERER:  And I really don't want to get into

3    a tit for tat.  I just want to very briefly point out

4    something.  I am just looking at the letters that

5    Mr. Bode gave me, everything in these letters is

6    absolutely true.  I did make inquiries as to how

7    Mr. Patino's Colombian lawyer can visit.  The staff at

8    MDC was very courteous about that.  I made inquiries

9    about how to do a lie detector test.  They were courteous

10   about that.  How to make social calls.  All of this

11   stuff is fine.

12          That wasn't the basis of any my complaints.  I

13   didn't see the need to complain about things that they

14   were doing.  It was the things that they weren't doing

15   that was the problem.  The things that were causing him

16   extreme discomfort, the things that were interfering with

17   his right to counsel; that was what existed.

18          So what Mr. Bode is just saying is absolutely

19   true.  They were very cordial, very nice about the stuff.

20   It's the important stuff that we're objecting to.

21          Secondly, I just feel obliged to point out that

22   on page 87 of the transcript, Mr. Bode says:

23          "Mr. Bode:  Agent Rosado is the agent in charge

24   of the threat assessment."

25          This is a quote.

30

**Proceedings**

1        "Mr. Bode:  He hadn't shared that with me but

2   when I've spoken to witnesses who I believe have

3   information as to the threat, I have asked him to come

4   along to be able to listen in as to these witnesses.

5   That's his job."

6        That's why I believe Agent Rosado wasn't

7   proactive.  That he simply was there to observe.  I

8   didn't have the opportunity, but I believe it's elsewhere

9   in the transcript were Mr. Bode describes Agent --

10  Marshal Rosado, excuse me, his participation in that way.

11       THE COURT:  All right.  Let me just start with

12  this process that the Bureau of Prisons has with respect

13  to the administrative segregation.  One of the issues I

14  noted raised by Mr. Merer is that the notice of

15  administrative segregation which is supposed to spell

16  out, according to the rules and regulations, the

17  rationale for the segregation.  That document, I don't

18  remember the number of it, was supposed to be delivered

19  within a 24-hour basis and set forth the reasons.

20       The first complaint is that it's deficient.

21  The second issue that -- speaking to the exhaustion

22  question, is that the regular, routine review that the

23  regulations require, I've looked at the transcript of the

24  prison official McFarland that was here, I must tell you,

25  she seemed not to know very much about how this process

31

**Proceedings**

1   went, if that's why you're relying on to argue that the

2   administrative exhaustion, you know, has sufficed or was

3   available, then that's sure deficient.

4           MR. BODE:  Well let me say, your Honor, we

5   didn't know we were having a hearing until the judge said

6   call your witness.

7           THE COURT:  Okay.

8           MR. BODE:  And I really wasn't sure if she was

9   talking to Mr. Merer or me but I brought the attorney

10  from the BOP -- from MDC all the way here to try and

11  answer what I thought, and what I told her, was the -- I

12  thought was actually some of the other issues that I

13  couldn't really address; the telephone and things like

14  that.

15          My understanding is she wasn't the staff

16  attorney for the past few months.  She's been recently on

17  this and I note the letters; previously it was

18  Mr. Johnson who was dealing with this.  So I asked her if

19  she would look into that for the Court.

20          My understanding is if she didn't send it out,

21  she was sending it out very recently, this week, letters

22  to counsel regarding some of these matters and I know she

23  was preparing a letter for the Court.  I told her once I

24  appeared here today, you know, we could kind of figure

25  out in terms of scheduling and everything, I would -- you

**Proceedings**

1  know, she should probably direct those to your Honor, as

2  well.

3          THE COURT:  But, Mr. Bode, this is like many

4  moons since the complaints were made.  I mean, you know,

5  the fact is that --

6          MR. BODE:  Well let me say, your Honor --

7          THE COURT:  -- this supports Mr. Merer's

8  argument that it's taken judicial review to get the

9  Bureau of Prisons to do some of the things they should

10  have been doing.

11          MR. BODE:  They haven't even started the

12  process, Judge.  They refused to start the process.

13          THE COURT:  Well you say they haven't started

14  the process but there's no doubt that there's a number of

15  letters, correspondence, back and forth, trying to

16  address even some of the smaller issues without

17  resolution.

18          MR. BODE:  Frankly, your Honor, if counsel is

19  not -- in the letter of November 24 -- actually, November

20  13, which is just days later, they outline where to go to

21  look at the administrative -- where the remedy process

22  is.  You know, the regulations permit attorneys to assist

23  inmates in filing the paperwork.  The inmates have to

24  sign them.

25          THE COURT:  Well hold on.  Let's not mix apples

33

## Proceedings

1  and oranges.

2          MR. BODE:  And gives the number --

3          THE COURT:  Okay?  Apples and oranges in my

4  opinion; the apples here are the obligations of the

5  Bureau of Prisons to follow the regulations with respect

6  to administrative segregation.  That is the rules are set

7  forth in a very clear fashion.  There are specific

8  timetables that the Bureau of Prisons is supposed to

9  follow with respect to administrative segregation.

10 There's monthly review that's supposed to occur.

11         MR. BODE:  And I have asked --

12         THE COURT:  And I am not sure that any of that

13 has happened.

14         MR. BODE:  No.  And I have asked them to -- I

15 have asked her to familiarize herself with those things,

16 so that it can be addressed with the Court.

17         THE COURT:  Okay.  So that's --

18         MR. BODE:  But --

19         THE COURT:  -- the apple in this case.  The

20 oranges might be the other issues, you know, the thermal

21 underwear and whether or not you know he used the right

22 form for complaining about thermal underwear.  But I

23 don't want to like blend all of these problems together,

24 I mean --

25         MR. BODE:  Well, the administrative remedy

34

**Proceedings**

1  process is for resolving both types of things.  I mean it

2  should be a different -- obviously a different letter in

3  terms of the content, the substance of it.  But it's --

4  the process isn't the same.

5          And if Patino had availed himself of this, if

6  counsel simply weren't trying to engineer this into a

7  crisis, we would frankly be done with this process

8  already.  He received this letter in November, did

9  nothing and --

10          THE COURT:  What do you mean by that?  You

11  know, is there any question in the Bureau of Prisons'

12  mind that he's complaining about administrative

13  segregation?

14          MR. BODE:  Well --

15          THE COURT:  And what's been done about that?

16          MR. BODE:  Judge, I submit there is -- you have

17  to submit -- the way the Bureau of Prisons -- I mean it's

18  tough, your Honor.  I am here --

19          THE COURT:  Yes.

20          MR. BODE:  This was referred.  It was on for a

21  status today and not a hearing, so I don't have someone

22  from BOP here to address this.  So I can talk to it --

23  talk at it as best as I can.

24          THE COURT:  Then here's what I would recommend,

25  okay?  You're not prepared to answer these questions but

**Proceedings**

1  these are the questions the Court has.

2       MR. BODE:  I asked them to look at this since

3  we were on a few days ago and I have asked them to look

4  at this and, you know, after -- the first thing they were

5  able to locate was the initial notices for each defendant

6  which defendants had claimed they had never received.  So

7  that was the starting place.

8       THE COURT:  All right.  So here's my plan.

9  First I needed to resolve this question of whether or not

10  I can remain on this case.  I'm satisfied now that both

11  sides want me to continue with this case for whatever

12  reasons.  They feel that this is going to be -- that

13  Marshal Rosado is not going to present a problem to my

14  participation in this case.  If that changes, you'll let

15  me know.

16       Secondly, I didn't expect that we would

17  undertake an evidentiary hearing starting today because I

18  wasn't sure if I was going to be on this case and I

19  haven't fully reviewed the entire record that's been

20  developed up to this point.  Thanks to Mr. Merer, I have

21  at least a chronology that I can focus on and I am going

22  to do that.  If you want to submit something, Mr. Bode,

23  you --

24       MR. BODE:  Yes.  And if I could just take a

25  look at what he handed up --

36

**Proceedings**

1          THE COURT:  Of course.

2          MR. BODE:  -- just to make sure I have it all

3    before -- at the end of the proceeding is fine.

4          MR. MERER:  Judge, may I just --

5          THE COURT:  Yes, hold on.  Let me just finish.

6    And then I want to -- today, I think there's no question

7    that we could at least address the smaller -- the tail of

8    this, which is the Long Island designatio.  I think

9    that's a very small component of this.  We should be able

10   to resolve that today.

11         But I am very interested, first of all,

12   Mr. Bode, in the -- you know, you rely heavily on the

13   Prison Law Reform Act, the "PLRA" as a basis for arguing

14   administrative exhaustion.  The case law makes clear that

15   there's another avenue for challenging conditions of

16   confinement and I believe -- you know, it's clear that

17   that's the vehicle that's being used to challenge the

18   conditions of confinement here, that is the habeas

19   process, which doesn't -- you know, doesn't address

20   statutory exhaustion.  It's a different form of

21   exhaustion.  It's what the Courts have described as

22   judicial exhaustion.

23         And it seems to me that to the extent that I

24   have read the case law on this and again, I've read the

25   Basciano case and the Bell case and some of the others is

37

**Proceedings**

1  Judge Irizarry's case, that the Courts jump in.  That is

2  Judge Block's case, as well.  And then that is that to

3  the extent that the Court has a concern that

4  constitutional issues impinging on liberty interests are

5  involved, that the Court's going to jump in and assure

6  itself that there is a sufficient basis for it and that

7  it's not punitive.

8           So I throw that out to you, just to give you

9  the head's up of what my review of the case law reveals.

10  So you need to move off of the PLRA and start focusing on

11  the habeas aspect of this in order to -- if you want to

12  approach this, you know, on the law, then that's the law

13  that you have got to be considering.  So that's number

14  one.

15           Number two, is that even if we focus on the

16  habeas component of this, as I have said, the Courts have

17  said there's still some element of judicial exhaustion

18  that's involved.  I'm not clear what judicial exhaustion

19  consists of.  The one thing that I do know from the

20  regulations is that the -- independent of whatever

21  obligation the defendant has to pursue administrative

22  remedies, the Bureau of Prison has its own obligations

23  when it comes to this kind of segregation.  And I don't

24  know and the record seems to indicate that -- and again,

25  I don't have a firm answer on this but it looks like the

38

**Proceedings**

1  Bureau of Prison dropped the ball and they haven't done

2  what they're supposed to be doing under the regulations

3  which would in my mind, satisfy the judicial exhaustion

4  issue.

5       So that's where I am headed.  If the record is

6  not complete and you need to add more to disabuse the

7  Court of that notion, that's fine.  I am also concerned

8  about this idea that you know, if you don't file the

9  right form, you don't get the review.  There's no

10  question that this defendant's been complaining about

11  segregation and I am not going to exalt form over

12  substance.  So that's another aspect of this.

13      In any event, those are my thoughts.  You can

14  address them as you see fit.  I don't expect you to

15  address them today but that's the kind of the world of

16  ideas I am living in right now.

17      MR. BODE:  And, let me say, I've obviously got

18  similar thoughts in terms of your Honor, in terms of what

19  I am pursuing because although I submit they haven't even

20  tried administratively.  And the BP-8 is an informal

21  complaint.  They haven't even -- they need to do the BP-9

22  which I have set forth in my letter.  We've given them a

23  copy of.  You know, there's -- besides the whole issue in

24  terms of the special housing unit, all these others

25  issues, they're not attempting any of those other issues

39

**Proceedings**

1   either.

2          You know, I submit it's beyond question that

3   long underwear is an administrative question and they're

4   not -- they would rather not engage that process.

5          THE COURT:  I ultimately think that the long

6   underwear is going to be a problem that we can resolve

7   with no problem.

8          MR. BODE:  I submit we can, Judge.

9          THE COURT:  Okay.

10         MR. BODE:  In terms of the BOP regulations,

11  obviously the -- as I indicated, you know, my reading of

12  the PLRA, I submit is a little different in terms of what

13  went on and what Judge Irizarry found in <u>Kahn</u> (phonetic).

14  But be that as it may, I have already spoken with the

15  BOP.

16         The first order of business, had they even

17  received a notice, they both claimed under oath they

18  hadn't.  We've shown they have.  Well, I will bring in

19  the officers, if need be, who gave it to him but now I

20  will also, you know, speak with the BOP about that

21  further administrative process; the monthly reviews, et

22  cetera.

23         THE COURT:  Again --

24         MR. BODE:  I can't speak to it off the cuff.

25  But I will --

40

### Proceedings

1    THE COURT:  I just want to make clear, I am not

2 trying to, you know, bypass the rules.  You know, to the

3 extent that the plaintiff wants -- the petitioner here

4 wants, you know, toothpaste, he's going to have to file

5 the form or the request.  I am not going to allow

6 somebody to jump at the Court every time they need

7 toothpaste.

8    On the other hand, to the extent that

9 constitutional liberty issues are raised and significant

10 interference is occurring with the right to counsel,

11 that's the kind of question that the Courts do jump into

12 when they feel that the circumstances warrant.

13    MR. BODE:  Yes.  And, you know, I would note --

14    THE COURT:  And that's what's raised here.

15    MR. BODE:  Yes.  And I would note that the --

16 way back in November, that the BOP was already dealing

17 with that issue.  When I spoke to Ms. McFarland, I think

18 it was yesterday or the day before, she was having all

19 the logs pulled and everything pulled, so that we can try

20 and get to the bottom of those things.  You know, I think

21 she -- because she wasn't the attorney originally on

22 this, she's not as familiar with the older stuff.

23    THE COURT:  All right.  I got it.

24    MR. BODE:  So, she's familiarizing herself now.

25    THE COURT:  Okay.

41

## Proceedings

1    MR. BODE:  So, I know she is looking for the

2 opportunity to assist the Court in answering those

3 questions.

4    THE COURT:  All right.  So that's the universe

5 of ideas.  And we're going to -- you know, when -- I will

6 give you a date when we'll actually physically start this

7 process.  I want to look through all of the paperwork.  I

8 haven't had that -- I've clearly started the process but

9 I am not ended.  It hasn't finished.

10    MR. MERER:  May I?

11    THE COURT:  Yes, Mr. Merer.

12    MR. MERER:  Just briefly, your Honor.

13    THE COURT:  Yes.

14    MR. MERER:  In the interest of judicial

15 economy, and also as it relates to Mr. Patino's rights,

16 all of these other issues that Mr. Bode just spoke about

17 that should not come to the Court's attention and the

18 Court said obviously they shouldn't, all of them are

19 because he's in the SHU; and has the thermal underwear,

20 the lack of calls and so on.

21    THE COURT:  Yes.

22    MR. MERER:  So, the SHU is the issue.

23 Secondly, as we have expressed, we need to proceed

24 expeditiously.  Mr. Bode is free to bring whatever

25 witnesses he wants but I truly don't see the point of him

42

**Proceedings**

1  bringing in witnesses such as Ms. McFarland or personnel

2  from the BOP to testify as to what did or did not happen.

3          I will tell you that up until the point where

4  we filed this latest round of motions, I personally

5  requested of many lieutenants and other correctional

6  officers, that Mr. Patino receive his BP-8, HIS BP-9 and

7  start the process.

8          I was always told in a very nice way, no

9  problem.  But there was a problem; he didn't get it.  Now

10  once that happened, I instructed Mr. Patino not to file

11  anything because Id ont' want to get caught up in that

12  morass because despite what Ms. McFarland testified as to

13  the 20 days in the decision and then it goes another 20

14  days and it goes to regional, I know from bitter

15  experience that these things go on for years because

16  there's a thing called adjournments, just like there are

17  in court.

18          So I don't see the need for BOP to come in if

19  we get over the threshold issue of whether or not the

20  administrative remedies need to be exhausted because then

21  it's moot.

22          THE COURT:  Yes.

23          MR. MERER:  I think what we really should do

24  and I am in total accord with your Honor about going to

25  the issues that we can resolve today, is get to the

43

**Proceedings**

1   issues.  Now Mr. Bode may want to bring in his witnesses

2   or your Honor may make a determination as to how those

3   witnesses will be dealt with.  I have made some

4   suggestions that I think you might have seen in my

5   transcript.

6           Nevertheless, that has to happen another day, I

7   hope soon.  But the issue as to the related case, the

8   issue as to how we're going to proceed, whether we have

9   to bring in these BOP people which is really nothing to

10  do with the underlying issue, I think we can resolve

11  today.  I don't see why this whole three-headed motion

12  can't be resolved today and at the next appearance which

13  will hopefully be in the near future.

14          THE COURT:  Well but Mr. Merer, don't you

15  acknowledge that, you know, clearly the government has

16  not waived the exhaustion issue.

17          MR. MERER:  Clearly.

18          THE COURT:  And clearly the case law says that

19  there is this aspect of judicial exhaustion and an

20  element of reviewing whether or not the judicial

21  exhaustion element has been made, involves some review of

22  what's happened up to now.

23          MR. MERER:  Okay.  Your Honor, then I will just

24  ask -- well I am sure the Court will have no problem with

25  that.  I did not include in my packet my letters to MDC

44

**Proceedings**

1  which I referred to in my cross-examination of Ms.

2  McFarland.

3          THE COURT:  Yes.

4          MR. MERER:  I will submit them to the Court.

5          THE COURT:  You need to do that.

6          MR. MERER:  Yes, I will.

7          THE COURT:  That's clearly what I am referring

8  to.

9          MR. MERER:  And again, just so we can move

10 quickly --

11         THE COURT:  Right.

12         MR. MERER:  -- I have no issues with the two

13 letters that Mr. Bode gave me today.

14         THE COURT:  All right.

15         MR. MERER:  These are things that BOP did

16 right.

17         THE COURT:  Okay.

18         MR. MERER:  It's the problems that we're

19 talking about.

20         THE COURT:  Okay.

21         MR. MERER:  Finally, I just want to point out,

22 your Honor, and I just can't let this pass, not only do

23 we say that BOP dropped the ball, we say that they're

24 totally misleading the Court.  This, I suppose it's a

25 review, two of which are attached to Mr. Bode's last

45

**Proceedings**

1  submission by lieutenants who supposedly were to give

2  this to Mr. Patino or at least to counsel, were never

3  given to him or to myself.

4          But nevertheless, it's interesting to note that

5  the first one is dated October 29 at 9:30 in the evening.

6  That's the day after Mr. Patino arrived at MDC.  And, "It

7  is this office's decision" -- and this is just

8  boilerplate because it appears in all of these decisions,

9  whether it's in his case or not, "It's this office's

10 decision based on the circumstances that the inmate's

11 presence poses a serious threat to life, property, self,

12 staff, other inmates or security or orderly running of

13 the institution."  That is simply boilerplate, taken out

14 of the administrative -- the applicable administrative

15 code.

16         I can tell you that whatever information BOP

17 had came from the marshal.  This is the day after he went

18 to SHU, which is the only place he's ever been.

19         THE COURT:  Yes.

20         MR. MERER:  And whatever information the

21 marshal got came from the United States Attorney's

22 Office.  Nevertheless, on October 24, Mr. Bode's letter

23 to the Court states that not only is he now in the case

24 and AUSA Klapper and Agent Viola are no longer assigned

25 to the case, he says, "to the extent that we seek to

46

**Proceedings**

1  direct the Bureau of Prisons to make certain findings as

2  to threat assessment in housing, that's premature."  If

3  BOP requested threat assessment from the government, such

4  evaluation will be made by Mr. Bode or his superiors.

5        Now that's disingenuous, your Honor.  He is

6  saying if they do, when in fact, it had already been made

7  by Ms. Klapper because she told me it had been made.  And

8  I represent that as an officer of the Court.  And that's

9  why three weeks earlier I had that motion to

10  Judge Seybert.

11        THE COURT:  All right.

12        MR. MERER:  So this is a process that was

13  locked in place and everybody is in lock step with the

14  process locked in place.  And that brings us here and I

15  don't see the need to waste time once your Honor is

16  satisfied, if your Honor is satisfied, that we get past

17  that exhaustion problem.

18        THE COURT:  Well I am very close to that.  I do

19  think thought that I need to give the government, to the

20  extent that they still want to argue the point, the

21  opportunity to present what they think I need to consider

22  but I mean that seems -- I am not going to prevent them

23  from doing that but I am very much aware that that

24  initial review had to -- the information for that initial

25  review of the Bureau of Prisons had to have come from the

47

**Proceedings**

1   United States attorney and the investigative --

2             MR. MERER:  Yes.

3             THE COURT:  -- you know, the investigator.

4             MR. MERER:  And along those lines, your Honor,

5   you were just discussing with Mr. Bode, the

6   investigations that took place.  One of the things that I

7   found particularly disturbing from the get go is that

8   AUSA Klapper totally ignored the allegations of the

9   extortion against Agent Viola, flat out told me it was

10  impossible and never, never did anything to investigate

11  that.  They may have paid lip service to it, your Honor,

12  but the only people that are investigating that is the

13  Office of Investigations of Homeland Security.  They're

14  actively investigating it.

15            And one other thing that Mr. Bode says is

16  factually incorrect.  There were dual investigations; one

17  in Bogota and the one I just referred to out of

18  Washington.  The one in Bogota, frankly, is a he said, he

19  said situation.  Someone says they gave Agent Viola

20  money.  Someone else says they didn't.  So it's not

21  surprising that that is not merely as weighty as the

22  investigation here which has been going on quite

23  seriously for over a year, I can tell you that.

24            That investigation which was recently dropped

25  was conducted by a prosecutor who came to Washington --

48

### Proceedings

1   to Miami and spoke to Agent Viola.  Her trip was paid for

2   by ICE.  She spoke to Agent Viola.  She took his

3   affidavit.  We have a copy of that.

4           She also went to the jail and spoke to the two

5   people, the two original witnesses who made the threat

6   allegation against Mr. Patino that landed him in the SHU

7   in the first place.  Mr. Bode says these agents --

8   there's other witnesses since then.  We shall see.

9           Of those two witnesses, she took their

10  affidavits, as well.  One of them indeed says yes, there

11  was a threat made.  Interesting to note that his attorney

12  has a client in this case -- in Mr. Patino's case, who is

13  I believe cooperating.

14          The second witness said I don't know anything

15  about it.  And the affidavit was ended.

16      Then apparently there was an amendment to the

17  affidavit in which he says I recollect now everything and

18  he proceeds to say exactly what the first witness says.

19  Interestingly enough, his attorney is no longer present.

20  So I don't know the circumstances of that.

21          However we've submitted to the Court the

22  psychological evaluation of that second witness who was

23  kept in isolation in Combe (phonetic) because he tried to

24  kill himself and attacked other inmates.  His son and his

25  father committed suicide.  He's got serious problems.

**Proceedings**

1   He's on serious medication.  The side effects of which I

2   have included in my package, your Honor, so you can see

3   that both being on the medication and/or the withdrawal

4   from the medication creates mental instability.

5           Those were the two witnesses that the

6   government relied upon to put Mr. Patino in the SHU.

7   Since then, and Mr. Bode incredibly to me says there's

8   still witnesses we haven't spoken to which alarms me

9   because I want to move quickly, so I would ask the Court

10  to direct the government that if they have witnesses, to

11  speak to them or to follow the Court's direction as to

12  the procedure to be followed immediately.  We can't waste

13  any more time.  It's simply not right.

14          MR. BODE:  I am not going to discuss with

15  counsel the -- where witnesses are or what they might be

16  doing and how we're proceeding.  You know, if we get to a

17  point where I have to show the threat's real, I have no

18  doubt I can do that and I will do it with as many

19  witnesses as I need.

20          THE COURT:  Well I guess the point is that you

21  should not be caught by surprise if I turn to you and I

22  say okay, I am ready to hear from the witnesses.

23          MR. BODE:  Well and that's why, you know, (1) I

24  would like to -- you know, I am -- I still think that --

25  you know, that the defense has to make some effort here

50

**Proceedings**

1   whatsoever and I submit they have engineered this into a

2   crisis.  He's instructed his client not to file the

3   administrative review.

4            THE COURT:  Mr. Bode, I guess you're not

5   getting my point.  I think you're hanging on by your

6   fingernails on that issue. So you know, the point is you

7   can still cling to it.

8            MR. BODE:  Well, no --

9            THE COURT:  You may be able to, you know -- you

10  may be able to convince me otherwise but I am very

11  inclined to --

12           MR. BODE:  I seek to.

13           THE COURT:  What?

14           MR. BODE:  I seek to.

15           THE COURT:  Okay.  But I am very inclined to

16  review this because of the concern I have as the Court

17  for the constitutional issues that have been raised.

18           MR. BODE:  I guess I am just a little shocked

19  in terms of counsel's basically repeating what he said at

20  the last hearing that he has instructed his client not to

21  pursue the review process in essence because he thinks

22  they all take too long, et cetera.  And there's a review

23  process that was outlined, you know, three, four months

24  ago.

25           But moving -- aside from that, which you know,

51

### Proceedings

1  I obviously --

2       THE COURT:  The administrative segregation is a

3  very extreme form of segregation which is why the Court's

4  become concerned about it.  And you know, courts being

5  courts, they want to make sure that things are fair.

6       MR. BODE:  I totally understand, your Honor.

7       THE COURT:  And so that's why they jump in and

8  examine these questions to make sure that there is some

9  review of the process, especially when you have

10  allegations as exist in this case, whether they're

11  baseless or not, who knows.  I don't have a judgment yet

12  on that issue.

13       But allegations that the information that

14  resulted in the defendant being segregated in this

15  fashion came from people who have an axe to grind.  You

16  know who -- not only an axe to grind, are corrupt.

17  That's the allegation that Agent Viola is corrupt and has

18  corrupted the process.

19       So once allegations of that type are made, it

20  seems that, you know, especially when it's clear that the

21  Bureau of Prisons is going to rely on the allegations of

22  that agent to do its threat assessment, then it almost

23  leaves the Court with no choice but to take a look at it.

24       MR. BODE:  Well I submit in the absence of

25  threat frankly, that special housing would be the

52

**Proceedings**

1  appropriate place to house Mr. Patino given his history,

2  given his resources.

3         THE COURT:  Okay.

4         MR. BODE:  But that's a road that we may go

5  down.

6         THE COURT:  But you have illicit -- you have

7  made clear that the reason why he's in the SHU is because

8  of the threats.  That was the principle reason that the

9  government says is the basis for him being there, at

10  least --

11         MR. BODE:  Well actually that's -- what I said

12  in my letter, your Honor --

13         THE COURT:  Yes.

14         MR. BODE:  -- turning to paragraph 2, was

15  twofold.

16         THE COURT:  Yes, there's a separate --

17         MR. BODE:  (1) the conspiracy and (2) that

18  destabilizing effect he would have in a general prison

19  population --

20         THE COURT:  Right.

21         MR. BODE:  -- where he has access to all of

22  these other inmates, in essence, to do his bidding and

23  that aspect of it as well and I don't --

24         THE COURT:  That's a -- you know, and maybe

25  there's more to this than that but that seems like such a

53

**Proceedings**

1  generic statement that it basically had no impact on me

2  at all.  But that doesn't mean there's nothing to it.

3          MR. BODE:  Oh, no.

4          THE COURT:  You can say that about any

5  prisoner.

6          MR. BODE:  Well I submit Mr. Patino is not any

7  prisoner in terms of, you know, he's a -- not to be glib,

8  you know, he's a multi-million dollar murderer.  He has

9  access to money.  He has demonstrated in the past his --

10          THE COURT:  Look, I don't want to argue this

11  point.  This is -- there's no point.  There are many

12  prisoners who have access and clout and who, if that were

13  the criteria, would be in the SHU.  That is, their

14  ability to circulate amongst the population and influence

15  other prisoners to do their bidding, you know, that can

16  be said about a great number of prisoners.

17          MR. BODE:  And, you know, I will -- if I have

18  the opportunity, you know, I may seek to put in evidence

19  in terms of his threats in the Colombia, et cetera.

20          THE COURT:  Okay.

21          MR. BODE:  But I guess what I would ask now,

22  rather than simply rehashing what's gone, in terms of the

23  prior argument, over and over again --

24          THE COURT:  Yes.

25          MR. BODE:  -- if we can, you know, put this

54

**Proceedings**

1  down, I would ask for a chance to, you know, argue.  And

2  even in terms of as your Honor indicated, besides the BOP

3  exhaustion, the judicial exhaustion issue, and I will,

4  you know, get BOP here to deal with that aspect of it.

5          THE COURT:  You're not precluded.

6          MR. BODE:  And then if we're moving on beyond

7  that, you know --

8          THE COURT:  Be ready.  That's the point.  And

9  you know if we move on beyond that, you better be ready

10 because I am not going to -- you know, we're not going to

11 delay it another several weeks, so you can prepare.  I

12 think that what I am telling you is be prepared for the

13 possibility, which looks like a probability now, but

14 again I don't want you to misconstrue what I am saying.

15 I'm just --

16         MR. BODE:  No, it's just -- I just need to know

17 in terms of if we do move on, how we're going to move on

18 because it makes a difference.  If witnesses are

19 interviewed, you know, ex parte or in camera versus if

20 they're --

21         THE COURT:  I thought I made myself clear.  If

22 you convince me that the witnesses are in such danger

23 that to produce them for -- in court would create such a

24 dangerous situation for them and their families, if I am

25 convinced of that, then I can assure you that I will take

55

**Proceedings**

1   that review in camera.

2             MR. BODE:  Okay.

3             THE COURT:  But I have to be assured of that.

4             MR. BODE:  Yes, so I just want to -- need time

5   to make -- to take precautions.

6             THE COURT:  But there's at least two witnesses

7   that the defendants know of, it seems, I mean that are no

8   secret here that, you know, there's no such -- it doesn't

9   seem they would warrant that kind of protection.

10            MR. BODE:  Well, I still -- in terms of those

11  witnesses, you know, I agree in terms of they've -- you

12  know, they've in essence been outted, so-to-speak shall

13  we say.

14            THE COURT:  Right.  That's a, you know --

15            MR. BODE:  So, you know, in terms of those

16  witnesses, I've got to move them.  I will start that

17  process, although I am -- in terms of my position, I

18  don't change my position.  But obviously I am going to

19  get ready, Judge.  You don't have to tell me to get ready

20  for a hearing.

21            THE COURT:  No, okay.

22            MR. BODE:  I just need to know what we're

23  doing.

24            THE COURT:  That's the only point I am making.

25  All right.

56

**Proceedings**

1        MR. MERER:  Judge?

2        THE COURT:  Let's talk about the Long Island

3   case designation.

4        MR. MERER:  Wait, your Honor.

5        THE COURT:  Yes.

6        MR. MERER:  I'm sorry.  Again, I apologize but

7   Mr. Bode said again something I just want to briefly

8   respond to.  This argument that he just discussed in this

9   paragraph 2 about the destabilizing effect on the

10  calculation, I don't believe this was referred to

11  your Honor.  This is Judge Seybert's -- a letter to

12  Judge Seybert regarding the lead defendant in this case,

13  Luis -- Mr. Gomez Bustamente.  Books have been written

14  about this fellow.  His nickname is "Rasguno".  There's a

15  tella novella about him.  He has supposedly has killed

16  many, many hundreds of people.

17       AUSA Klapper wrote a very well-written

18  exhaustive ten-paged document to Judge Seybert as to why

19  he would have a destabilizing effect in the population.

20       THE COURT:  Bustamente.

21       THE COURT:  Mr. Bustamente, the lead defendant

22  in this case.  Mr. Bustamente had been in the SHU.  He

23  had been complaining about it.  It went before Judge

24  Seybert.  Lo and behold, Mr. Bustamente is now in a CTF

25  facility, which is a private jail in Washington, D.C.,

57

**Proceedings**

1  which happens to house hundreds of Colombian inmates

2  because they bring them to the District of Columbia

3  district court on these 959 import cases.

4         He's there because the government upon

5  information and belief accepted his cooperation.  So all

6  of the sudden those concerns don't matter.

7         There's another fellow who is even more well-

8  know.  He's known by the name of "Lollipop" or "Chupetta"

9  (phonetic).  He is again, a North Valley cartel leader

10  and I refer to him because that will come up in the

11  related argument case, which we're going to segue into in

12  a moment but he not only has killed hundreds of people

13  and has admitted it, I believe to the government, among

14  his victims were a registered United States informant, a

15  fellow named, I believe Patino Formecchi (phonetic), no

16  relation here.

17         He, too, was in the SHU and on those days where

18  I would spend my six or eight hours and my paralegal

19  would, visiting Mr. Patino, Mr. -- his name is Juan

20  Carlos Ramirez Abadia (phonetic), would be in the next

21  cubicle because he would have someone come to take him

22  out every day.  He couldn't stand the segregation in an

23  eight by six cell.  He, too was kept there until

24  magically, he's returned to general population.  Why?

25  Because he's now cooperating.

### Proceedings

1    So clearly what the government is doing is

2 rewarding those who cooperate and say now wait a minute,

3 you're not cooperate, you're a bad guy, you're a threat.

4 That's what's happening here, Judge.  And it's pretty

5 clear if you're out there dealing with the situation.

6    It's just bewildering to me that it's gone on

7 for so long, so frequently and no one seems to have done

8 anything about it.  But in this case I feel obliged to do

9 whatever I can do because Mr. Patino is not going to be

10 able to prepare for what's going to be an extended trial.

11 He simply isn't going to be able to do it in the present

12 conditions, nor can I.

13    And having said that, your Honor, I am ready to

14 talk about the related case motions.

15    THE COURT:  All right.  So let's talk about the

16 related case.  How does the designation come up?

17    MR. BODE:  I am going to summarize, your Honor.

18 I regret, I grabbed half the file.  I must have left out

19 the folder regarding -- with my prior letter about this.

20 But to summarize our submission, these defendants are

21 charged in two separate instruments; superseder 8 and

22 superseder 9 respectively and I think Mr. Patino is in

23 superseder 9 is my understanding, is what he is here

24 before the Court on.

25    The original case as to -- was filed in 2002 as

59

**Proceedings**

1  to Bustamente, I believe.

2          THE COURT:  Right.

3          MR. BODE:  That case was -- and I apologize, I

4  don't have it in front of me, Judge.  I grabbed the wrong

5  folders.  That case was -- we summarize it in our letter,

6  however -- that case was related to some money remitter

7  cases which were before Judge Seybert.  Prior to that,

8  there's a chain of cases and we set it forth in the

9  letters and I'll get those for the Court and provide

10  them.  They're just down in my office.

11          These cases had originally -- the first case

12  had gone to Judge Seybert when she was sitting in

13  Brooklyn.

14          MR. MERER:  I'm sorry, sitting in where?

15          MR. BODE:  Sitting in -- well, I don't know if

16  she was sitting -- I think the case was a Queens case but

17  I think Judge Seybert was sitting in Brooklyn at the

18  time, is my understanding.

19          THE COURT:  Well, when a judge -- was she --

20  well, I don't know.

21          MR. BODE:  So --

22          THE COURT:  I don't think she started in '02.

23          MR. BODE:  Yes.  No, no, it's before that.

24          THE COURT:  Okay.

25          MR. BODE:  The case is before that.  By '02,

60

**Proceedings**

1  she was out here, is my understanding.

2      THE COURT:  Okay.

3      MR. BODE:  So this whole chain of these related

4  cases began with Judge Seybert and then they traveled

5  with her when she moved out to Long Island.  And that's -

6  - and I will get those papers and get them up to the

7  Court in terms of the specific cases.  But in terms of

8  that, that's how it -- this began.  And in terms of -- so

9  that's why it remains.

10      THE COURT:  Well that's important.

11      MR. BODE:  Yes.

12      THE COURT:  No, I mean if the -- the argument

13  here is that there's no Long Island nexus.

14      MR. BODE:  Yes.

15      THE COURT:  If the assignment was made while

16  Judge Seybert was in Brooklyn --

17      MR. BODE:  Yes.

18      THE COURT:  -- it being a Queens-related case

19  and then everything else follows from that. That's not a

20  problem.

21      MR. BODE:  And counsel's wrong in terms of the

22  remedy.  If, let's say -- I submit he's not, but if they

23  were right, the remedy wouldn't be that it go to

24  Brooklyn.  The remedy is that it would go on the wheel

25  amongst all the judges in the district, Brooklyn and Long

61

**Proceedings**

1  Island, because frankly for this case, the government

2  need only show by statute that drugs come to the United

3  States and then the defendant is prosecuted in the

4  district where they land.

5          THE COURT:  Well, I don't even know that that's

6  the remedy.  I mean at this point, you know, assuming

7  these cases were properly related, this one in particular

8  -- there's also one of reasons for these rules is to

9  allocate judicial resources.  It's to control judicial

10 resources.  You know, the fact of the matter is,

11 Judge Seybert's been on this case since 2002 and knows

12 this case inside out.

13         MR. BODE:  Yes.

14         THE COURT:  So nobody in this court is going to

15 be jumping to throw this all on somebody else's lap

16 unless --

17         MR. BODE:  We just wanted to make sure --

18         THE COURT:  -- there's very good reason for it.

19         MR. BODE:  Yes, we just wanted to make sure the

20 Court was aware in terms of it's not as if the government

21 you know, sought out Judge Seybert.  This case started --

22         THE COURT:  Well that's the important component

23 of this issue in my opinion.

24         MR. BODE:  Yes.

25         THE COURT:  If you basically sought

62

**Proceedings**

1   Judge Seybert out because you like her, then that's nice

2   to know but it's not the right reason to place a case

3   with somebody.  Okay.

4            Where is that material though, Mr. Bode?  Did

5   you submit it?

6            MR. BODE:  Well yes.  No, it's filed ECF,

7   Judge.

8            THE COURT:  Okay.

9            MR. BODE:  I just don't have my copies with me,

10  so I can't give you -- I regret, I grabbed the --

11           THE COURT:  When did you submit that?

12           MR. BODE:  This would have been back in

13  November or December.  And what I will do is I will go

14  get copies and have someone bring them up to the Court of

15  those letters.

16           THE COURT:  Okay.

17           MR. BODE:  They're all filed ECF.

18           THE COURT:  All right.  I am sure I can find

19  them if they're filed with ECF.

20           Yes, Mr. Merer?

21           MR. MERER:  Yes, your Honor, it's true that

22  Mr. Bode has made representations about linked cases and

23  apparently the earliest case was, from my understanding,

24  before Judge Seybert in Brooklyn and the case has

25  followed her out, related with her when she moved out

63

**Proceedings**

1  here.

2          THE COURT:  Okay.

3          MR. MERER:  No question -- there's no argument

4  about that.

5          THE COURT:  All right.

6          MR. MERER:  What there is a dispute about is

7  some of the statements that Mr. Bode made early on about

8  how the cases were originally linked together.  He said,

9  for instance, that the DeSoto (phonetic) case was linked

10 to the Carpio (phonetic) case and so on.  And as proof of

11 this, this is not it, I don't have it with me either, but

12 he put in these information sheets which I think

13 your Honor has probably seen during her days here and in

14 the United States Attorney's Office.

15         THE COURT:  Yes.

16         MR. MERER:  Basically all it is, the only thing

17 that's pertinent to the issue is copying which cause of

18 action arose.  And that's this case here, Kings

19 (phonetic), and then there's another one -- another

20 information sheet copied in which cause of action arose

21 in Queens.

22         Now what I am trying to suggest, your Honor, is

23 that every single one of these information sheets in

24 these four or five or six or eight linked cases, the

25 cause of action arose in Kings or Queens which would have

Transcription Plus II       Rosalie Lombardi

64

**Proceedings**

1  meant that it would have brought into Brooklyn.  Clearly

2  this court has venue when the cases are --

3          THE COURT:  Well actually that's not quite the

4  rule, Mr. Merer.

5          MR. MERER:  Well --

6          THE COURT:  Because what the rule also provide

7  -- the rules also provide that at the outset of the case,

8  the case is going to go to the jurisdiction where the

9  case arose.

10          MR. MERER:  Right.

11          THE COURT:  That is, the Court where the case

12  arose and if it started out as a Brooklyn case while

13  Judge Seybert was in Brooklyn, then that's perfectly

14  appropriate.

15          MR. MERER:  No, that's true.

16          THE COURT:  Okay.

17          MR. MERER:  I take no issue with that.  What I

18  was trying to --

19          THE COURT:  But to the extent that subsequent

20  cases which are developed as a result of the first case;

21  that is either because the witnesses are the same -- and

22  this is the case related rule, that's a very different

23  set of rules --

24          MR. MERER:  Yes.

25          THE COURT:  -- as you know.

65

**Proceedings**

1          MR. MERER:  As I know and as I have no argument

2  with.

3          THE COURT:  And it's been the subject of some

4  sore, sore --

5          MR. MERER:  Yes, it has.

6          THE COURT:  -- sore discussions between the

7  judges because when an interesting case comes up, perhaps

8  on Long Island and then it gets referred to Brooklyn on

9  the case related rule, everybody, you know feels like why

10  didn't I get that case.

11          MR. MERER:  And I am sure it works the other

12  way when a particularly boring case comes along.

13          THE COURT:  Of course, of course.

14          MR. MERER:  But what I am trying to say,

15  your Honor, I think upon examination, some of the

16  linkages are actually weak.  That although there may have

17  been a person in one case that knew or at some point did

18  some transaction with a person in another case, in and of

19  itself, that wasn't enough because as we pointed out in

20  our memorandum of law, simply because there's some nexus

21  doesn't mean there's enough nexus to relate.  That's one

22  point I am trying to make.

23          The second is this, your Honor, you just said

24  that Judge Seybert has had these cases for 15 years.

25  Actually, I believe the <u>Bustamente</u> case, although it was

66

**Proceedings**

1  a sealed indictment -- this case was sealed in 2002, I

2  don't believe it actually was unsealed until 2004.  I may

3  be mistaken.

4          Nevertheless, yes, she's had these cases but I

5  point out not one of them has gone to trial.  So she's

6  had them to the extent where they're have been either

7  pleas or cooperation agreements and sentencing or many of

8  them ongoing cooperations and not sentencing.  So there's

9  not been the exposure to Judge Seybert and her chambers

10  and staff of discovery.

11          THE COURT:  I think she would disagree with

12  you.

13          MR. MERER:  Well, maybe; okay.  But in any

14  event, it hasn't gone to trial, your Honor.

15          THE COURT:  Yes.

16          MR. MERER:  And what I am trying to say is this

17  case that has been referred to by the government, that

18  Ms. Klapper frequently referred to as the North Valley

19  Cartel case is simply a law enforcement term as

20  your Honor is aware.  There's no membership cards.

21  There's no admission process or dues paying to this

22  organization.  It's a law enforcement term collectively

23  used to apply to people who from a certain area may be

24  doing drug business; just as it was used in the Calle

25  Cartel and the Medajin Cartel.  And those cases were all

67

**Proceedings**

1  over the country depending on the district where the

2  cause of action arose.

3          Mr. Patino's contact, not only with people in

4  this case but particularly with people in the preceding

5  cases is absolutely nil.  The facts in his case have

6  nothing to do with the experience or the factors or the

7  facts that Judge Seybert has dealt with.

8          THE COURT:  All right.

9          MR. MERER:  So he --

10         THE COURT:  I have an answer to this question

11  and I think --

12         MR. MERER:  I have a few more points and then I

13  will --

14         THE COURT:  It's not going to be helpful.

15         MR. MERER:  Well --

16         THE COURT:  I can tell you this.

17         MR. MERER:  The other -- one of the other --

18         THE COURT:  Let me just stop you there,

19  Mr. Merer on this question --

20         MR. MERER:  Yes.

21         THE COURT:  -- because it seems to me very

22  clear, this case was properly referred to Judge Seybert

23  while she sat in Brooklyn.  There seems to be no question

24  about that.

25         MR. MERER:  Not this case, your Honor, the

68

**Proceedings**

1   preceding case.

2          THE COURT:  I mean the original case.

3          MR. MERER:  Not the --

4          THE COURT:  The 02 case.

5          MR. MERER:  No, I don't --

6          THE COURT:  I thought that was the 02-cr-1188.

7          MR. MERER:  I believe that Judge Seybert was

8   out here at that point.

9          MR. BODE:  What the 02 case related to a series

10  of money remitter cases, though if you go back to the

11  first of those cases, it went to Judge Seybert in the

12  '90s in Brooklyn.

13         THE COURT:  In the '90s.

14         MR. BODE:  In the '90s.

15         MR. MERER:  Yes, just --

16         MR. BODE:  Some time in the '90s; yes.

17         THE COURT:  Okay.

18         MR. MERER:  She was here, I believe when this

19  case went to her.

20         THE COURT:  When the 02 case was started.

21         MR. MERER:  Yes, and that is one of the basis

22  upon which I am saying we -- although -- even though

23  there's been -- I believe Mr. Patino is defendant number

24  24 or 28 and there's more to come, just by the fact that

25  no one else has raised the issue before him doesn't

69

**Proceedings**

1  preclude him from objecting to that fact, I think,

2  That's my position.

3          But moreover, your Honor, what we do allege is

4  that during the period of time where AUSA Klapper stopped

5  working out of the Brooklyn office and was assigned to

6  the Long Island office, an inordinate amount of her cases

7  suddenly appeared under the related case doctrine in Long

8  Island including this case at that time.  Now she's back

9  in Brooklyn, that's true.  But I am talking about during

10  that time period and I believe this is one of them.

11          Furthermore, your Honor, if we're talking about

12  judicial economy, this case was originally scheduled for

13  this morning at 9:30 before Judge Seybert.  Then we

14  received the change to come before your Honor at 10:30.

15  When I went down at 10 o'clock the marshals, I was

16  informed that Mr. Patino hasn't been here.  I said, gee,

17  what would have happened had he been due before

18  Judge Seybert and the marshals said well, impossible and

19  we would have informed chambers.

20          So if and when this case goes to trial, you've

21  got this transportation problem.  When Mr. Patino and

22  this is again in my pleadings, when his --

23          THE COURT:  Mr. Merer, please.

24          MR. MERER:  I will get -- then I will cut to

25  the real problem here, your Honor.

70

**Proceedings**

1          THE COURT:  Okay.

2          MR. MERER:  The real problem is this and this

3    is --

4          THE COURT:  You're just going to have to get a

5    hotel out here if --

6          MR. MERER:  Actually --

7          THE COURT:  -- which is where I think is really

8    going.

9          MR. MERER:  I was thinking of buying a house,

10    but whatever, because it may be an extended trial.

11          THE COURT:  Okay.

12          MR. MERER:  But, Judge?

13          THE COURT:  yes.

14          MR. MERER:  This article is in the papers that

15    I --

16          THE COURT:  I don't know what you're holding

17    up.

18          MR. MERER:  This is a Newsday article, okay?

19    This is among the documents I handed up to the Court.

20    It's attributed by the reporter, who I have spoken to and

21    have done his secrecy thing and said I stand by what I

22    said, it's attributed to law enforcement sources and it

23    talks about this threat.  It talks about when Mr. Patino

24    first arrived from MDC-SHU that first night.  In the

25    morning he was picked up by a convoy of ten or twelve

71

**Proceedings**

1  armored vehicles manned by SWAT teams, state troopers ---

2          THE COURT:  Was that Bob Kessler?

3          MR. MERER:  Yes.

4          THE COURT:  He's in this courthouse every day.

5          MR. MERER:  I know that, your Honor.  But --

6          THE COURT:  And he is going to be watching you.

7          MR. MERER:  And I will be watching him.  But

8  the bottom line, Judge, is that Long Island, Suffolk

9  County, Nassau County is a geographically insular

10 community and people read Newsday.  What effect does this

11 have on Mr. Patino's ability to get a fair trial?

12         THE COURT:  The problem is that our pool, our

13 jury pool, is drawn from all five districts and all five

14 boroughs -- not five -- yes, five; Staten Island, Queens,

15 Brooklyn --

16         MR. MERER:  No, I don't think -- I mean I can

17 request --

18         THE COURT:  We draw from the same wheel that

19 Brooklyn draws from.

20         MR. MERER:  I can recall a case before

21 Judge Wexler where every single juror came out of Nassau

22 County.

23         THE COURT:  There was a time -- when was that,

24 Mr. Merer?

25         MR. MERER:  Probably about 300 years ago, but -

72

**Proceedings**

1   -

2        THE COURT:  All right.  Well 300 years ago

3   there was a time when there was a Long Island wheel which

4   was representative of just Long Island residents.

5        MR. MERER:  Right.

6        THE COURT:  But that has since changed.

7        MR. MERER:  Yes.

8        THE COURT:  The wheel is now the same wheel

9   that Brooklyn draws from.

10       MR. MERER:  And since I --

11       MR. BODE:  And anecdotally --

12       MR. MERER:  -- grew up in Brooklyn, I can live

13  with that.

14       THE COURT:  Okay.

15       MR. BODE:  Anecdotally, I have had Staten

16  Island jurors in he past year sitting on a jury here.

17       THE COURT:  Right.  And I have presided over

18  many trials with Brooklyn, Queens, Staten Island

19  residents.  It always surprises me when a Staten Island

20  resident agrees to serve as a juror out here but they do

21  all the time.  All right.

22       Look, to me, the case related rule changes the

23  whole complexion of things.  And what I was going to say

24  is the following.  Since this starts out, it sounds like,

25  a case that which had original questions to Queens and

73

**Proceedings**

1  Kings County, went to Judge Seybert while she was sitting

2  in Brooklyn, a very proper designation, it follows her

3  when she comes out to Long Island, to the extent that

4  there's an argument and which is what I hear, that there

5  isn't enough of a relationship, I am actually going to

6  leave that to Judge Seybert because she knows the whole

7  history of this from day one.  And my impression of this

8  is that she sees this as very definitely connected to

9  things that she's reviewed in the past but I am not going

10  to go over all of the prior indictments and all the prior

11  cases to make sure there's that nexus.

12         And she has that intimate knowledge.  And if

13  her knowledge supports the view that there is a

14  connection between the cases, that's good enough.

15         MR. MERER:  So your recommendation is that

16  there will be none on that third motion.

17         THE COURT:  Right.

18         MR. MERER:  Okay.

19         THE COURT:  All right.  Given the way that

20  argument has been shaped now, I think that you know, the

21  factual nexus is one which she can easily answer having

22  an intimate knowledge of the facts of all of these cases

23  and it would be a lot simpler for her to do that, given

24  that the start of this assignment was correct as conceded

25  by both sides.

74

**Proceedings**

1          MR. MERER:  Just for the record, your Honor, I

2  believe she was assigned this case after she was here

3  because -- on the idea that the related cases followed

4  her out.

5          THE COURT:  Correct.

6          MR. MERER:  But that --

7          THE COURT:  That's right.

8          MR. MERER:  Okay.

9          THE COURT:  That's right.  That's what I

10  understood.

11          MR. MERER:  Okay.

12          THE COURT:  All right.  So now that leaves us

13  with having to figure out some dates.

14          MR. BODE:  In terms of -- I leave it up to

15  your Honor in terms of if you want to do this in terms of

16  have a date when we can bring in the -- someone from the

17  BOP, given that they've been looking at these new

18  allegations, et cetera.  We can do that relatively

19  quickly.

20          In terms of witnesses, they'll need a little

21  time to move folks if we're going to do that.  So we

22  could do a date and then if we're going to go further,

23  have a ruing on that next date in terms of the

24  administrative exhaustion and judicial exhaustion and

25  then set a date after that or we could set a little

75

**Proceedings**

1  further date and -- I leave it up to your Honor.

2          THE COURT:  All right.  Hold on.  Let me just

3  pull up a calendar.

4          (Court and clerk confer)

5          THE COURT:  We can start the hearing on Monday

6  the 23rd at 2 o'clock.

7          MR. MERER:  Judge, this Monday next,

8  your Honor?

9          THE COURT:  Yes.

10          MR. MERER:  At 2 o'clock.

11          THE COURT:  At 2 o'clock.  I have a criminal

12  jury selection in the morning.  I am pretty sure we can

13  get that done fairly quickly.

14          MR. MERER:  As long as -- can we end by 5:30

15  that day, Judge?

16          THE COURT:  Yes, I --

17          MR. MERER:  If we have to continue, we can go

18  further the next day?

19          THE COURT:  Right.  We can go into the next

20  day.

21          MR. MERER:  I appreciate it.  Thank you.

22          THE COURT:  And then what I would like you to

23  do is reserve Thursday, the 26th.

24          (Court and clerk confer)

25          THE COURT:  Thursday, the 26th for whatever

76

**Proceedings**

1  follow-up.

2          MR. BODE:  Okay.  I won't be able to have -- I

3  will try, Judge, but I sincerely doubt I will have

4  witnesses by then.

5          THE COURT:  All right.

6          MR. BODE:  They're not in the district.

7          THE COURT:  Well I am concerned about going too

8  far out.

9          MR. MERER:  Judge, is that morning or afternoon

10  or the whole day?

11          THE COURT:  What was that?

12          MR. MERER:  What time on the 26th --

13          THE COURT:  Well, if --

14          MR. BODE:  I mean it's a week from today.  I

15  will never get people moved here by then.

16          THE COURT:  Okay.  All right.  Then that's --

17          MR. MERER:  But, your Honor, if I could just

18  interject.  I am reasonably -- I don't want to say

19  something I am not sure about.  I suspect that the

20  witnesses that Mr. Bode is referring to are coming from

21  Florida.  I know as fact that the government has brought

22  these witnesses up here numerous times and others like

23  them, some of whom have not turned out the way they would

24  have hoped.

25          It seems to me, Judge, that under the

**Proceedings**

1   circumstances the government could reach out and make it

2   happen.  They certainly would, if there was a trial and

3   they needed those witnesses to prove up a case.

4            THE COURT:  The only -- that may be so.

5            MR. MERER:  Yes.

6            THE COURT:  But if the 26th is not workable,

7   it's not going to -- March 3 would be the next day --

8   would be the -- the 26th is I believe a Thursday;

9   correct?  So by the following Tuesday, that gives you a

10  few extra days --

11           MR. BODE:  I will get the writs going today,

12  Judge.  If there's -- if I learn from the marshal's

13  service that the date is after that, I will submit a

14  letter to your Honor.

15           THE COURT:  Right.  All right.  So let's just

16  set aside March 3.  Oh, wait a minute, is that that --

17           (Court and clerk confer)

18           THE COURT:  So here's what we're going to do.

19  Apparently I have a trial that week but I am going to --

20  instead of the 3rd, make it March 2, the Monday.  Then I

21  can move the trial back --

22           MR. MERER:  March?  March?

23           THE COURT:  March 2.

24           MR. MERER:  All right.

25           THE COURT:  10 a.m.

78

**Proceedings**

 1          MR. MERER:  10 a.m., your Honor?

 2          THE COURT:  10 in the morning.  I'm pretty sure

 3   we could have -- we can have the prisoner here by 10:00;

 4   correct?  Yes?

 5          UNIDENTIFIED MALE SPEAKER:  Oh, I am sorry,

 6   Judge.  That shouldn't be a problem.

 7          THE COURT:  Okay.

 8          UNIDENTIFIED MALE SPEAKER:  10 a.m.?

 9          THE COURT:  10:00; yes.  So reserve March 2 and

10   the 26th.  Was it --

11          MR. BODE:  23rd.

12          THE COURT:  23rd, sorry.

13          MR. MERER:  23rd?

14          THE COURT:  23rd.

15          MR. MERER:  23rd all day, your Honor?

16          THE COURT:  No, 23rd starting at 2 o'clock;

17   correct?

18          MR. MERER:  Oh, I am sorry.  And then the --

19          THE COURT:  And then the follow-up would be

20   March 2.

21          MR. BODE:  And --

22          MR. MERER:  So we're -- the 26th is off then.

23          THE COURT:  The 26th is off.

24          MR. BODE:  And if need be, the 23rd, into the

25   morning of the 24th, your Honor, if we need to go past

79

**Proceedings**

1  5:30.

2  THE COURT:  Yes.  Correct.

3  MR. BODE:  Thank you.

4  MR. MERER:  All right.  So there will be

5  argument on the exhaustion issue on the next appearance

6  and then the Court will determine what then follows?

7  THE COURT:  Right.  I think what we can expect

8  is that on the 23rd, we'll take some testimony.  I am not

9  -- I am very optimistic that we're going to finish that

10  issue on the 23rd but if need be, we'll extend into the

11  24th.  And then to the extent that we have the taking of

12  testimony on the actual threat, that would occur on the

13  2nd.

14  MR. MERER:  Your Honor, I am going to make a

15  request then.  If, and just so the government can be

16  prepared, if in fact your Honor rules that we are going

17  to go ahead to the second date and directs the government

18  to produce witnesses, I am going to ask that the

19  government also produce Agent Viola.

20  And I say that because I am of the belief that

21  Agent Viola has spoken to these witnesses and he has had

22  dealings with their associates and that his testimony

23  subject to the Court's ruling is proper, and the

24  question's proper, may be very pertinent to whatever

25  decision your Honor comes to.

80

**Proceedings**

1          THE COURT:  Can you produce him, Mr. Bode?

2    Have him available, whether or not he actually has to

3    testify we'll decide at another point.

4          MR. BODE:  Yes.

5          THE COURT:  But have him available.

6          MR. BODE:  I would say Mr. Merer should give me

7    a subpoena and I will give it to him and his agency.

8          THE COURT:  All right.  Make sure he is

9    available for the 2nd.

10          MR. BODE:  Of --

11          THE COURT:  Of March.

12          MR. BODE:  I will give him the subpoena.  It's

13    up to the agency and him in terms of whether, you know, I

14    am --

15          THE COURT:  I am directing you to have him

16    available for March 2.  Is that subpoena enough?

17          MR. BODE:  Yes, Judge.  I am just saying in

18    terms of, you know, him, I -- you know, I don't know

19    whether he's going to -- you know, whether he's going to

20    assert any rights to counsel or anything like that, given

21    the application.

22          THE COURT:  Well that's why you should --

23          MR. BODE:  That's why I want the --

24          THE COURT:  -- tell him now.

25          MR. BODE:  That's why I want a subpoena, so

81

## Proceedings

1   that I have a subpoena from counsel to give to, you know

2   to him and to give to his agency.

3          THE COURT:  I --

4          MR. MERER:  Your Honor, I don't mean to quibble

5   but if I don't -- I do not see the need for me to

6   subpoena Agent Viola.

7          THE COURT:  I am not ordering a subpoena.  I

8   directed that Agent Viola be available to testify on

9   March 2.  The question of whether or not he will be

10  required to testify is one which I leave open, depending

11  on how the matter goes but he should be available.

12          If he has issues that -- of concern which

13  require counsel, then he should certainly have counsel

14  available to him if he feels it's necessary.  Okay?

15  Conduct himself as though he had been subpoenaed.  That's

16  -- I don't think it actually requires a subpoena; if he

17  has some issues or concerns about whether or not there is

18  some jeopardy here for him.  All right.

19          Anything else?

20          MR. MERER:  Thank you, your Honor.

21          THE COURT:  Okay, folks, thank you.

22          MR. BODE:  Thank you.

23              (Matter concluded)

24                  -oOo-

25

82

# C E R T I F I C A T E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this  **20th**  day of **February** , 2009.

**Rosalie Lombardi**
**Transcription Plus II**