Carlos Arturo Patino Restrepo
Fed. No. 64782-053
FTC SCHUYLKILL
FEDERAL CORRECTIONAL INSTITUTION
P.O. BOX 759
MINERSVILLE, PA 17954

RECEIVED
JUN 02 2020
PRO SE OFFICE

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
JUN 02 2020
BROOKLYN OFFICE
SP_____ JUN 02 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x

UNITED STATES OF AMERICA

        Plaintiff,

        Case no. 02-CR-01188-LDW

Vs.

        EMERGENCY MOTION FOR COMPASSIONATE
        RELIEF DUE TO CORONAVIRUS AND THE
        FIRST STEP ACT

CARLOS ARTURO PATINO RESTREPO

        Defendant.
-------------------------------------------------x

Comes now Carlos Arturo Patino Restrepo, in a pro se capacity and respectfully files this motion for compassionate release pursuant to 18 U.S.C. § 3624 and 18 USC 4042 (Duties of Bureau of Prisons) and the First Step Act of 2018. Given the exceptional circumstances of his deteriorating medical conditions and the current coronavirus pandemic, Mr. Patino Restrepo files this as an emergency motion and invokes Bureau of Prison *Program Statement 5050.50*.

### INTRODUCTION

We live in extraordinary and dangerous times. The spread of the Covid-19 virus across our state and country threatens us with unprecedented dangers. We have been told by the authorities to stay home, stay safe, and not be closer than six feet to anyone. Older persons, persons with weakened immune systems and those with underlying health problems need to take ever greater precautions because of the dangerous aspects of this virus. Mr. Patino-Restrepo falls under this category according to the guidelines set by the Center of Disease Control ("CDC") due to his, inter alia, bullous lung disease as reported by his medical records, *supra*.

At the outset, Mr. Patino-Restrepo will state that he has exhausted his administrative remedies. The warden at FCI Sckuylkill Minersville, Pennsylvania is in possession of a petition filed by his father Mr. Luis Bernardo Patino-Ramirez. See Petition to Warden with Certify Mail Receipt as **Exhibit A.**

Program Statement 5050.50 § 571.(b) states in part that another person may file a petition on behalf of the inmate. See PS. 5050.50 attached as **Exhibit B.** Mr. Patino Restrepo now brings this motion for compassionate relief in good faith.

On December 21, 2018, Congress passed, and the President signed into law the "First Step Act of 2018" which, among other things, changed the law governing Compassionate Releases under Title 18 use §§ 3582 and 4205(g). Among those changes a prisoner or a family member may petition the sentencing court for compassionate release/ reduction of sentence after the Warden fails to respond to prisoner's request, or after the prison has exhausted administrative remedies. 28 CFR 571.61-62.

Given the current events of the coronavirus pandemic, Mr. Patinio Restrepo is overly concern, and for good reason, that he will get infected by the virus while in the custody of the Bureau of Prisons. The Bureau of Prisons ("BOP") has reported that a total of fifty (50) inmates have died because of the coronavirus. The first inmate was Patrick Jones (BOP 83582-180) who died on March 28th, 2020. These numbers are expected to increase.  More than 2,818 inmates infected, and 262 staff members have tested positive for the disease. According to the DCD, these numbers are expected to rise. See BOP Covid-19 Update Chart as **Exhibit C.**

The Bop is not equipped with the necessary staff and medical supplied needed to handle the rapid spread of the virus.  See  18 USC 4042 Duties of Bureau  of Prisons; (2) provide suitable quarters and provide for the *safekeeping, care*, and subsistence of all persons charged with or convicted of offenses against the United States.

In fact, the union representing Bureau of Prison officers filed a complaint with the Occupational Safety and Health Administration against the Bureau of Prisons, saying officials were "proliferating the spread of a known and deadly contagion both within our prison system and to our surrounding communities.

Already jurisdictions around the country have begun releasing prison populations that are

susceptible to COVID-19 exposure.  See, e.g., L.A. County Releasing Some Inmates from Jail to Combat Coronavirus, L.A. Times, Mar. 16, 2020, available at: http://www.latimes.com/california/story/2020-03-16/la-jail-population-arrests-down-amid coronavirus; NYC Board of Correction Calls on City to Begin Process of Releasing Certain Prisoners in Response to COVID-19, Sentencing Law and Policy blog, available at: http://sentencing.typepad.com/sentencing_law_and_policy/2020/03/nyc-board-of-correction calls-on-city-to-begin-the-process-of-releasing-certain-prisoners-asap-in-re.html.

In response to the mounting panic, U.S. Attorney General William P. Barr in early April directed federal prison officials to accelerate and expand early release programs for the sickest inmates.

Hence, release under 18 § 3624 (c) is particularly warranted in this case because Mr. Patino Restrepo has underlying health conditions with a weaken immune system and does not present substantial risks to the community because upon release he will be deported to Colombia.

Mr. Patino-Restrepo seek relief pursuant to 18 U.S.C. § 3582, as modified by the First Step Act, and do so to protect his Eighth Amendment and their Due Process rights.  As discussed more fully below, the Patino-Restrepo' health profiles and age match those who are commonly identified as being most at risk of contracting and suffering the most severe health consequences – hospitalization or death. Indeed, a leading epidemiologist from John Hopkins University, Dr. Chris Beyrer, has stated under oath regarding COVID-19 that the "fatality rate is higher in men, and varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardio-vascular disease, respiratory disease, diabetes, and immune compromise."  (Declaration of Chris Beyrer, MD, MPH, in Support of Persons in Detention and Detention Staff, COVID-19, (hereinafter "Beyrer Decl."), attached hereto as **Exhibit D**).

As of December 2018, Congress invested this Court with the power and duty to consider reducing a limited number of its previous sentences where extraordinary circumstances, not foreseen at the time of sentencing, make such reconsiderations appropriate.

As stated above, Section 3582(c)(1)(A) of Title 18 permits a defendant to file directly with the Court a motion seeking reduction of his or her sentence for extraordinary and compelling reasons if: (1) the defendant has fully exhausted his administrative remedies; or (2) there has been a lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier.  18 U.S.C. § 3582(c)(1)(A)(i).  No longer is the Court divested of jurisdiction after sentencing a defendant. Upon the proper showing and considering extraordinary circumstances this Court is permitted to release an inmate.  Accordingly, upon consideration of Mr. Patino-Restrepo' extraordinary and compelling showing below, he ask this Court to act quickly and decisively by releasing him from custody and permitting him to be deported back to his country.

As part of the extraordinary circumstances not known at the time of sentencing, is the rapid changing world where the Covid-19 has infected over four million people worldwide and killed over three hundred thousand people. This Covid-19 virus will undoubtedly affect how Mr. Patino-Restrepo serves the remaining portion of his sentence. The Court must consider his Eight Amendment protection against harsh and cruel punishment. Being in a close environment with other prisoners raises the risk of being infected. It is just a matter of time at the rate the coronavirus is spreading.   His health condition has deteriorated both physically and mentally. Mr. Patino Restrepo was diagnosed with short-segment Barrett's Esophagus disease. This can lead to invasive cancer and cardiovascular disease. He suffers from a heart condition where a previous infection reached his heart and required medical intervention. He only has one functioning kidney from a prior kidney disease. He has been diagnosed with Bullous Lung disease known as Subpleural Bullous/Bleb which is a respiratory illness making him extremely vulnerable for Covid-19.   In support see medical records he obtained while incarcerated as **Exhibit E.**

The Bureau of Prison is not a hospital and will not give him the adequate care once he is infected. This evil and contagious virus attacks the respiratory system and seeks person with weak immune defense. There is no cure for this deadly virus. Mr. Patino Restrepo is tormented with the thought that he could easily succumbed to this disease. He is at high risk according to the *Centers for Disease Control* because of his prior medical conditions. If the coronavirus enters his body, it could be a death sentence due to his underlying health condition. This risk is heightened by the circumstances inside the BOP, where there is already confirmed positive inmates, several other inmates are under quarantine. Mr. Patino Restrepo cannot practice regular hand hygiene, and he cannot effectively socially distance himself. So what would be the solution? To keep him in a segregated cell for the next 20 years by himself with the hope he never gets the virus. That too would be cruel and unusual punishment for a man that has not violated any institution rules in the last 13 years.

Mr. Patino Restrepo went to a jury trial and respects the jury verdict for the offense he was charged with   under 21 USC 841 (a) (1) and 952 (a) Conspiracy to Distribute a Controlled Substance. He is overly concern and frighten that he will just be another statistic once he gets infected. He has an advance age of 55 and has served over 13 years with good behavior. His current release date is set for May 11, 2041. What is the purpose to keep him in prison until he is 75 years of age? How does it serve the best interest of the public to have another inmate get infected with this virus? According to world health experts, it is just a matter of time before he becomes sick and the BOP does not have a cure to save his life.

Mr. Patino Restrepo has standing to bring this motion and *does not need to prove he will die in prison*. The Court is aware of the major pandemic that is spreading rapidly all over the world.

Mr. Patino Restrepo deserves mercy with the passage of the First Step Act, Congress emphasized the imperative of reducing unnecessary incarceration and avoiding unduly punitive sentences that do not serve the ends of justice. United States v. Simons, No. 07-CR-00874, 2019 WL 1760840, at *8 (E.D.N.Y. Apr. 22, 2019).

The New York Times has explained that jails are a much more dangerous place to be than a cruise ship. Soap and hand sanitizer is only available if one can purchase it from commissary.

The following cases are a compilation of court decisions that support the granting of relief:

Samy v. United States, No. 2:16-cr-20610-1, 2020 WL 1888842 (E.D. Mich Apr. 16, 2020) (Order granting petitioner's motion for reconsideration of order denying compassionate release based in part on COVID-19), Dkt. 88

United States v. Hammond, No. 1:02-cr-00294-BAH-1, 2020 WL 1891980        (D.D.C. Apr. 16, 2020) (Memorandum and Indicative Ruling, granting compassionate release based in part on COVID-19, if Court of Appeals remands), Dkt. 51

United States v. Coker, No. 3:14-CR-085-RLJ-DCP-20, 2020 WL 1877800 (E.D. Tenn. Apr. 15, 2020) (Memorandum Opinion, granting compassionate release based in part on COVID-19), Dkt. 868

United States v. Cosgrove, No. 2:15-cr-00230-RSM-1, 2020 WL 1875509 (W.D. Wash. Apr. 15, 2020) (Order Granting Defendant's Motion for Reconsideration, granting compassionate release in part based on COVID-19), Dkt. 95

United States v. Kataev, No. 1:16-cr-00763-LGS-5 (S.D.N.Y. Apr. 14, 2020) (Amended Order, granting compassionate release in part based on COVID-19), Dkt. 779

United States v. Wen, No. 6:17-CR-06173, 2020 WL 1845104 (W.D.N.Y. Apr. 13, 2020) (Decision and Order, granting compassionate release in part based on COVID-19), Dkt. 106

United States v. Smith, No. 1:12-cr-00133-JFK-1, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020) (Opinion and Order, granting compassionate release based in part on COVID-19), Dkt. 197

United States v Ben-Yhwh, No. 11:15-cr-00830-LEK-1, 2020 WL 1874125 (D. Hawaii Apr. 13, 2020) (Amended Order, granting in part and denying in part defendant's emergency motion to modify sentence for compassionate release based in part on COVID-19), Dkt. 206

United States v. Tran, No. 8:08-cr-00197-DOC, 2020 WL 1820520 (C.D. Cal. Apr. 10, 2020)

(Order re: Motion Emergency Motion to Reduce Sentence, granting compassionate release in part based on COVID-19), Dkt. 405

United States v. Burrill, No. 17-cr-00491-RS-2, 2020 WL 1846788 (N.D. Cal. Apr. 10, 2020)
(Order Granting Emergency Motion for [Compassionate] Release, based in part on COVID-19), Dkt. 308

Accordingly, because Mr. Patino-Restrepo qualifies for compassionate relief under the First Step Act of 2018, § 3624, and the BOP cannot protect him pursuant to 18 USC 4042, the current conditions militate strongly in favor of granting compassionate relief. Moreover, he will not be a danger to the community because he will be deported by ICE to a location outside of the United States.

WHEREFORE, I respectfully request that this Honorable Court give Mr. Carlos Arturo Patino Restrepo meaningful consideration and grant this motion in the name of justice or any relief this Court deems appropriate.

Respectfully submitted,

x Carlos Arturo Patino R.

Carlos Arturo Patino Restrepo
Fed. No. 64782-053

FTC SCHUYLKILL
FEDERAL CORRECTIONAL INSTITUTION
P.O. BOX 759
MINERSVILLE, PA 17954

Prepared and researched by
Charlie Morales Prison Law Clerk
On behalf of
Carlos Arturo Patino Restrepo

# CERTIFICATE OF SERVICE

I, Carlos Arturo Patino Restrepo, hereby certify that I mailed first class of my Motion for Compassionate Release to the following address:

US ATTORNEY'S OFFICE
271 CADMAN PLAZA EAST
BROOKLYN NEW YORK 17954

**Allen Lee Bode**
United States Attorneys Office,
Eastern District of New York
610 Federal Plaza
Central Islip, NY 11722

This 12th day of May, 2020

x *Carlos Arturo Patino R.*
Carlos Arturo Patino Restrepo
Fed. No.  64782-053

FTC SCHUYLKILL
FEDERAL CORRECTIONAL INSTITUTION
P.O. BOX 759
MINERSVILLE, PA 17954

8





May 6, 2020

Luis Bernardo Patino Ramirez
c/o World Agency services
81-31 Baxter Ave Suite LA
Elmhurst NY 11373

Scott Finley
Warden
FCI Schuylkill
P.O. Box 700
Minersville, PA 17954

In the matter of Carlos Arturo Patino Restrepo Fed. Reg. 64782-053
Administrative request for compassionate release. Program Statement 5050.50

Dear Warden,

Please accept this letter as my formal request pursuant to PS 5050.50 regarding compassionate release. The program statement allows family members to file for compassionate release by a family member. In this case, I am the father of Carlos Arturo Patino Restrepo. He has been under the Bureau of Prisons custody for close to 14 years. My son tells me he has tried several times to file his administrative request for compassionate release but has been unable because he is in constant locked down. Thus, I am filing as permitted by your program statement.

Due to the recent coronavirus and change of circumstances, I am asking if you could grant compassionate release under the following guidelines:

On December 21, 2018, Congress passed, and the President signed into law the "First Step Act of 2018" which, among other things, changed the law governing Compassionate Releases under Title 18 use §§ 3582 and 4205(g). Among those changes a prisoner may petition the Bureau of Prisons and/or the sentencing court for compassionate release. 28 CFR 571.61-62.

Given the exceptional events of the current coronavirus pandemic, my son is overly concern, and for good reason, that he will get infected by the virus while in the custody of the Bureau of Prisons. The Bureau of Prisons ("BOP") has reported that a total of 28 inmates have died because of the coronavirus. The first inmate was Patrick Jones (BOP 83582-180) who died on March 28th, 2020. These number are expected to increase.  More than 100 inmates in one prison alone, FCI Oakdale, are under quarantine, and four staff members have tested positive for the disease. More than 250 inmates nationwide are infected. The Bop is not equipped with the necessary staff and medical supplied needed to handle the spread of the virus.

I know my son is housed at your facility and our family is overly concern that with the movement of prisoners the virus can easily spread.  While I know that you make every effort to care for the inmates, there is no guarantee that this invisible virus will not infect Mr. Vasquez-Uribe. My son suffers from a kidney disorder and has only one functioning kidney. He has also suffered an infection that reached his heart. I have attached a copy of his medical records. Even though it is not complete since it is a lengthy record. His health is deteriorating and, in a few years, will reach the age of 60.  If this request is granted,

A

he will be deported back to his country in Colombia and no longer a burden to the government. He has served enough time and I would cordially ask that you grant him this request.

I respectfully request that you grant this compassionate letter or make a recommendation to the U.S. Attorney Office. Please inform me of your decision on this request as soon as you can. Thank you for your consideration of this request.

Very truly yours,

/c/   Luis Bernardo Patino Ramirez

CC. Case Manager Mr. Mendez





**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T

OPI             OGC/LCI
NUMBER    5050.50
DATE        January 17, 2019

# Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)

/s/
*Approved*: Hugh J. Hurwitz
Acting Director, Federal Bureau of Prisons

## 1. PURPOSE AND SCOPE

**§571.60  Purpose and scope.**

**Under 18 U.S.C. 4205(g), a sentencing court, on motion of the Bureau of Prisons, may make an inmate with a minimum term sentence immediately eligible for parole by reducing the minimum term of the sentence to time served. Under 18 U.S.C. 3582(c)(1)(A), a sentencing court, on motion of the Director of the Bureau of Prisons, may reduce the term of imprisonment of an inmate sentenced under the Comprehensive Crime Control Act of 1984.**

**The Bureau uses 18 U.S.C. 4205(g) and 18 U.S.C. 3582(c)(1)(A) in particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing.**

18 U.S.C. 3582 was amended by the First Step Act of 2018, revisions noted below in Summary of Changes.

For the purposes of this Program Statement, the terms "compassionate release" and "reduction in sentence" are used interchangeably.

**Federal Regulations from 28 CFR are in this type.**
Implementing information is in this type.

In deciding whether to file a motion under either 18 U.S.C. 4205(g) or 18 U.S.C. 3582, the Bureau of Prisons (BOP) should consider whether the inmate's release would pose a danger to the safety of any other person or the community.

Under 18 USC 3582 (d)(2)(3), the Bureau ensures that all facilities regularly and visibly post, including in prisoner handbooks, staff training materials, and facility law libraries and medical and hospice facilities, and make available to prisoners upon demand, notice of—

(i) a defendant's ability to request a sentence reduction pursuant to subsection (c)(1)(A);

(ii) the procedures and timelines for initiating and resolving requests described in clause (i); and

(iii) the right to appeal a denial of a request described in clause (i) after all administrative rights to appeal within the Bureau of Prisons have been exhausted.

**§572.40  Compassionate release under 18 U.S.C. 4205(g).**

**18 U.S.C. 4205(g) was repealed effective November 1, 1987, but remains the controlling law for inmates whose offenses occurred prior to that date.  For inmates whose offenses occurred on or after November 1, 1987, the applicable statute is 18 U.S.C. 3582(c)(1)(A).  Procedures for compassionate release of an inmate under either provision are contained in 28 CFR part 571, subpart G.**

a.  **Program Objectives.**  The expected results of this program are:

■  A motion for a modification of a sentence will be made to the sentencing court only in particularly extraordinary or compelling circumstances that could not reasonably have been foreseen by the court at the time of sentencing.

■  The public will be protected from undue risk by careful review of each compassionate release request.

■  Compassionate release motions will be filed with the sentencing judge in accordance with the statutory requirements of 18 U.S.C. 3582 or 4205(g).

b.  **Summary of Changes**

*Policy Rescinded*

P 5050.49 CN-1  Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g)

The following have been added to this version of the Program Statement:

- Requirements of section 603(b) of the First Step Act, codified at 18 USC § 3582:
    - ➢ Requiring inmates be informed of reduction in sentence availability and process;
    - ➢ Modifying definition of "terminally ill;"
    - ➢ Requiring notice and assistance for terminally ill offenders;
    - ➢ Requiring requests from terminally ill offenders to be processed within 14 days;
    - ➢ Requiring notice and assistance for debilitated offenders; and
    - ➢ Specifying inmates may file directly to court after exhaustion of administrative remedies, or 30 days from receipt of a request by the Warden's Office.

## 2. INITIATION OF REQUEST – EXTRAORDINARY OR COMPELLING CIRCUMSTANCES

### § 571.61 Initiation of request – extraordinary or compelling circumstances.

**a. A request for a motion under 18 U.S.C. 4205(g) or 3582(c)(1)(A) shall be submitted to the Warden. Ordinarily, the request shall be in writing, and submitted by the inmate. An inmate may initiate a request for consideration under 18 U.S.C. 4205(g) or 3582(c)(1)(A) only when there are particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing. The inmate's request shall at a minimum contain the following information:**

**(1) The extraordinary or compelling circumstances that the inmate believes warrant consideration.**

**(2) Proposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment.**

**b. The Bureau of Prisons processes a request made by another person on behalf of an inmate in the same manner as an inmate's request. Staff shall refer a request received at the Central Office to the Warden of the institution where the inmate is confined.**

A request for a RIS is considered "submitted" for the purposes of 18 USC §3582 (c)(1), when received by the Warden in accordance with this section.

## 3. REQUESTS BASED ON MEDICAL CIRCUMSTANCES

The criteria for a reduction in sentence (RIS) request may include the following:

a. **Terminal Medical Condition**. RIS consideration may be given to inmates who have been diagnosed with a terminal, incurable disease and whose life expectancy is eighteen (18) months or less, and/or has a disease or condition with an end-of-life trajectory under 18 USC § 3582(d)(1). The BOP's consideration should include assessment of the primary (terminal) disease, prognosis, impact of other serious medical conditions of the inmate, and degree of functional impairment (if any). Functional impairment (e.g., limitations on activities of daily living such as feeding and dressing oneself) is not required for inmates diagnosed with terminal medical conditions; however, functional impairment may be a factor when considering the inmate's ability or inability to reoffend.

Pursuant to 18 U.S.C. § 3582(d)(2)(A), in the case of a diagnosis of a terminal illness, the Bureau of Prisons shall, subject to confidentiality requirements:

> (i) not later than 72 hours after the diagnosis notify the defendant's attorney, partner, and family members of the defendant's condition and inform the defendant's attorney, partner, and family members that they may prepare and submit on the defendant's behalf a request for a sentence reduction pursuant to subsection (c)(1)(A);

> (ii) not later than 7 days after the date of the diagnosis, provide the defendant's partner and family members (including extended family) with an opportunity to visit the defendant in person;

> (iii) upon request from the defendant or his attorney, partner, or a family member, ensure that Bureau of Prisons employees assist the defendant in the preparation, drafting, and submission of a request for a sentence reduction pursuant to subsection (c)(1)(A); and

> (iv) not later than 14 days of receipt of a request for a sentence reduction submitted on the defendant's behalf by the defendant or the defendant's attorney, partner, or family member, process the request.

The statutory time frames of section 3582(d)(2)(A), begin once the Clinical Director of an institution makes a terminal diagnosis. Once the diagnosis is made, the Clinical Director will inform the Warden and the appropriate Unit Manager as soon as possible so as to ensure requirements are met.

If the inmate is physically/psychologically able, the inmate should consent to notifications above using Form BP-A0192, Release of Information Consent, or equivalent written authorization.

If a visit is denied for security concerns, as reflected in 18 U.S.C. § 3582(d)(3)(J), the reasons should be documented.

The Warden will forward the information indicated in Section 8 of this policy, below, to Central Office within 14 days.

**b. Debilitated Medical Condition.** RIS consideration may also be given to inmates who have an incurable, progressive illness or who have suffered a debilitating injury from which they will not recover. The BOP should consider a RIS if the inmate is:

- Completely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or chair; or
- Capable of only limited self-care and is confined to a bed or chair more than 50% of waking hours.

The BOP's review should also include any cognitive deficits of the inmate (e.g., Alzheimer's disease or traumatic brain injury that has affected the inmate's mental capacity or function). A cognitive deficit is not required in cases of severe physical impairment, but may be a factor when considering the inmate's ability or inability to reoffend.

Pursuant to 18 U.S.C. § 3582(d)(2)(B), in the case of an inmate unable to submit a request for a RIS BOP institution staff shall:

(i) inform the defendant's attorney, partner, and family members that they may prepare and submit on the defendant's behalf a request for a sentence reduction pursuant to subsection (c)(1)(A)

(ii) accept and process a request for sentence reduction that has been prepared and submitted on the defendant's behalf by the defendant's attorney, partner, or family member under clause (i); and

(iii) upon request from the defendant or his attorney, partner, or family member, ensure that Bureau of Prisons employees assist the defendant in the preparation, drafting, and submission of a request for a sentence reduction pursuant to subsection (c)(1)(A).

All RIS requests should be assessed using the factors outlined in Section 7.

## 4. REQUESTS BASED ON NON-MEDICAL CIRCUMSTANCES – ELDERLY INMATES

The criteria for a RIS request may include the following:

a. **"New Law" Elderly Inmates.** Inmates sentenced for an offense that occurred on or after November 1, 1987 (e.g., "new law"), who are age 70 years or older and have served 30 years or more of their term of imprisonment.[1]

b. **Elderly Inmates with Medical Conditions.** Inmates who fit the following criteria:

- Age 65 and older.
- Suffer from chronic or serious medical conditions related to the aging process.
- Experiencing deteriorating mental or physical health that substantially diminishes their ability to function in a correctional facility.
- Conventional treatment promises no substantial improvement to their mental or physical condition.
- Have served at least 50% of their sentence.

Additionally, for inmates in this category, the BOP should consider the following factors when evaluating the risk that an elderly inmate may reoffend:

- The age at which the inmate committed the current offense.
- Whether the inmate suffered from these medical conditions at the time the inmate committed the offense.
- Whether the inmate suffered from these medical conditions at the time of sentencing and whether the Presentence Investigation Report (PSR) mentions these conditions.

The BOP Medical Director will develop and issue medical criteria to help evaluate the inmate's suitability for consideration under this RIS category.

c. **Other Elderly Inmates.** Inmates age 65 or older who have served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentenced.

---

[1] These criteria are different from those provided in 18 U.S.C 3582(c)(1)(a)(ii), which states that a court, upon motion of the BOP Director, may reduce a sentence term if it finds that "the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g)."

Elderly inmates who were age 60 or older at the time they were sentenced ordinarily should not be considered for RIS if their current conviction is listed in the Categorization of Offenses Program Statement.

All RIS requests should be assessed using the factors outlined in Section 7.

## 5. REQUESTS BASED ON NON-MEDICAL CIRCUMSTANCES – DEATH OR INCAPACITATION OF THE FAMILY MEMBER CAREGIVER.

The criteria for a RIS request may include the death or incapacitation of the family member caregiver of an inmate's child, e.g.. RIS requests from inmates whose biological or legally adopted child or children ("child") are suddenly without a family member caregiver due to that caregiver's death or incapacitation.

For these requests, "child" means a person under the age of 18 and "incapacitation" means the family member caregiver suffered a severe injury (e.g., auto accident) or suffers from a severe illness (e.g., cancer) that renders the caregiver incapable of caring for the child.

In reviewing these requests, BOP should assess, based on the information provided, whether release of the inmate to care for the inmate's child is in the best interest of the child.

a. **First Stage of the Warden's Review.** The following information should be provided by the inmate to the Warden in writing for RIS requests based on the death or incapacitation of the family member caregiver:

- A statement that explains that the inmate's family member caregiver has died or become incapacitated and that person was the caregiver for the inmate's biological or legally adopted child.
- A statement that this person was the only family member capable of caring for the inmate's child.
- The name of the deceased or incapacitated family member caregiver and the relationship of that person to the inmate (e.g., spouse, common-law spouse, mother, sister) and statement that the caregiver is a family member of the child.
- For requests based on a deceased family member caregiver, an official copy of the family member caregiver's death certificate.
- For requests based on an incapacitated family member caregiver, verifiable medical documentation of the incapacitation.
- Verifiable documentation that the inmate is the parent of the child.  Acceptable documentation includes birth certificates, adoption papers, or verification of the inmate's paternity.

- Verifiable documentation providing the name and age of the child.
- A clear statement and documentation that the inmate has a release plan, including housing, and the financial means to care for the child immediately upon the inmate's release.
- Authorization from the inmate for the BOP to obtain any information or documents from any individual, medical entity or doctor, or any government agency about the inmate, family members, and minor child.

The Warden may deny the inmate's request at the institution level of review if the Warden finds that the inmate has not provided adequate information and documentation as set forth above.

b. **Second Stage of the Warden's Review.** Even if the inmate provides adequate and sufficient information and documentation set forth above regarding the RIS request, further investigation is appropriate. At this stage, the Warden should convene a committee consisting of the inmate's unit manager, correctional counselor, and any other relevant staff (social worker, physician, psychologist, etc.) to investigate the facts and circumstances provided by the inmate and to review supporting letters and documents before the Warden makes a recommendation to approve or deny the RIS request. The additional information and supporting documentation gathered by the committee for the Warden's review should include:

- A general description of the child's physical and mental condition.
- A description of the nature of the child's care both during the inmate's pre-arrest and pre-sentence period, and during the inmate's current incarceration.
- Letters or documentation that the deceased/incapacitated family member was and still is the only family member caregiver capable of caring for the inmate's minor child. These letters or documentation should include:

  ➢ Information indicating whether this family member was, in fact, caring for the child during the inmate's incarceration and immediately prior to the family member's death or incapacitation.
  ➢ An explanation of who has been caring for the child since the family member's death or incapacitation.
  ➢ If the child is in foster care, documentation verifying that the inmate will be able to immediately obtain custody of the child.

All RIS requests should be assessed using the factors outlined in Section 7 as well as the following factors.

- Has the inmate committed violent acts before or during the period of incarceration as reflected in the PSR, institutional disciplinary records, or other appropriate documentation?
- Did the inmate have drugs, drug paraphernalia, firearms, or other dangerous substances in the home while caring for the child prior to incarceration?

- To what degree has the inmate had contact with or cared for the child prior to arrest, pretrial or pre-sentence, and during incarceration?  Staff should review institution records for evidence of contact (telephone, mail, email, visiting log, etc.).
- Is there any evidence of child abuse, neglect, or exploitation in the PSR or other documents?
- Are there any documents regarding the inmate's parenting skills or obligations (e.g., child support orders, restraining orders for physical or emotional abuse of spouse, registered partner or children, certificates for classes in anger management or other types of counseling, removal of child from the home for any reasons)?
- Are there records regarding the termination of parental rights or loss of custody of the inmate's (other) child?
- Does the inmate have a detainer as a deportable alien to a country other than where the child resides?
- Has the inmate received public funding or had a job with a living wage for any period of time prior to incarceration?
- Has the inmate engaged in programming (e.g., parenting, anger management) during incarceration that would indicate efforts to improve parenting skills or that would indicate a commitment to caring for the child upon release?

Wardens should also consider any additional reliable documentation (e.g., letters of support from family members, neighbors, doctors, hospitals, and state or local agencies).  Documentation may be obtained with the assistance of the Office of Probation and Pretrial Services.  Wardens should also consider whether the inmate participated in the Inmate Financial Responsibility Program and any information relating to the inmate's substance abuse treatment, physical/mental/ emotional health, and work evaluations during incarceration.

The care of a child may be requested to be a condition of the inmate's release to a supervised release term.  Thus, failure to care for the child may result in a finding of a supervised release violation and return to custody.

## 6.  REQUESTS BASED ON NON-MEDICAL CIRCUMSTANCES – INCAPACITATION OF A SPOUSE OR REGISTERED PARTNER

The criteria for a RIS request may include the incapacitation of an inmate's spouse or registered partner when the inmate would be the only available caregiver for the spouse or registered partner.

For these requests, "spouse" means an individual in a relationship with the inmate, where that relationship has been legally recognized as a marriage, including a legally-recognized common-law marriage.  "Registered partner" means an individual in a relationship with the inmate, where that relationship has been legally recognized as a civil union or registered domestic partnership.

The relationship should have been established before the inmate's offense date of arrest, and should be verified by information in the PSR or other administratively acceptable documentation (e.g. marriage certificate).

For these requests, "incapacitation" means the inmate's spouse or registered partner has:

- Suffered a serious injury, or a debilitating physical illness and the result of the injury or illness is that the spouse or registered partner is completely disabled, meaning that the spouse or registered partner cannot carry on any self-care and is totally confined to a bed or chair; or
- A severe cognitive deficit (e.g., Alzheimer's disease or traumatic brain injury that has severely affected the spouse's or registered partner's mental capacity or function), but may not be confined to a bed or chair.

For these requests, the inmate should demonstrate that the inmate is the only available caregiver for the spouse or registered partner, meaning there is no other family member or adequate care option that is able to provide primary care for the spouse or registered partner.

a. **First Stage of the Warden's Review.** The following information should be provided by the inmate to the Warden in writing for RIS requests based on the incapacitation of the spouse or registered partner:

- Statement that explains that the inmate's spouse or registered partner has become incapacitated.
- Statement that the inmate is the only family member capable of caring for the spouse or registered partner.
- Verifiable medical documentation of the incapacitation of the spouse or registered partner.
- A clear statement and documentation of the inmate's release plan, including housing, and the financial means to care for the spouse or registered partner immediately upon release.
- Written authorization from the inmate and others (as needed) for the BOP to obtain any information or documents from any individual, medical entity or doctor, or any government agency about the inmate, the spouse or registered partner, or other family members.

The Warden may deny the inmate's request at the institution level of review if the Warden finds that the inmate has not provided adequate information and documentation as set forth above.

b. **Second Stage of the Warden's Review.** Even if the inmate provides adequate and sufficient information and documentation set forth above regarding the RIS request, further investigation is appropriate. At this stage, the Warden should convene a committee consisting of the inmate's unit manager, correctional counselor and any other relevant staff (social worker, physician, psychologist, etc.) to investigate the facts and circumstances provided by the inmate and to

review supporting letters and documents before the Warden makes a recommendation to approve or deny the RIS request. The information and supporting documentation gathered by the committee for the Warden's review should include:

- A general description of the spouse's or registered partner's physical and mental condition.
- A description of the nature of the spouse's or registered partner's care, as relevant, during the inmate's pre-arrest and pre-sentence period, and during the inmate's current incarceration.
- Letters or documentation indicating whether the inmate is the only family member caregiver capable of caring for the spouse or registered partner. This should include an explanation of who has been caring for the spouse or registered partner during the inmate's period of incarceration, as relevant.
- Letters or documentation indicating the spouse or registered partner is, or would be, supportive of the inmate's release, and of the inmate assuming the role of the primary caregiver.

All RIS requests should be assessed using the factors outlined in Section 7 as well as the following factors.

- Has the inmate committed violent acts before or during the period of incarceration, as reflected in the PSR, institution disciplinary records, or other appropriate documentation?
- To what extent would the inmate and spouse or registered partner be relying on publicly available resources (e.g., financial or medical) to provide care to the spouse or registered partner?
- Has the inmate ever been charged with, or convicted of, a crime of domestic violence?
- Did the inmate share a residence with the spouse or registered partner prior to the period of incarceration?
- Did the inmate have drugs, drug paraphernalia, firearms, or other dangerous substances in the home shared with the spouse or registered partner prior to incarceration?
- To what degree has the inmate had contact with (or cared for) the spouse or registered partner prior to arrest, pretrial or pre-sentence, and during incarceration? Staff should review institution records for evidence of contact (telephone, mail, email, visiting log, etc.).
- Is there any evidence of abuse or neglect involving the spouse or registered partner in the PSR or other documents?
- Are there any documents regarding the inmate's custodial skills or obligations (e.g., child support orders, restraining orders for physical or emotional abuse of spouse or registered partner or children, certificates for classes in anger management or other types of counseling, removal of children from the home for any reasons)?
- Does the inmate have a detainer as a deportable alien to a country other than where the spouse or registered partner resides?
- Has the inmate received public funding or had a job with a living wage for any period of time prior to incarceration?

- Has the inmate engaged in programming (e.g., anger management, financial responsibility program) during incarceration that would indicate efforts to improve custodial skills and/or that would indicate a commitment to the inmate's spouse or registered partner upon release?

Wardens should also consider any additional reliable documentation (e.g., letters of support from family members, neighbors, doctors, hospitals, and state or local agencies). Documentation may be obtained with the assistance of the Office of Probation and Pretrial Services.

The care of the spouse or registered partner may be requested to be a condition of the inmate's release to a supervised release term. Thus, failure to care for the spouse or registered partner may result in a finding of a supervised release violation and return to custody.

## 7. FACTORS AND EVALUATION OF CIRCUMSTANCES IN RIS REQUESTS

For all RIS requests, the following factors should be considered:

- Nature and circumstances of the inmate's offense.
- Criminal history.
- Comments from victims.
- Unresolved detainers.
- Supervised release violations.
- Institutional adjustment.
- Disciplinary infractions.
- Personal history derived from the PSR.
- Length of sentence and amount of time served. This factor is considered with respect to proximity to release date or Residential Reentry Center (RRC) or home confinement date.
- Inmate's current age.
- Inmate's age at the time of offense and sentencing.
- Inmate's release plans (employment, medical, financial).
- Whether release would minimize the severity of the offense.

When reviewing RIS requests, these factors are neither exclusive nor weighted. These factors should be considered to assess whether the RIS request presents particularly extraordinary and compelling circumstances.

Overall, for each RIS request, the BOP should consider whether the inmate's release would pose a danger to the safety of any other person or the community.

## 8. APPROVAL OF REQUEST

### §571.62 Approval of request.

**a. The Bureau of Prisons makes a motion under 18 U.S.C. 4205(g) or 3582(c)(1)(A) only after review of the request by the Warden, the General Counsel, and either the Medical Director for medical referrals or the Assistant Director, Correctional Programs Division for non-medical referrals, and with the approval of the Director, Bureau of Prisons.**

**(1) The Warden shall promptly review a request for consideration under 18 U.S.C. 4205(g) or 3582(c)(1)(A). If the Warden, upon an investigation of the request determines that the request warrants approval, the Warden shall refer the matter in writing with recommendation to the Office of General Counsel.**

The Warden's referral at a minimum must include the following:

a. The Warden's written recommendation as well as any other pertinent written recommendations or comments made by staff during the institution review of the request.

b. A complete copy of Judgment and Commitment Order or Judgment in a Criminal Case and sentence computation data.

c. A progress report that is not more than 30 days old. All detainers and holds should be resolved prior to the Warden's submission of a case under 18 U.S.C. 3582 (c)(1)(A) or 4205(g). If a pending charge or detainer cannot be resolved, an explanation of the charge or conviction status is needed.

d. *All* pertinent medical records if the reason for the request involves the inmate's health. Pertinent records include, at a minimum, a Comprehensive Medical Summary by the attending physician, which should also include an estimate of life expectancy, and all relevant test results, consultations, and referral reports/opinions.

e. The referral packet must include, when available, a copy of the Presentence Investigation and Form U.S.A. 792, Report on Convicted Offender by U.S. Attorney, Custody Classification form, Notice of Action forms, Probation form 7a, information on fines, CIM Case Information Summary (BP-A0339), and any other documented information that is pertinent to the request. In the absence of a Form U.S.A. 792, the views of the prosecuting Assistant U.S. Attorney may be solicited; those views should be made part of the Warden's referral memo.

f. If the inmate is subject to the Victim and Witness Protection Act of 1982 (VWPA), confirmation of notification to the appropriate victim(s) or witness(es) must be incorporated into the Warden's referral. A summary of any comments received must also be incorporated into the referral. If the inmate is not subject to the VWPA, a statement to that effect must be in the referral.

g. For a request under 18 U.S.C. 3582(c)(1)(A), when a term of supervised release follows the term of imprisonment, confirmation that release plans have been approved by the appropriate U.S. Probation Office must be included in the referral.   If the inmate will be released to an area outside the sentencing district, the U.S. Probation Office assuming supervision must be contacted. If no supervision follows the term of imprisonment, release plans must still be developed.

h. The development of release plans must include, at a minimum, a place of residence and the method of financial support, and may require coordination with various segments of the community, such as hospices, the Department of Veterans Affairs or veterans' groups, Social Security Administration, welfare agencies, local medical organizations, or the inmate's family.

i. Because there is no final agency decision until the Director has reviewed the request, staff at any level may not contact the sentencing judge or solicit the judge's opinion through other officers of the court.

**(2) If the General Counsel determines that the request warrants approval, the General Counsel shall solicit the opinion of either the Medical Director or the Assistant Director, Correctional Programs Division depending upon the nature of the basis for the request. With this opinion, the General Counsel shall forward the entire matter to the Director, Bureau of Prisons, for final decision.**

**(3) If the Director, Bureau of Prisons, grants a request under 18 U.S.C. 4205(g), the Director will contact the U.S. Attorney in the district in which the inmate was sentenced regarding moving the sentencing court on behalf of the Bureau of Prisons to reduce the minimum term of the inmate's sentence to time served. If the Director, Bureau of Prisons, grants a request under 18 U.S.C. 3582(c)(1)(A), the Director will contact the U.S. Attorney in the district in which the inmate was sentenced regarding moving the sentencing court on behalf of the Director of the Bureau of Prisons to reduce the inmate's term of imprisonment to time served.**

**b. Upon receipt of notice that the sentencing court has entered an order granting the motion under 18 U.S.C. 4205(g), the Warden of the institution where the inmate is confined shall schedule the inmate for hearing on the earliest Parole Commission docket.**

Institution staff prepare an amended Sentence Data Summary for use at this hearing. Staff provide a copy of the most recent progress report to the Parole Commission.

**Upon receipt of notice that the sentencing court has entered an order granting the motion under 18 U.S.C. 3582(c)(1)(A), the Warden of the institution where the inmate is confined shall release the inmate forthwith.**

**c. In the event the basis of the request is the medical condition of the inmate, staff shall expedite the request at all levels.**

A request for an expedited review permits the review process to be expedited, but does not lessen the requirement that documentation be provided.

## 9. DENIAL OF REQUEST

**§571.63  Denial of request.**

**a.  When an inmate's request is denied by the Warden, the inmate will receive written notice and a  statement of reasons for the denial.  The inmate may appeal the denial through the Administrative Remedy Procedure (28 CFR part 542, subpart B).**

**b.  When an inmate's request for consideration under 18 U.S.C. 4205(g) or 3582(c)(1)(A) is denied by the General Counsel, the General Counsel shall provide the inmate with a written notice and statement of reasons for the denial.  This denial constitutes a final administrative decision.**

**c.  When the Director, Bureau of Prisons, denies an inmate's request, the Director shall provide the inmate with a written notice and statement of reasons for the denial within 20 workdays after receipt of the referral from the Office of General Counsel.  A denial by the Director constitutes a final administrative decision.**

**d.  Because a denial by the General Counsel or Director, Bureau of Prisons, constitutes a final administrative decision, an inmate may not appeal the denial through the Administrative Remedy Procedure.**

Under 18 USC 3582 (c) (1), an inmate may file a request for a reduction in sentence with the sentencing court after receiving a BP-11 response under subparagraph (a), the denial from the General Counsel under subparagraph (d), or the lapse of 30 days from the receipt of such a request by the Warden of the inmate's facility, whichever is earlier.

## 10. INELIGIBLE OFFENDERS

**§571.64  Ineligible offenders.**

**The Bureau of Prisons has no authority to initiate a request under 18 U.S.C. 4205(g) or 3582(c)(1)(A) on behalf of state prisoners housed in Bureau of Prisons facilities or D.C. Code offenders confined in federal institutions.  The Bureau of Prisons cannot initiate such a motion on behalf of federal offenders who committed their offenses prior to November 1, 1987, and received non- parolable**

**sentences.**

## 11. TRACKING REDUCTION IN SENTENCE REQUESTS

To ensure consistent handling and documentation of RIS requests, Wardens must identify a staff member to serve as an institution RIS Coordinator (IRC) and an alternate.  The principal responsibility of the IRC is to receive and document RIS requests and other RIS-related information in the RIS electronic tracking database.

For each RIS request, the following information is entered into the RIS tracking database by the IRC:

- Inmate's full name.
- Federal register number.
- Date of birth and age.
- Institution.
- Date RIS request received by institution.
- Reason for RIS request.
- Whether staff assisted the inmate with submitting the RIS request.
- Whether the request was submitted by a third party (attorney, partner, family member).
- Disposition of request (e.g., approval or denial).
- Reason for disposition.
- Date of disposition of request.

At the Central Office (CO) level, information regarding RIS requests is entered into the database by RIS Coordinators in the Office of General Counsel, the Health Services Division, and the Correctional Programs Division.  The following information is entered into the RIS tracking database by CO staff:

- Date RIS request received by CO.
- Director's final decision.


## 12. ANNUAL REPORT

Under 18 U.S.C. § 3582 (d)(3), not later than December 21, 2019, and once every year thereafter, the Director of the Bureau of Prisons shall submit to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives a report on requests for sentence reductions pursuant to subsection (c)(1)(A), which shall include a description of, for the previous year—

(A) the number of prisoners granted and denied sentence reductions, categorized by the criteria

relied on as the grounds for a reduction in sentence;

(B) the number of requests initiated by or on behalf of prisoners, categorized by the criteria relied on as the grounds for a reduction in sentence;

(C) the number of requests that Bureau of Prisons employees assisted prisoners in drafting, preparing, or submitting, categorized by the criteria relied on as the grounds for a reduction in sentence, and the final decision made in each request;

(D) the number of requests that attorneys, partners, or family members submitted on a defendant's behalf, categorized by the criteria relied on as the grounds for a reduction in sentence, and the final decision made in each request;

(E) the number of requests approved by the Director of the Bureau of Prisons, categorized by the criteria relied on as the grounds for a reduction in sentence;

(F) the number of requests denied by the Director of the Bureau of Prisons and the reasons given for each denial, categorized by the criteria relied on as the grounds for a reduction in sentence;

(G) for each request, the time elapsed between the date the request was received by the warden and final decision, categorized by the criteria relied on as the grounds for a reduction in sentence;

(H) for each request, the number of prisoners who died while their request was pending and, for each, the amount of time that had elapsed between the date the request was received by the Bureau of Prisons, categorized by the criteria relied on as the grounds for a reduction in sentence;

(I) the number of Bureau of Prisons notifications to attorneys, partners, and family members of their right to visit a terminally ill defendant as required under paragraph (2)(A)(ii) and, for each, whether a visit occurred and how much time elapsed between the notification and the visit;

(J) the number of visits to terminally ill prisoners that were denied by the Bureau of Prisons due to security or other concerns, and the reasons given for each denial; and

(K) the number of motions filed by defendants with the court after all administrative rights to appeal a denial of a sentence reduction had been exhausted, the outcome of each motion, and the time that had elapsed between the date the request was first received by the Bureau of Prisons and the date the defendant filed the motion with the court.

## 13. ACA AGENCY ACCREDITATION PROVISIONS

None.

## REFERENCES

*Directives Referenced*
P5162.05       Categorization of Offenses (3/16/09)

*Federal Regulations*
- Rules cited in this Program Statement are contained in 28 CFR 571.60 through 571.64.

- Rules referenced in this Program Statement are contained in 28 CFR 542.10 through 542.16 and 572.40.

*U.S. Code Referenced*
- Title 18, United States Code, Section 4205(g).
- Title 18, United States Code, Section 3582.

*BOP Forms*
BP-A0339    CIM Case Information Summary
BP-A0192    Release of Information Consent

*Records Retention Requirements*
Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) system on Sallyport.



Learn More

## Coronavirus.gov

The primary lane of information for the public regarding Coronavirus (COVID-19) is a portal for public information published by the Coronavirus (COVID-19) Task Force at the White House, working in conjunction with CDC, HHS and other agency stakeholders.

Go to coronavirus.gov

## CDC.gov

The Centers for Disease Control and Prevention (CDC) has established a resource portal on CDC.gov with the latest information from CDC and the overarching medical community on COVID-19.

Go to cdc.gov

## USA.gov

To learn about international travel restrictions, how you can prepare for coronavirus, and what the U.S. government is doing in response to the virus, visit https://www.usa.gov/coronavirus

Go to usa.gov/coronavirus

# COVID-19 Cases

05/12/2020 - The BOP has **139,584** federal inmates in BOP-managed institutions and **11,235** in community-based facilities. The BOP staff complement is approximately **36,000**. There are **2818 federal inmates** and **262 BOP staff** who have confirmed positive test results for COVID-19 nationwide. Currently, **1288** inmates and **279** staff have recovered. There have been **50** federal inmate deaths and **0** BOP staff member deaths attributed to COVID-19 disease. **Full breakdown and additional details ...**

BOP: COVID-19 Update



*[Mouseover facility markers for more information. Zoom in to densely clustered marker areas to see additional locations.]*

## COVID-19 Home Confinement Information

Given the surge in positive cases at select sites and in response to the Attorney General Barr's directives, the BOP began immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, to determine which inmates are suitable for home confinement. Since the release of the Attorney General's original memo to the Bureau of Prisons on March 26, 2020 instructing us to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the BOP has placed an additional **2,471** inmates on home confinement; an increase of **87.5** percent.

COVID-19 Home Confinement Information Frequently Asked Questions

---

## Resources

- Correcting Myths and Misinformation About the BOP and COVID-19

- COVID-19 Visitor/Volunteer/Contractor Screening Tool

- COVID-19 Inmate Screening Tool

- COVID-19 Staff Screening Tool

- Coronavirus (COVID-19) Precautions/Modified Operations for Residential Reentry Centers.

- Coronavirus (COVID-19) Religious Accommodations



Declaration for Persons in Detention and Detention Staff
COVID-19

Chris Beyrer, MD, MPH
Professor of Epidemiology
Johns Hopkins Bloomberg School of Public Health
Baltimore, MD

I, Chris Beyrer, declare as follows:

1.  I am a professor of Epidemiology, International Health, and Medicine at the Johns Hopkins
    Bloomberg School of Public Health, where I regularly teach courses in the epidemiology
    of infectious diseases. This coming semester, I am teaching a course on emerging
    infections. I am a member of the National Academy of Medicine, a former President of the
    International AIDS Society, and a past winner of the Lowell E. Bellin Award for Excellence
    in Preventive Medicine and Community Health.  I have been active in infectious diseases
    Epidemiology since completing my training in Preventive Medicine and Public Health at
    Johns Hopkins in 1992.

2.  I am currently actively at work on the COVID-19 pandemic in the United States. Among
    other activities I am the Director of the Center for Public Health and Human Rights at
    Johns Hopkins, which is active in disease prevention and health promotion among
    vulnerable populations, including prisoners and detainees, in the US, Africa, Asia, and
    Latin America.

                    **The nature of COVID-19**

3.  The SARS-nCoV-2 virus, and the human infection it causes, COVID-19 disease, is a
    global pandemic and has been termed a global health emergency by the WHO. Cases
    first began appearing sometime between December 1, 2019 and December 31, 2019 in
    Hubei Province, China. Most of these cases were associated with a wet seafood market
    in Wuhan City.

4.  On January 7, 2020, the virus was isolated. The virus was analyzed and discovered to be
    a coronavirus closely related to the SARS coronavirus which caused the 2002-2003 SARS
    epidemic.

5.  COVID-19 is a serious disease. The overall case fatality rate has been estimated to range
    from 0.3 to 3.5%, which is 5-35 times the fatality associated with influenza infection.
    COVID-19 is characterized by a flu-like illness. While more than 80% of cases are self-
    limited and generally mild, overall some 20% of cases will have more severe disease
    requiring medical intervention and support.

6.  The case fatality rate varies significantly depending on the presence of certain
    demographic and health factors. The case fatality rate is higher in men, and varies
    significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for
    those with pre-existing medical conditions including cardio-vascular disease, respiratory
    disease, diabetes, and immune compromise.

7.  Among patients who have more serious disease, some 30% will progress to Acute
    Respiratory Distress Syndrome (ARDS) which has a 30% mortality rate overall, higher in
    those with other health conditions.  Some 13% of these patients will require mechanical

ventilation, which is why intensive care beds and ventilators have been in insufficient supply in Italy, Iran, and parts of China.

8. COVID-19 is widespread. Since it first appeared in Hubei Province, China, in late 2019, outbreaks have subsequently occurred in more than 100 countries and all continents, heavily affected countries include Italy, Spain, Iran, South Korea, and increasingly, the US. As of today, March 16th, 2020, there have been 178,508 confirmed human cases globally, 7,055 known deaths, and some 78,000 persons have recovered from the infection. The pandemic has been termed a global health emergency by the WHO. It is not contained and cases are growing exponentially.

9. SARS-nCoV-2 is now known to be fully adapted to human to human spread. This is almost certainly a new human infection, which also means that there is no pre-existing or "herd" immunity, allowing for very rapid chains of transmission once the virus is circulating in communities.

10. The U.S. CDC estimates that the reproduction rate of the virus, the $R_0$, is 2.4-3.8, meaning that each newly infected person is estimated to infect on average 3 additional persons. This is highly infectious and only the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity. This again, is likely a function of all human populations currently being highly susceptible. The attack rate given an exposure is also high, estimated at 20-30% depending on community conditions, but may be as high as 80% in some settings and populations. The incubation period is thought to be 2-14 days, which is why isolation is generally limited to 14 days.

### The risks of COVID-19 in detention facilities

11. COVID-19 poses a serious risk to inmates and workers in detention facilities. Detention Facilities, including jails, prisons, and other closed settings, have long been known to be associated with high transmission probabilities for infectious diseases, including tuberculosis, multi-drug resistant tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis.

12. The severe epidemic of Tuberculosis in prisons in Central Asia and Eastern Europe was demonstrated to increase community rates of Tuberculosis in multiple states in that region, underscoring the risks prison outbreaks can lead to for the communities from which inmates derive.

13. Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities, as 6-foot distancing and proper decontamination of surfaces is virtually impossible. For example, several deaths were reported in the US in immigration detention facilities associated with ARDS following influenza A, including a 16-year old male immigrant child who died of untreated ARDS in custody in May, 2019.

14. A number of features of these facilities can heighten risks for exposure, acquisition, transmission, and clinical complications of these infectious diseases. These include physical/mechanical risks such as overcrowding, population density in close confinement, insufficient ventilation, shared toilet, shower, and eating environments and limits on hygiene and personal protective equipment such as masks and gloves in some facilities.

15. Additionally, the high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure. This has led to prison outbreaks of COVID-19 in multiple detention facilities in China, associated with introduction into facilities by staff.

16. In addition to the nature of the prison environment, prison and jail populations are also at additional risk, due to high rates of chronic health conditions, substance use, mental health issues, and, particularly in prisons, aging and chronically ill populations who may be vulnerable to more severe illnesses after infection, and to death.

17. While every effort should be made to reduce exposure in detention facilities, this may be extremely difficult to achieve and sustain.  It is therefore an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible.

18. Pre-trial detention should be considered only in genuine cases of security concerns. Persons held for non-payment of fees and fines, or because of insufficient funds to pay bail, should be prioritized for release.  Immigrants awaiting decisions on their removal cases who are not a flight risk can be monitored in the community and should be released from immigration detention centers. Older inmates and those with chronic conditions predisposing to severe COVID-19 disease (heart disease, lung disease, diabetes, immune-compromise) should be considered for release.

19. Given the experience in China as well as the literature on infectious diseases in jail, an outbreak of COVID-19 among the U.S. jail and prison population is likely. Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of March, 2020.


Professor Chris Beyrer[1]

---

[1] These views are mine alone; I do not speak for Johns Hopkins University or any department therein.

**References**

Stuckler D, Basu S, McKee M, King I. Mass incarceration can explain population increases in TB and multi-drug resistant TB in European and Central Asian countries. Proceedings of the National Academy of Science USA, 2008. 105:13280-85.

Beyrer C, Kamarulzaman A, McKee M; Lancet HIV in Prisoners Group. Prisoners, prisons, and HIV: time for reform. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30829-7. doi: 10.1016/S0140-6736(16)30829-7. [Epub ahead of print] No abstract available.
PMID: 27427447.

Marusshak LM, Sabol W, Potter R, Reid L, Cramer E. Pandemic Influenza and Jail Facilities and Populations. American Journal of Public Health. 2009 October; 99(Suppl 2): S339–S344.

Rubenstein LS, Amon JJ, McLemore M, Eba P, Dolan K, Lines R, Beyrer C. HIV, prisoners, and human rights. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30663-8. doi: 10.1016/S0140-6736(16)30663-8

Wang J, Ng, CY, Brook R. Response to COVID-19 in Taiwan: Big Data Analytics, New Technology, and Proactive Testing. March 3, 2020. *JAMA.* Published online March 3, 2020. doi:10.1001/jama.2020.3151



12/21/2009  12:56   2123125142        RADIOLOGY DEPT              PAGE 01/02

NEW YORK DOWNTOWN HOSPITAL
DEPARTMENT OF RADIOLOGY
170 WILLIAM STREET
NEW YORK, NY 10038

PATIENT: I ...
MR#: 08209531        DOB: 04/23/1964      AGE/SEX: 45Y M
REFERRING LOCATION: RADIOLOGY
ORDERING PHYSICIAN: Borecky, Michael
DIAGNOSIS: (PVT)

*PATINO -RESTREPO,*
*CARLOS*
*64782-053*

EXAM: CCHTWO       CT CHEST, (NON-CONTRAST)
EXAM COMPLETION: 12/17/2009  1046    ORDER NUMBER: 11731CT09
STATUS: Final

Clinical information: 45-year-old man with lung nodules identified on prior
abdominal CT.

Technique: 12/17/2009 - CT of the chest helically acquired in 3.70 mm
contiguous axial sections from the thoracic inlet to the adrenal glands,
without intravenous contrast.

Comparison: Abdominal CT dated 02/24/2009.

Findings:

There is a 1.8 x 1.2 cm low attenuation nodule within the left thyroid,
without calcification. There is no thoracic lymphadenopathy. The heart is
of normal size, and there is no pericardial effusion. There is no pleural
effusion.

A 4 mm nodule in the periphery of the lateral basal right lower lobe (ser
601, im 43) is stable, as is a 5 mm nodule within the periphery of the
posterior basal left lower lobe (ser 601, im 49). No other nodule is
identified. There is no pulmonary infiltrate or consolidation.  The trachea
and mainstem bronchi are patent.

Limited images the upper abdomen demonstrate normal appearance of the
adrenal glands. Left renal cortical scarring and a lower pole cyst
containing dependent calcium are stable. No suspicious osseous lesion is
identified.

IMPRESSION:
1. Stable appearance of solitary subcentimeter nodules within the periphery
of each lower lobe, as described above. Stability over 10 months is
suggestive of benign etiology. No other nodule is identified.
2. Non-calcified solitary left thyroid nodule measuring up to 1.8 cm. No
associated calcification or lymphadenopathy. This is statistically most
likely to represent an adenoma, although specific diagnosis cannot be made

FINALIZED ON: 12/17/2009
CPT4 CODE: 71250,76376

M. BORECKY M.D
MEDICAL OFFICER   MB
MDC BROOKLYN

ξ

*64782-053*

NEW YORK DOWNTOWN HOSPITAL
DEPARTMENT OF RADIOLOGY
170 WILLIAM STREET
NEW YORK, NY 10038

PATIENT: PATINO-RESTREPO,CARLOS
MR#: 08209551    DOB: 04/23/1964    AGE/SEX: 44Y M
REFERRING LOCATION: RADIOLOGY
ORDERING PHYSICIAN: Borecky, Michael
DIAGNOSIS: (PVT) BILATERAL KIDNEY STONES

EXAM: CABPWO    CT ABDOMEN / PELVIS (WO)
EXAM COMPLETION: 02/24/2009  1101    ORDER NUMBER: 1688CT09
STATUS: Final

CT ABDOMEN AND PELVIS

HISTORY: 44 year-old male with reported bilateral kidney stones.

TECHNIQUE: Serial transaxial CT sections of the abdomen and pelvis were
obtained from the diaphragm to the pubic symphysis in the spiral mode using
3.75 mm slice thicknesses. No contrast was administered as per the renal
stone protocol. Additional 2 mm coronal reconstructions were obtained.
There are no previous studies available for comparison.

FINDINGS: Review of the lung bases at lung windows reveals a small
subpleural bullous/bleb in the right lower lobe. There is a tiny nodule
measuring less than 5 mm in the lateral right lower lobe (series 601, image
9). There is a 0.4 x 0.5 cm left lower lobe nodule with a maximum pixel
value of 176 Hounsfield units, possibly representing a calcified granuloma
(series 601, image 15 and series 602, image 107). A chest CT scan is
recommended for further characterization, to rule out other nodules, and to
serve as a baseline for future follow-up studies. Mild bilateral
gynecomastia is seen.

The liver and spleen appear unremarkable. The pancreas is without evidence
of mass. No adrenal masses are seen. A 0.3 x 0.4 cm calcified stone is seen
in the mid right kidney. One or 2 tiny stones are also seen in the lower
pole of the right kidney. There is marked cortical thinning/scarring
involving the posterior left kidney. A calcified stone measuring 0.6 x 1.2
cm is seen in the mid left kidney. A bilobed low attenuation lesion in the
mid and lower pole of the left kidney measures water density and measures
5.9 x 5 x 4.8 cm, likely representing a cyst. It contains a small amount of
probable layering milk of calcium inferiorly. An additional rounded low
attenuation lesion in the posterior mid left kidney measures 1.6 x 2.2 cm
and measures water density, also likely representing a cyst. It contains a
small punctate focus of mural calcification. There is no evidence of
hydronephrosis. There is no evidence of stone in the ureters.

There is no evidence of retroperitoneal lymphadenopathy. Sections taken
through the pelvis reveal no evidence of pelvic lymphadenopathy or abnormal
pelvic mass. The bladder appears unremarkable. There is no evidence of
stone in the bladder. The prostate measures 3.1 x 4.2 cm, which is not

FINALIZED ON: 02/25/2009
CPT4 CODE: 74150,72192,76376

12/21/2009  12:56    2123125142          RADIOLOGY DEPT              PAGE  02/02

NEW YORK DOWNTOWN HOSPITAL
DEPARTMENT OF RADIOLOGY
170 WILLIAM STREET
NEW YORK, NY 10038

PATIENT: H.,
MR#: 06209551     DOB: 04/23/1964    AGE/SEX: 45Y M
REFERRING LOCATION: RADIOLOGY
ORDERING PHYSICIAN: Borecky, Michael
DIAGNOSIS: (PVT)

EXAM: CCHTWO     CT CHEST, (NON-CONTRAST)
EXAM COMPLETION: 12/17/2009   1046     ORDER NUMBER: 11731CT09
STATUS: Final

on CT. Correlation with thyroid panel is recommended.
Electronically Signed By: T338 David  A. Boyajian M.D.



RECEIVED
JAN 2 6 2010

M. BORECKY M.D.
MEDICAL OFFICER
MDC BROOKLYN

FINALIZED ON: 12/17/2009
CPT4 CODE: 71250,76376

**Bureau of Prisons**
**Health Services**
**Clinical Encounter**

| | | | |
|---|---|---|---|
| Inmate Name: | PATINO RESTREPO, CARLOS ARTURO | Reg #: | 64782-053 |
| Date of Birth: | 04/23/1964 | Sex: M Race: WHITE | Facility: BRO |
| Encounter Date: | 11/10/2010 14:34 | Provider: McLean, Diane MD | Unit: Z05 |

Chronic Care encounter performed at Special Housing Unit.

**SUBJECTIVE:**

    **COMPLAINT 1**      **Provider:** McLean, Diane MD

        **Chief Complaint:** MENTAL HEALTH

        **Subjective:**    Asked to see IM by psychology. Pt interviewed with interpreter. He reports self d/c both Zyprexa and prozac " because one of them made me feel like a zombie during the day". He reports current depressed mood, poor sleep, moderate appetite, po intake, energy. Discussed plan to re-start prozac, d/c Zyprexa, start remeron; pt reports agreement with plan.

        **Pain Location:**

        **Pain Scale:**

        **Pain Qualities:**

        **History of Trauma:**

        **Onset:**

        **Duration:**

        **Exacerbating Factors:**

        **Relieving Factors:**

        **Comments:**

**Seen for clinic(s):** Mental Health

**ROS:**

    **Psychiatric**

        **General**

            Yes: Anxiety-Moderate, Appetite-Normal, Concentration-Normal, Energy-Normal, Memory-Normal, Mood-Down, Sleep-Decreased

            No: Hallucinations-Auditory, Hallucinations-Olfactory, Hallucinations-Tactile, Hallucinations-Visual, Homicide/Other Harm Thoughts, Suicide/Self-Harm Thoughts

**OBJECTIVE:**

**Exam:**

    **Mental Health**

        **Posture**

            Yes: Normal, Upright, Attentive

        **Grooming/Hygiene**

            Yes: Normal, Appropriate Grooming

        **Facial Expressions**

            Yes: Normal Expression, Appropriate Expression

        **Affect**

            Yes: Constricted, Depression

        **Speech/Language**

            Yes: Normal, Appropriate

        **Mood**

            Yes: Dysphoric

| Inmate Name: | PATINO RESTREPO, CARLOS ARTURO | | | Reg #: | 64782-053 |
|---|---|---|---|---|---|
| Date of Birth: | 04/23/1964 | Sex: | M  Race:  WHITE | Facility: | BRO |
| Encounter Date: | 11/10/2010 14:34 | Provider: | McLean, Diane MD | Unit: | Z05 |

**Exam:**

**Thought Process**
Yes: Normal, Appropriate

**Thought Content**
Yes: Normal, Appropriate

**Perceptions**
No: Hallucinations-Auditory, Hallucinations-Visual, Hallucinations - Tactile, Hallucinations - Olfactory

**Orientation**
Yes: Normal, Appropriate, Alert and Oriented x 3

**ASSESSMENT:**

| Description | ICD9 | Status | Status Date | Progress | Type |
|---|---|---|---|---|---|
| Axis II: Deferred | Axis II: Deferred | Current | 02/26/2010 | Not Improved/Same | Chronic |
| Axis V: GAF 71 - 100 | G4 | Current | 02/26/2010 | Worsened | Chronic |
| Axis I:  Depressive DO, not elsewhere classified | 311 | Current | 11/10/2010 | Initial | Temporary/Acute |

**PLAN:**

**New Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | Fluoxetine Capsule | 11/10/2010 14:34 | 20mg Orally  daily x 180 day(s) — Please re-start prozac |
| | Indication:  Axis I:  Depressive DO, not elsewhere classified | | |
| | Mirtazapine Tablet | 11/10/2010 14:34 | 15mg Orally  at bedtime x 180 day(s) Pill Line Only |
| | Indication:  Axis I:  Depressive DO, not elsewhere classified | | |

**Discontinued Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| 86564-BRO | OLANZapine  5 MG Tab | 11/10/2010 14:34 | *Take one tablet by mouth at bedtime ***pill line*** *Consent form on file * |

Discontinue Type:    *When Pharmacy Processes*
Discontinue Reason: *Adverse Drug Reaction (ADR)*
Indication:

NEW YORK DOWNTOWN HOSPITAL
DEPARTMENT OF RADIOLOGY
170 WILLIAM STREET
NEW YORK, NY 10038

PATIENT: PATINO-RESTREPO,CARLOS
MR#: 05209581      DOB: 04/23/1984      AGE/SEX: 45Y M
REFERRING LOCATION: RADIOLOGY
ORDERING PHYSICIAN: Borocky, Michael
DIAGNOSIS: (PVT) BILATERAL KIDNEY STONES

EXAM: CABPWO      CT ABDOMEN / PELVIS (WO)
EXAM COMPLETION: 02/24/2009  1101      ORDER NUMBER: 1688CT09
STATUS: Final

enlarged.

Review of bone windows reveals no evidence of destructive lesions.

IMPRESSION:

1. Bilateral nonobstructing renal stones, as described above. No evidence
of stone in ureters or bladder.
2. Marked cortical thinning/scarring involving the posterior left kidney.
3. Left renal cysts, as described above.
4. Bilateral lung nodules. A chest CT scan is recommended for further
evaluation. See above discussion.
5. Mild bilateral gynecomastia.


Electronically Signed By: T359 Lawrence M.D. Milner



NOV 24 2009
M. Borecky, MD
Physician
MDC Brooklyn



FINALIZED ON: 02/25/2009
CPT4 CODE: 74150,72192,76378

NEW YORK DOWNTOWN HOSPITAL
DEPARTMENT OF RADIOLOGY
170 WILLIAM STREET
NEW YORK, NY 10038

PATIENT: PATINO-RESTREPO,CARLOS
MR#: 08209581    DOB: 04/23/1964    AGE/SEX: 45Y M
REFERRING LOCATION: RADIOLOGY
ORDERING PHYSICIAN: Borecky, Michael
DIAGNOSIS: (PVT) BILATERAL KIDNEY STONES

EXAM: CABPWO    CT ABDOMEN / PELVIS (WO)
EXAM COMPLETION: 02/24/2009  1101    ORDER NUMBER: 1688CT09
STATUS: Final

CT ABDOMEN AND PELVIS

HISTORY: 44 year-old male with reported bilateral kidney stones.

TECHNIQUE: Serial transaxial CT sections of the abdomen and pelvis were
obtained from the diaphragm to the pubic symphysis in the spiral mode using
3.75 mm slice thicknesses. No contrast was administered as per the renal
stone protocol. Additional 2 mm coronal reconstructions were obtained.
There are no previous studies available for comparison.

FINDINGS: Review of the lung bases at lung windows reveals a small
subpleural bullous/bleb in the right lower lobe. There is a tiny nodule
measuring less than 5 mm in the lateral right lower lobe (series 601, image
9). There is a 0.4 x 0.5 cm left lower lobe nodule with a maximum pixel
value of 176 Hounsfield units, possibly representing a calcified granuloma
(series 601, image 15 and series 602, image 107). A chest CT scan is
recommended for further characterization, to rule out other nodules, and to
serve as a baseline for future follow-up studies. Mild bilateral
gynecomastia is seen.

The liver and spleen appear unremarkable. The pancreas is without evidence
of mass. No adrenal masses are seen. A 0.3 x 0.4 cm calcified stone is seen
in the mid right kidney. One or 2 tiny stones are also seen in the lower
pole of the right kidney. There is marked cortical thinning/scarring
involving the posterior left kidney. A calcified stone measuring 0.6 x 1.2
cm is seen in the mid left kidney. A bilobed low attenuation lesion in the
mid and lower pole of the left kidney measures water density and measures
5.9 x 5 x 4.8 cm, likely representing a cyst. It contains a small amount of
probable layering milk of calcium inferiorly. An additional rounded low
attenuation lesion in the posterior mid left kidney measures 1.6 x 2.2 cm
and measures water density, also likely representing a cyst. It contains a
small punctate focus of mural calcification. There is no evidence of
hydronephrosis. There is no evidence of stone in the ureters.

There is no evidence of retroperitoneal lymphadenopathy. Sections taken
through the pelvis reveal no evidence of pelvic lymphadenopathy or abnormal
pelvic mass. The bladder appears unremarkable. There is no evidence of
stone in the bladder. The prostate measures 3.1 x 4.2 cm, which is not

FINALIZED ON: 02/25/2009
CPT4 CODE: 74150,72192,76376

NOV 2 4 2009    M. Borecky, MD
Physician
MDC Brooklyn



PATINO,CARLOS
ID:     64782053

11/20/2009 10:12:26

IRREGULAR SINUS BRADYCARDIA
** INTERPRETATION MADE WITHOUT KNOWING PATIENT'S GENDER/AGE **
NO OTHER FINDING

D.O.B.:
Meds:
Class:
Loc:    1

| Vent. Rate: | 58 bpm |
| RR Interval: | 1028 ms |
| PR Interval: | 142 ms |
| QRS Duration: | 78 ms |
| QT Interval: | 396 ms |
| QTc Interval: | 393 ms |
| QT Dispersion: | 22 ms |
| P-R-T AXIS: | 26° 14° 33° |

Summary: NORMAL ECG EXCEPT FOR RATE   * Unconfirmed Analysis *

NOV 24 2009

M Berecky, MD
Physician
MDC Brooklyn

| Specimen # 324-142-5924-0 | Control/Req Number 60097414987 | Pg 3 | LabCorp® V 1.36 |
|---|---|---|---|

| Fasting | Micro Source | Total Urine Volume | Report Status | Clinical Information |
|---|---|---|---|---|
| N/A | | | S /Final | |

| Date Collected 11/20/09 | Time Collected 10:45 | Date Entered 11/21/09 | Date Reported 11/23/09 | |

| Patient ID Number 64782053 | Patient Phone Number | Patient SSN | Account |
|---|---|---|---|

**Patient Name** PATINO, RESTREPO

**Patient Address**

Sex M   Date of Birth 04/23/64

Account 31761420
MDc Brooklyn

100 29th St
Brooklyn NY  11232

718-840-4200

DR.ID: BORECKY    PHY NAME: BORECKY

B7

**Comments**
PATN AGE: 045/06/28

**Tests Requested** CBC With Differential/Platelet; Comp. Metabolic Panel (14);
Urinalysis, Routine; Lipid Panel; Prostate-Specific Ag, Serum

PSA value 0.2 ng/mL or greater.
Values obtained with different assay methods or kits cannot be used
interchangeably. Results cannot be interpreted as absolute evidence
of the presence or absence of malignant disease.

----------------------------------------------------------------
01 RN    LabCorp Raritan          Dir: Michael Mahoney, MD
         69 First Avenue, Raritan, NJ 08869-1800
For inquiries, the physician may contact Branch: 800-745-0233 Lab: 800-631-5250
----------------------------------------------------------------
                    LAST PAGE OF REPORT

RECEIVED
DEC 0 1 2009

M. Borecky, MD
Physician
MDC Brooklyn

**FINAL REPORT**

© 2007 Laboratory Corporation of America® Holdings
All Rights Reserved

PATINO, RESTREPO          64782053       324-142-5924-0  Seq# 3528  11-23-09 10:05ET



| Specimen # | Control/Req Number | Pg | 2 | | LabCorp® V 1.36 |
|---|---|---|---|---|---|
| 324-142-5924-0 | 60097414987 | | | | |
| Fasting | Micro Source | Total Urine Volume | Report Status | | Clinical Information |
| N/A | | | S /Final | | |
| Date Collected | Time Collected | Date Entered | Date Reported | | |
| 11/20/09 | 10:45 | 11/21/09 | 11/23/09 | | |

Patient ID Number: 64782053
Patient Name: PATINO, RESTREPO
Sex: M
Date of Birth: 04/23/64

Account
31761420
MDc Brooklyn
100 29th St
Brooklyn NY 11232
718-840-4200
B7

Comments
PATN AGE: 045/06/28

DR.ID: BORECKY   PHY NAME: BORECKY

Tests Requested: CBC With Differential/Platelet; Comp. Metabolic Panel (14);
Urinalysis, Routine; Lipid Panel; Prostate-Specific Ag, Serum

| TESTS | RESULT | FLAG | | REFERENCE INTERVAL | LAB |
|---|---|---|---|---|---|
| A/G Ratio | 1.6 | | | 1.1 - 2.5 | |
| Bilirubin, Total | 0.7 | | mg/dL | 0.1 - 1.2 | 01 |
| Alkaline Phosphatase, S | 75 | | IU/L | 25 - 150 | 01 |
| AST (SGOT) | 20 | | IU/L | 0 - 40 | 01 |
| ALT (SGPT) | 19 | | IU/L | 0 - 55 | 01 |
| **Urinalysis, Routine** | | | | | |
| Urinalysis Gross Exam | | | | | 01 |
| Specific Gravity | 1.015 | | | 1.005 - 1.030 | 01 |
| pH | 7.5 | | | 5.0 - 7.5 | 01 |
| Urine-Color | Yellow | | | Yellow | 01 |
| Appearance | Clear | | | Clear | 01 |
| WBC Esterase | Negative | | | Negative | 01 |
| Protein | Negative | | | Negative/Trace | 01 |
| Glucose | Negative | | | Negative | 01 |
| Ketones | Negative | | | Negative | 01 |
| Occult Blood | Negative | | | Negative | 01 |
| Bilirubin | Negative | | | Negative | 01 |
| Urobilinogen,Semi-Qn | 1.0 | | EU/dL | 0.0 - 1.9 | 01 |
| Nitrite, Urine | Negative | | | Negative | 01 |
| Microscopic Examination | | | | | |
| Microscopic follows if indicated. | | | | | 01 |
| **Lipid Panel** | | | | | |
| Cholesterol, Total | 257 | High | mg/dL | 100 - 199 | 01 |
| Triglycerides | 173 | High | mg/dL | 0 - 149 | 01 |
| HDL Cholesterol | 45 | | mg/dL | >39 | 01 |
| Comment | | | | | 01 |
| According to ATP-III Guidelines, HDL-C >59 mg/dL is considered a | | | | | |
| negative risk factor for CHD. | | | | | |
| VLDL Cholesterol Cal | 35 | | mg/dL | 5 - 40 | |
| LDL Cholesterol Calc | 177 | High | mg/dL | 0 - 99 | |
| **Prostate-Specific Ag, Serum** | | | | | |
| Prostate Specific Ag, Serum | 0.6 | | ng/mL | 0.0 - 4.0 | 01 |
| Roche ECLIA methodology. | | | | | |

According to the American Urological Association, Serum PSA should
decrease and remain at undetectable levels after radical
prostatectomy. The AUA defines biochemical recurrence as an initial
PSA value 0.2 ng/mL or greater followed by a subsequent confirmatory

**FINAL REPORT**

© 2007 Laboratory Corporation of America® Holdings
All Rights Reserved

PATINO, RESTREPO          64782053      324-142-5924-0 Seq# 3528 11-23-09 10:05ET

Universal #2   56029187

| Specimen # | Control/Req Number | | Pg  1 | | LabCorp® V 1.36 |
|---|---|---|---|---|---|
| 324-142-5924-0 | 60097414987 | | | | |
| Fasting N/A | Micro Source | Total Urine Volume | Report Status S /Final | Clinical Information | |
| Date Collected 11/20/09 | Time Collected 10:45 | Date Entered 11/21/09 | Date Reported 11/23/09 | | |
| Patient ID Number 64782053 | Patient Phone Number | | Patient SSN | Account 31761420 | |

PATIENT NAME: PATINO, RESTREPO    Sex: M    Date of Birth: 04/23/64

MDc Brooklyn
100 29th St
Brooklyn NY  11232

718-840-4200

DR.ID: BORECKY      PHY NAME: BORECKY

B7

Coreworx

PATN AGE: 045/06/28

Tests Requested: CBC With Differential/Platelet; Comp. Metabolic Panel (14); Urinalysis, Routine; Lipid Panel; Prostate-Specific Ag, Serum

| CBC With Differential/Platelet | RESULT | FLAG | UNITS | REFERENCE INTERVAL | LAB |
|---|---|---|---|---|---|
| WBC | 8.0 | | x10E3/uL | 4.0 - 10.5 | 01 |
| RBC | 5.61 | High | x10E6/uL | 4.10 - 5.60 | 01 |
| Hemoglobin | 16.1 | | g/dL | 12.5 - 17.0 | 01 |
| Hematocrit | 47.9 | | % | 36.0 - 50.0 | 01 |
| MCV | 85 | | fL | 80 - 98 | 01 |
| MCH | 28.7 | | pg | 27.0 - 34.0 | 01 |
| MCHC | 33.6 | | g/dL | 32.0 - 36.0 | 01 |
| RDW | 13.4 | | % | 11.7 - 15.0 | 01 |
| Platelets | 199 | | x10E3/uL | 140 - 415 | 01 |
| Neutrophils | 65 | | % | 40 - 74 | 01 |
| Lymphs | 29 | | % | 14 - 46 | 01 |
| Monocytes | 6 | | % | 4 - 13 | 01 |
| Eos | 0 | | % | 0 - 7 | 01 |
| Basos | 0 | | % | 0 - 3 | 01 |
| Neutrophils (Absolute) | 5.2 | | x10E3/uL | 1.8 - 7.8 | 01 |
| Lymphs (Absolute) | 2.3 | | x10E3/uL | 0.7 - 4.5 | 01 |
| Monocytes(Absolute) | 0.5 | | x10E3/uL | 0.1 - 1.0 | 01 |
| Eos (Absolute) | 0.0 | | x10E3/uL | 0.0 - 0.4 | 01 |
| Baso (Absolute) | 0.0 | | x10E3/uL | 0.0 - 0.2 | 01 |
| | | | | | |
| Comp. Metabolic Panel (14) | | | | | |
| Glucose, Serum | 82 | | mg/dL | 65 - 99 | 01 |
| BUN | 17 | | mg/dL | 5 - 26 | 01 |
| Creatinine, Serum | 1.15 | | mg/dL | 0.76 - 1.27 | 01 |
| eGFR | >59 | | mL/min/1.73 | >59 | |
| eGFR AfricanAmerican | >59 | | mL/min/1.73 | >59 | |

Note:  Persistent reduction for 3 months or more in an eGFR <60 mL/min/1.73 m2 defines CKD.  Patients with eGFR values >/=60 mL/min/1.73 m2 may also have CKD if evidence of persistent proteinuria is present. Additional information may be found at www.kdoqi.org.

| BUN/Creatinine Ratio | 15 | | | 8 - 27 | |
| Sodium, Serum | 140 | | mmol/L | 135 - 145 | 01 |
| Potassium, Serum | 4.8 | | mmol/L | 3.5 - 5.2 | 01 |
| Chloride, Serum | 101 | | mmol/L | 97 - 108 | 01 |
| Carbon Dioxide, Total | 25 | | mmol/L | 20 - 32 | 01 |
| Calcium, Serum | 9.7 | | mg/dL | 8.5 - 10.6 | 01 |
| Protein, Total, Serum | 8.1 | | g/dL | 6.0 - 8.5 | 01 |
| Albumin, Serum | 5.0 | | g/dL | 3.5 - 5.5 | 01 |
| Globulin, Total | 3.1 | | g/dL | 1.5 - 4.5 | |

FINAL REPORT

© 2007 Laboratory Corporation of America® Holdings
All Rights Reserved

PATINO, RESTREPO    64782053    324-142-5924-0 Seq# 3528 11-23-09 10:05ET

M. Borecky, MD
Physician
MDC Brooklyn

Universal #2   S00261a1

DEC 07 2009 RECEIVED

**LabCorp** V 1.35

| Specimen # | Control/Req Number | Pg | 2 |
|---|---|---|---|
| 312-142-6599-0 | 54009923903 | | |

| Fasting | Micro Source | Total Urine Volume | Report Status |
|---|---|---|---|
| N/A | | | S /Prelim |

Clinical Information
SRC: URINE

| Date Collected | Time Collected | Date Entered | Date Reported |
|---|---|---|---|
| 11/07/08 | 11:03 | 11/08/08 | 11/10/08 |

| Patient ID Number | Patient Phone Number | Patient SSN |
|---|---|---|
| 64782-053 | | |

Account
31761420
MDc Brooklyn                    B7

| Patient Name | | Sex | Date of Birth |
|---|---|---|---|
| PATINO, RESTREPO | | M | 04/24/64 |

Patient Address

100 29th St
Brooklyn NY  11232

718-840-4200

Comments

PATN AGE: 044/06/14

DR.ID: BOREKY

Tests Requested CBC With Differential/Platelet; Comp. Metabolic Panel (14);
Urinalysis, Routine; Microalb/Creat Ratio, Randm Ur;
Urine Culture, Routine;

| TESTS | RESULT | FLAG | UNITS | REFERENCE INTERVAL | LAB |
|---|---|---|---|---|---|
| Globulin, Total | 3.3 | | g/dL | 1.5 - 4.5 | |
| A/G Ratio | 1.3 | | | 1.1 - 2.5 | |
| Bilirubin, Total | 0.6 | | mg/dL | 0.1 - 1.2 | 01 |
| Alkaline Phosphatase,S | 70 | | IU/L | 25 - 150 | 01 |
| AST (SGOT) | 31 | | IU/L | 0 - 40 | 01 |
| ALT (SGPT) | 38 | | IU/L | 0 - 55 | 01 |
| **Urinalysis, Routine** | | | | | 01 |
| Urinalysis Gross Exam | | | | | 01 |
| Specific Gravity | 1.024 | | | 1.005 - 1.030 | 01 |
| pH | 5.5 | | | 5.0 - 7.5 | 01 |
| Urine-Color | Yellow | | | Yellow | 01 |
| Appearance | Clear | | | Clear | 01 |
| WBC Esterase | Negative | | | Negative | 01 |
| Protein | Negative | | | Negative/Trace | 01 |
| Glucose | Negative | | | Negative | 01 |
| Ketones | Negative | | | Negative | 01 |
| Occult Blood | Negative | | | Negative | 01 |
| Bilirubin | Negative | | | Negative | 01 |
| Urobilinogen,Semi-Qn | 1.0 | | EU/dL | 0.0 - 1.9 | 01 |
| Nitrite, Urine | Negative | | | Negative | 01 |
| Microscopic Examination | | | | | |
| Microscopic follows if indicated. | | | | | 01 |
| **Microalb/Creat Ratio, Randm Ur** | | | | | |
| Creatinine, Urine | 244.3 | | mg/dL | 22.0 - 328.0 | 01 |
| **Microalbum.,U,Random** | 35.6 | High | ug/mL | 0.0 - 17.0 | 01 |
| Microalb/Creat Ratio | 14.6 | | ug/mg creat | 0.0 - 30.0 | |
| **Urine Culture, Routine** | Will Follow | | | | |

01 RN    LabCorp Raritan              Dir: Michael Mahoney, MD
         69 First Avenue, Raritan, NJ 08869-1800
For inquiries,the physician may contact Branch: 800-745-0233 Lab: 800-631-5250

                    LAST PAGE OF REPORT
                    PRELIMINARY

PATINO, RESTREPO        64782-053     312-142-6599-0 Seq# 0334 11-10-08 10:05ET

REPORT

© 2007 Laboratory Corporation of America® Holdings
All Rights Reserved

M. PORECKY MD
MEDICAL OFFICER
MDC BROOKLYN

Universal #2   560261a1

| Specimen # | Control/Req Number | | Pg  1 | LabCorp® V 1.35 |
|---|---|---|---|---|
| 312-142-6599-0 | 54009923903 | | | |

| Fasting | Micro Source | Total Urine Volume | Report Status | Clinical Information |
|---|---|---|---|---|
| N/A | | | S /Prelim | SRC: URINE |

| Date Collected | Time Collected | Date Entered | Date Reported |
|---|---|---|---|
| 11/07/08 | 11:03 | 11/08/08 | 11/10/08 |

| Patient ID Number | Patient Phone Number | Patient SSN |
|---|---|---|
| 64782-053 | | |

| Patient Name | | Sex | Date of Birth |
|---|---|---|---|
| PATINO, RESTREPO | | M | 04/24/64 |

Patient Address

Account
31761420
MDc Brooklyn                              B7

100 29th St
Brooklyn NY  11232

718-840-4200

DR.ID: BOREKY

**Comments**

PATN AGE: 044/06/14

**Tests Requested** CBC With Differential/Platelet; Comp. Metabolic Panel (14);
Urinalysis, Routine; Microalb/Creat Ratio, Randm Ur;
Urine Culture, Routine;

| TESTS | RESULT | FLAG | UNITS | REFERENCE INTERVAL | LAB |
|---|---|---|---|---|---|
| **CBC With Differential/Platelet** | | | | | |
| WBC | 7.4 | | x10E3/uL | 4.0 - 10.5 | 01 |
| RBC | 5.89 | High | x10E6/uL | 4.10 - 5.60 | 01 |
| Hemoglobin | 16.6 | | g/dL | 12.5 - 17.0 | 01 |
| **Hematocrit** | 50.8 | High | % | 36.0 - 50.0 | 01 |
| MCV | 86 | | fL | 80 - 98 | 01 |
| MCH | 28.1 | | pg | 27.0 - 34.0 | 01 |
| MCHC | 32.6 | | g/dL | 32.0 - 36.0 | 01 |
| RDW | 14.6 | | % | 11.7 - 15.0 | 01 |
| Platelets | 191 | | x10E3/uL | 140 - 415 | 01 |
| Neutrophils | 50 | | % | 40 - 74 | 01 |
| Lymphs | 34 | | % | 14 - 46 | 01 |
| **Monocytes** | 15 | High | % | 4 - 13 | 01 |
| Eos | 1 | | % | 0 - 7 | 01 |
| Basos | 0 | | % | 0 - 3 | 01 |
| Neutrophils (Absolute) | 3.7 | | x10E3/uL | 1.8 - 7.8 | 01 |
| Lymphs (Absolute) | 2.5 | | x10E3/uL | 0.7 - 4.5 | 01 |
| **Monocytes(Absolute)** | 1.1 | High | x10E3/uL | 0.1 - 1.0 | 01 |
| Eos (Absolute) | 0.1 | | x10E3/uL | 0.0 - 0.4 | 01 |
| Baso (Absolute) | 0.0 | | x10E3/uL | 0.0 - 0.2 | 01 |
| | | | | | |
| **Comp. Metabolic Panel (14)** | | | | | |
| Glucose, Serum | 66 | | mg/dL | 65 - 99 | 01 |
| BUN | 19 | | mg/dL | 5 - 26 | 01 |
| Creatinine, Serum | 1.22 | | mg/dL | 0.76 - 1.27 | 01 |
| Glom Filt Rate, Est | >59 | | mL/min/1.73 | >59 | |
| | | **Please note reference interval change** | | | |
| If African-American | >59 | | mL/min/1.73 | >59 | |

Note:  Persistent reduction for 3 months or more in an eGFR
<60 mL/min/1.73 m2 defines CKD.  Patients with eGFR values
>/=60 mL/min/1.73 m2 may also have CKD if evidence of persistent
proteinuria is present. Additional information may be found at
www.kdoqi.org.

| BUN/Creatinine Ratio | 16 | | | 8 - 27 | |
| Sodium, Serum | 141 | | mmol/L | 135 - 145 | 01 |
| Potassium, Serum | 4.5 | | mmol/L | 3.5 - 5.2 | 01 |
| Chloride, Serum | 104 | | mmol/L | 97 - 108 | 01 |
| Carbon Dioxide, Total | 24 | | mmol/L | 20 - 32 | 01 |
| Calcium, Serum | 10.2 | | mg/dL | 8.5 - 10.6 | 01 |
| Protein, Total, Serum | 7.5 | | g/dL | 6.0 - 8.5 | 01 |
| Albumin, Serum | 4.2 | | g/dL | 3.5 - 5.5 | 01 |

**PRELIMINARY REPORT**

© 2007 Laboratory Corporation of America® Holdings
All Rights Reserved

PATINO, RESTREPO          64782-053   312-142-6599-0 Seq# 0334  11-10-08 10:05ET

M. BORECKY M.D
MEDICAL OFICER
MDC BROOKLYN

Universal #2   58026*a*

# Teaching Case of the Month

Joshua O Benditt MD, Section Editor

## Bullous Lung Disease or Bullous Emphysema?

Ritesh Agarwal and Ashutosh N Aggarwal

### Introduction

Bullous lung disease is an entity characterized by the presence of bullae in one or both the lung fields, with normal intervening lung.[1,2] On the other hand, bullous emphysema is the presence of bullae in a patient with chronic obstructive pulmonary disease (COPD), and is characterized by the presence of centrilobular emphysema in the nonbullous lung.[3–5] To select patients who are more likely to benefit from bullectomy (bullous lung disease), a proper preoperative assessment is essential.

Computed tomography (CT) can locate the bullae with considerable accuracy, even when their presence is not suspected on the basis of clinical and radiographic data. It also helps in assessing the extent and localization of bullae and associated diffuse nonbullous emphysema. Pulmonary function tests (PFTs) are also important tools in the assessment of these conditions. In addition to helping with the diagnosis, PFTs can help make an objective assessment of the severity of the underlying disease and monitor the response to treatment. The case we describe below illustrates the preoperative evaluation of a patient with giant bullous lung disease and the role of CT and PFT in the management of a patient presenting with giant bullae.

### Case Report

A 50-year-old male nonsmoker presented with history of progressive exertional dyspnea of 2 years duration. At presentation to our institute the patient had Medical Research Council grade III dyspnea. There was no history of cough, chest pain, or hemoptysis. General physical examination was normal. Examination of the respiratory system revealed absent breath sounds in the whole of the right hemithorax. A chest radiograph showed multiple air-filled

Ritesh Agarwal and Ashutosh N Aggarwal are affiliated with the Department of Pulmonary Medicine, Postgraduate Institute of Medical Education and Research, Chandigarh, India.

Correspondence: Ritesh Agarwal, Department of Pulmonary Medicine, Postgraduate Institute of Medical Education and Research, Sector 12, Chandigarh 160012, India. E-mail: riteshpgi@gmail.com; ritesh@indiachest.org.



Fig. 1. Chest radiograph showing a large bulla in the right hemithorax.

spaces in both the lungs, with the largest in the right hemithorax, occupying the whole of the right lung (Fig. 1). CT chest scan confirmed this finding, and also showed absence of emphysema in the nonbullous lung (Fig. 2). A provisional diagnosis of bullous lung disease was made. PFTs showed a restrictive defect and confirmed the presence of noncommunicating air spaces, as evidenced by a 3.12-L difference between the total-lung-capacity (TLC) value measured via body plethysmography and the TLC value measured via the helium-dilution technique (Table 1). In view of his symptoms, the patient underwent bullectomy. The postoperative chest radiograph showed complete expansion of the right lung (Fig. 3). PFTs repeated 3 months postoperatively showed a difference of 0.76 L between the TLC measured via body plethysmography versus via the helium-dilution technique; that difference was due to small bullae in the left lung (Table 2). A family screening to look for similar abnormalities was negative. The patient has been asymptomatic on regular follow-up for the last 2 years.

BULLOUS LUNG DISEASE OR BULLOUS EMPHYSEMA?



Fig. 2. Computed tomography chest scan confirming the presence of a large bulla in the right hemithorax. There is no centrilobular emphysema in the contralateral lung.

### Discussion

Bullous lung disease is different from bullous emphysema in that bullous lung disease has bullae with structurally normal intervening lung, whereas bullous emphysema has bullae associated with more diffusely abnormal lung parenchyma because of COPD. Giant bullous lung disease, as seen in our patient, is said to be present if the bullae occupy at least one third of the hemithorax and compress the surrounding lung parenchyma.[3] Bullectomy, either via videothoracoscopy or conventional thoracotomy, is the treatment of choice for giant bullous lung disease, even if asymptomatic.[6] Bullectomy is indicated for symptomatic patients who have incapacitating dyspnea or chest pain, and who have complications related to bullous disease such as infection or pneumothorax.



Fig. 3. Postoperative chest radiograph. The right lung is fully expanded.

Bullectomy needs to be differentiated from lung-volume reduction surgery (LVRS), which is surgical removal of 20–30% of nonbullous emphysematous lung from each side. The recently published National Emphysema Treatment Trial[7] showed that LVRS benefits selected subgroups of COPD patients who have upper-lobe disease and poor exercise capacity. Specifically, LVRS improves 6-min-walk distance, forced expiratory volume in the first second ($FEV_1$), dyspnea score, and quality-of-life score, and decreases residual volume and the need for supplemental oxygen. However, patients with $FEV_1 < 20\%$ of predicted and either homogenous emphysema or carbon-monoxide-diffusion capacity $< 20\%$ of predicted do not benefit from

Table 1.   Preoperative Pulmonary Function Test Results

| Variable | Predicted | Measured via Helium Dilution | | Measured via Body Plethysmography | |
|---|---|---|---|---|---|
| | | Observed | % of Predicted | Observed | % of Predicted |
| FVC (L) | 4.33 | 3.01 | 69.5 | 3.06 | 70.7 |
| $FEV_1$ (L) | 3.41 | 2.1 | 61.6 | 2.01 | 58.9 |
| $FEV_1$/FVC (% of predicted) | 78 | 69.8 | 89.5 | 65.7 | 84.2 |
| TLC (L) | 5.89 | 4.87 | 82.7 | 7.99 | 135.7 |
| RV (L) | 1.82 | 1.68 | 92.3 | 4.87 | 267.6 |

FVC = forced vital capacity
$FEV_1$ = forced expiratory volume in the first second
TLC = total lung capacity
RV = residual volume

Table 2.   Postoperative Pulmonary Function Test Results

| Variable | Predicted | Measured via Helium Dilution | | Measured via Body Plethysmography | |
|---|---|---|---|---|---|
| | | Observed | % of Predicted | Observed | % of Predicted |
| FVC (L) | 4.33 | 4.02 | 92.8 | 4.05 | 93.5 |
| $FEV_1$ (L) | 3.41 | 2.9 | 85 | 3.11 | 91.2 |
| $FEV_1$/FVC (% of predicted) | 78 | 72 | 92.3 | 77 | 98.7 |
| TLC (L) | 5.89 | 6.13 | 104 | 6.89 | 116.9 |
| RV (L) | 1.82 | 1.98 | 108.8 | 2.77 | 152.2 |

FVC = forced vital capacity
FEV = forced expiratory volume in the first second
TLC = total lung capacity
RV = residual volume

Case 2:02-cr-01188-DRH   Document 1004   Filed 06/02/20   Page 55 of 84 PageID #: 5223

LVRS and have unacceptable perioperative mortality.[7] Thus, taking a corollary from the National Emphysema Treatment Trial, some patients with bullous emphysema may also benefit from bullectomy. However, LVRS has distinct indications applicable only to a subset of patients, and with different expectations and outcomes than bullectomy.

Patient selection remains one of the most important aspects of successful surgery, since bullous lung disease is associated with excellent postoperative outcomes, whereas surgery for bullous emphysema is not very rewarding, except probably in a select group of patients.[4,8] In general, the freedom from long-term return of dyspnea is proportional to the quality of the remaining lung after bullectomy.

High-resolution CT is an important tool for preoperative assessment, because it can identify underlying centrilobular emphysema, which is synonymous with a diagnosis of bullous emphysema. Moreover, high-resolution CT also allows assessment of associated diseases such as bronchiectasis, infected cysts, pleural disease, and pulmonary hypertension.[4,5] PFTs can also differentiate between the 2 entities. PFT values from a patient with bullous lung disease typically show a restrictive defect, whereas those from a patient with bullous emphysema show an obstructive defect. In addition to helping in differential diagnosis, PFTs also help in quantifying the size of bulla and objectively documenting postoperative improvement.[6]

There is a difference between the lung volume measured via the helium-dilution technique and that measured via body plethysmography. In the former, the subject rapidly breathes in and out of a reservoir that contains a known volume of gas and a trace amount of helium (an inert gas, very little of which absorbs into the pulmonary circulation). The helium is diluted by the gas that was previously present in the lung. With the knowledge of the gas in the reservoir and the initial and final helium concentrations, the functional residual capacity and the TLC can be calculated. The helium-dilution technique may underestimate the exact volume of gas in the lung because of inadequate time to equilibrate with slowly communicating and noncommunicating air spaces such as bullae. However, lung volume can be more accurately measured and should be measured in these cases, with body plethysmography, which measures the total volume of the thorax. In fact, the difference in TLC between the 2 techniques (body plethysmography minus helium-dilution) approximates the volume of the bullae. In our case, there was substantial clinical improvement with decrease in bulla volume, documented on postoperative PFT (bulla volume fell from 3.12 L to 0.76 L).

In conclusion, this case exemplifies the importance of selecting the correct pulmonary function test (body plethysmography) for measuring lung volume, and the utility of CT in the evaluation of patients with bullous lung disease. The presence of bullae and the etiology (in this case, bullous lung disease) was confirmed by high-resolution CT. PFTs suggested the etiology and confirmed physiologic improvement after surgery.

## REFERENCES

1. Roberts L. Putman CE, Chen JTT, Goodman LR, Ravin CE. Vanishing lung syndrome: upper lobe bullous pneumopathy. Rev Interam Radiol 1987;12:249–255.

2. Murphy DM, Fishman AP. Bullous diseases of the lungs. In: Fishman AP, Elias JA, Kaiser LR, Fishman JA, Senior RM, Grippi MA, editors. Fishman's pulmonary diseases and disorders. New York: McGraw-Hill; 1998:849–866.

3. Stern EJ, Webb WR, Weinacker A, Muller NL. Idiopathic giant bullous emphysema (vanishing lung syndrome): imaging findings in nine patients. AJR Am J Roentgenol 1994;162(2):279–282.

4. Morgan MD, Strickland B. Computed tomography in the assessment of bullous lung disease. Br J Dis Chest 1984;78(1):10–25.

5. Carr DH, Pride NB. Computed tomography in pre-operative assessment of bullous emphysema. Clin Radiol 1984;35(1):43–45.

6. Greenberg JA, Singhal S, Kaiser LR. Giant bullous lung disease: evaluation, selection, techniques, and outcomes. Chest Surg Clin N Am 2003;13(4):631–649.

7. Fishman A, Martinez F, Naunheim K, Piantadosi S, Wise R, Ries A, et al; National Emphysema Treatment Trial Research Group. A randomized trial comparing lung-volume-reduction surgery with medical therapy for severe emphysema. N Engl J Med 2003;348(21): 2059–2073.

8. Fitzgerald MX, Keelan PJ, Cugell DW, Gaensler EA. Long-term results of surgery for bullous emphysema. J Thorac Cardiovasc Surg 1974;68(4):566–587.

## Bureau of Prisons
## Health Services
## Clinical Encounter

| | | |
|---|---|---|
| Inmate Name: PATINO RESTREPO, CARLOS ARTURO | | Reg #: 64782-053 |
| Date of Birth: 04/23/1964 | Sex: M | Race: WHITE |
| Encounter Date: 03/09/2009 15:34 | Provider: McLean, Diane MD | Facility: BRO |

Chronic Care Visit encounter performed at Special Housing Unit.

**SUBJECTIVE:**

**COMPLAINT 1**        **Provider:** McLean, Diane MD

**Chief Complaint:** Mental Health Complaint

**Subjective:** IM Patino reports severe;y depressed and hopeless mood, poor sleep, + SI with consideration of plan to hang himself but denies acting on plan and denies current intent to die. He reports he keeps living because of his 3 children. He reports + AH and + VH of " legs with white shoes". He denies current CAH to hurt self or others. He reports moderate appetite, po intake, low energy, poor concentration and memory. Discussed pan to start antidepressant and antipsychotic;  pt reports agreement with plan. Pt also contracts for safety to tell staff if suicidality worsens.

Pt interviewed in Spanish with psychology services staff interpreting.

**Pain Location:**

**Pain Scale:**

**Pain Qualities:**

**History of Trauma:**     No

**Onset:**

**Duration:**

**Exacerbating Factors:**

**Relieving Factors:**

**Comments:**

**ROS:**

**Psychiatric**

**General**

Anxiety-Moderate (yes), Appetite-Decreased (yes), Concentration-Decreased (yes), Energy-Decreased (yes), Hallucinations-Auditory (yes), Hallucinations-Olfactory (no), Hallucinations-Tactile (no), Hallucinations-Visual (yes), Homicide/Other Harm Thoughts (no), Memory-Decreased (yes), Mood-Down (yes), Sleep-Decreased (yes), Suicide/Self-Harm Thoughts (yes), Nightmares (no), Psychiatric Hospitalizations (no), Weight Loss (no)

**OBJECTIVE:**

**Exam:**

**Mental Health**

**Posture**

Slumped (yes)

**Grooming/Hygiene**

Normal (yes), Appropriate Grooming (yes)

**Facial Expressions**

Normal Expression (yes), Appropriate Expression (yes)

**Affect**

Constricted (yes), Depression (yes)

**Speech/Language**

Normal (yes), Appropriate (yes)

Case 2:02-cr-01188-DRH   Document 1004   Filed 06/02/20   Page 57 of 84 PageID #: 5225

**U.S. MEDICAL CENTERS FOR FEDERAL PRISONERS**
Laboratory, 1900 W. Sunshine
SPRINGFIELD, MISSOURI   65808
(417) 862-7041

**\*\*\*   SENSITIVE BUT UNCLASSIFIED   \*\*\***
**FINAL REPORT**

```
Register Number : 64782-053                  Age              : 46yr
Name            : PATINO RESTREPO, CARLOS     Sex              : M
Location        : MDC BROOKLYN                Room             :
Admit. Physician: DR. BERNHARD                Accession Number : 3018
Order. Physician: DR. BERNHARD
Collected       : 11/30/10 @  10:30 by:  RE
```

| Test | Result | Flag | Reference Range/Units | Tech |
|------|--------|------|-----------------------|------|
| LIPID PROFILE | | | | |
| COMP PROFILE | | | | |
| LIVER PROFILE | | | | |
| Glucose | 80 | | 70 - 110 mg/dL | CO JE |
| Urea Nitrogen | 16 | | 7 - 22 mg/dL | CO JE |
| Creatinine IDMS | 1.18 | | 0.66 - 1.25 mg/dL | CO JE |
| GFR | Greater than 60 | | | HS JE |
| | GFR units measured as mL\min\1.73 m^2 | | | |
| | If African American, multiply by 1.210. | | | |
| | A calculated GFR < 60 suggests chronic | | | |
| | kidney disease, if found over a 3 month | | | |
| | period. | | | |
| Sodium1 | 146 | | 137 - 148 mmol/L | CO JE |
| Potassium | 4.5 | | 3.5 - 5.0 mmol/L | CO JE |
| Chloride1 | 106 | | 99 - 114 mmol/L | CO JE |
| Calcium1 | 10.0 | | 8.5 - 10.9 mg/dL | CO JE |
| Total Protein | 8.3 | | 6.0 - 8.2 g/dL | CO JE |
| Albumin | 5.1 | HI | 3.6 - 5.1 g/dL | CO JE |
| Alkaline Phos. | 81 | | 41 - 133 U/L | CO JE |
| AST(SGOT) | 31 | | 11 - 55 U/L | CO JE |
| ALT1(SGPT) | 36 | | 11 - 66 U/L | CO JE |
| LDH | 475 | | 354 - 705 U/L | CO JE |
| GGT | 30 | | 10 - 78 U/L | CO JE |
| Total Bilirubin1 | 0.4 | | 0.2 - 1.3 mg/dL | CO JE |
| Bilirubin Unconj | 0.5 | | 0.0 - 1.1 mg/dL | CO JE |
| Bilirubin Conjug | 0.0 | | 0.0 - 0.3 mg/dl | CO JE |
| Cholesterol | 143 | | 50 - 200 mg/dL | CO JE |
| Triglyceride | 117 | | 10 - 150 mg/dL | CO JE |
| Globulin | 3.2 | | 2.0 - 3.7 g/dL | CO JE |
| A/G Ratio | 1.60 | | 1.00 - 2.30 | CO JE |
| BUN/Creat Ratio | 13.7 | | 5.6 - 33.3 | CO JE |
| dHDL | 52 | | 40 - 60 mg/dL | CO JE |
| LDLC | 68 | | 0 - 130 mg/dL | HS JE |
| Chol/dHDL Ratio | 3.0 | | 0.0 - 4.0 | CO JE |

RECEIVED DEC 0 3 2010

M. ROBECKY M.D
MEDICAL OFFICER
MDC BROOKLYN

Legend
LO=Low  AL=Alarm Low  HI=High  AH=Alarm High  AB=Abnormal
CL=Less than Clinically Reportable Range
CG=Greater than Clinically Reportable Range

```
Name            : PATINO RESTREPO, CARLOS      Location : BRO
Register Number : 64782-053                    Page     : 1 of 2
Printed         : 12/02/2010 @ 09:54
```

Case 2:02-cr-01188-DRH   Document 1004   Filed 06/02/20   Page 58 of 84 PageID #: 5226

## U.S. MEDICAL CENTERS FOR FEDERAL PRISONERS
### Laboratory, 1900 W. Sunshine
### SPRINGFIELD, MISSOURI 65808
### (417) 862-7041

\*\*\*  **SENSITIVE BUT UNCLASSIFIED**  \*\*\*
**FINAL REPORT**

```
Register Number : 64782-053                    Age              : 46yr
Name            : PATINO RESTREPO, CARLOS      Sex              : M
Location        : MDC BROOKLYN                 Room             :
Admit. Physician: DR. BERNHARD                 Accession Number : 3018
Order. Physician: DR. BERNHARD
Collected       : 11/30/10 @ 10:30 by:  RE
```

| Test | Result | Flag | Reference Range/Units | Tech |
|------|--------|------|-----------------------|------|
| CBC | | | | |
| White Blood Cell | 8.7 | | 4.3 - 11.1 10^3/uL | LN JE |
| Red Blood Cells | 5.38 | | 4.46 - 5.78 10^6/uL | LN JE |
| Hemoglobin | 15.7 | | 13.6 - 17.6 g/dL | LN JE |
| Hematocrit | 47.0 | | 40.2 - 51.4 % | LN JE |
| MCV | 87.4 | | 82.5 - 96.5 fL | LN JE |
| MCH | 29.2 | | 27.1 - 34.3 pg | LN JE |
| MCHC | 33.5 | | 33.0 - 35.0 g/dL | LN JE |
| RDW | 14.5 | HI | 12.0 - 14.0 % | LN JE |
| PLT | 205 | | 130 - 374 10^3/uL | LN JE |
| MPV | 10.8 | HI | 6.9 - 10.5 fL | LN JE |
| AUTODIFF | | | | |
| Neutrophils | 57.2 | | 43.0 - 67.0 % | LN JE |
| Lymphocytes | 34.4 | | 21.0 - 45.0 % | LN JE |
| Monocytes | 7.2 | | 5.0 - 13.0 % | LN JE |
| Eosinophils | 0.8 | | 0.0 - 7.0 % | LN JE |
| Basophils | 0.4 | | 0.0 - 1.0 % | LN JE |
| Neutrophil # | 5.0 | | 1.9 - 6.7 10^3/uL | LN JE |
| Lymphocyte # | 3.0 | | 1.3 - 3.7 10^3/uL | LN JE |
| Monocyte # | 0.6 | | 0.3 - 1.1 10^3/uL | LN JE |
| Eosinophil # | 0.1 | | 0.0 - 0.5 10^3/uL | LN JE |
| Basophil # | 0.0 | | 0.0 - 0.1 10^3/uL | LN JE |





Legend
LO=Low  AL=Alarm Low  HI=High  AH=Alarm High  AB=Abnormal
K=Less than Clinically Reportable Range
GR=Greater than Clinically Reportable Range

```
Name            : PATINO RESTREPO, CARLOS           Location : BRO
Register Number : 64782-053                         Page     : 2 of 2
Printed         : 12/02/2010 @ 09:54
```

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | |
|---|---|---|
| Inmate Name:  PATINO RESTREPO, CARLOS ARTURO | | Reg #:  64782-053 |
| Date of Birth:  04/23/1964 | Sex:  M | Race:  WHITE |
| Encounter Date: 11/07/2008 10:55 | Provider: (b)(6),(b)(7)(C),(b)(7)(F)  MD | Facility:  BRO |

Chronic Care Visit encounter performed at Health Services.

**SUBJECTIVE:**

**COMPLAINT  1**      Provider: (b)(6),(b)(7)(C),(b)(7)(F)  MD

**Chief Complaint:**  GENERAL CLINIC

**Subjective:**  44 YO MALE STATES THRU SPANISH MEDICAL INTERPRETER #1812 THAT HE HAD RIGHT KIDNEY SURGERY IN 1990 TO REMOVE STONES AND THE LEFT KIDNEY WAS DAMAGED AND ONLY HAS 10% FUNCTION. HE SAYS HE HAS BEEN FOLLOWED EVERY 3 MONTHS WITH A URINANALYSIS AND CREATININE BY HIS PRIVATE DOCTOR UNTIL HE WAS ARRESTED 18 MONTHS AGO. HE SAYS HE MAY HAVE 3-4 MORE STONES IN THE RIGHT KIDNEY WHICH ARE HIGH RISK AND CANNOT BE REMOVED. HE SAYS A PREVIOUS JAIL FOUND A URINE INFECTION AND TREATED HIM WITH ANTIBIOTICS. HE HAS NO SYMPTOMS NOW FROM HIS KIDNEY OR HIS URINE. HE HAS BACK PAIN SINCE HIS ARREST WHICH RADIATES FROM THE RIGHT LOWER BACK TO HIS KNEE. HE HAS BEEN TOLD THIS IS SCIATICA. HE ALSO HAS FRONTAL HEADACHES ASSOCIATED WITH DIFFICULTY READING AND MAY NEED GLASSES. HE REQUESTS TYLENOL FOR THESE HEADACHES AND IS WILLING TO TAKE THEM EVEN THOUGH HE REALIZES IT COULD AFFECT HIS KIDNEY ADVERSELY. HE WAS TOLD TO TAKE NO MORE THAT 6 TYLENOL IN A DAY.

**Pain Location:** Back-Lower
**Pain Scale:** 5
**Pain Qualities:** Aching
**History of Trauma:** No
**Onset:**
**Duration:**
**Exacerbating Factors:**
**Relieving Factors:**
**Comments:**

**ROS:**
   **Musculoskeletal**
      **General**
         Low Back Pain (yes), Neck Pain (yes)
GETS RIGHT LOWER BACK PAIN TO RIGHT KNEE WHEN HE STANDS UP FROM SITTING.  GETS NECK PAIN WHEN HE TRIES TO BEND HIS NECK FORWARD.  THE LOWER BACK ALSO HURTS WHEN HE PICKS UP SOMETHING HEAVY.
   **Neurological**
      **Motor System**
         Abnormal Gait (no), Incoordination (no), Involuntary Movements (no), Limp (no), Paralysis (no), Tremor (no)

**OBJECTIVE:**
**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 11/07/2008 | 11:05 BRO | 78 | Radial | Regular | (b)(6),(b)(7)(C),(b)(7)(F)  MD |

**Respirations:**

BOP-FOIA2015-06641.93 of 773



| Specimen # 324-142-5924-0 | Control/Reg Number 60097414987 | | Pg 2 | | LabCorp V 1.36 |
|---|---|---|---|---|---|

| Fasting N/A | Micro Source | Total Urine Volume | Report Status S /Final | Clinical Information |
|---|---|---|---|---|

| Date Collected 11/20/09 | Time Collected 10:45 | Date Entered 11/21/09 | Date Reported 11/23/09 |
|---|---|---|---|

Patient ID Number 64782053
Patient Name PATINO, RESTREPO   Sex M   Date of Birth 04/23/64
Patient Address

Comments
PATN AGE: 045/06/28

Account 31761420     (b)(6),(b)(7)(C),(b)(7)(F).
MDc Brooklyn
100 29th St
Brooklyn NY 11232      B7
718-840-4200
DR. ID:              PHY NAME:

Tests Requested CBC With Differential/Platelet; Comp. Metabolic Panel (14);
Urinalysis, Routine; Lipid Panel; Prostate-Specific Ag, Serum

| TESTS | RESULT | | | REFERENCE INTERVAL | LAB |
|---|---|---|---|---|---|
| A/G Ratio | 1.6 | | | 1.1 - 2.5 | |
| Bilirubin, Total | 0.7 | | mg/dL | 0.1 - 1.2 | 01 |
| Alkaline Phosphatase, S | 75 | | IU/L | 25 - 150 | 01 |
| AST (SGOT) | 20 | | IU/L | 0 - 40 | 01 |
| ALT (SGPT) | 19 | | IU/L | 0 - 55 | 01 |
| | | | | | |
| Urinalysis, Routine | | | | | |
| Urinalysis Gross Exam | | | | | 01 |
| Specific Gravity | 1.015 | | | 1.005 - 1.030 | 01 |
| pH | 7.5 | | | 5.0 - 7.5 | 01 |
| Urine-Color | Yellow | | | Yellow | 01 |
| Appearance | Clear | | | Clear | 01 |
| WBC Esterase | Negative | | | Negative | 01 |
| Protein | Negative | | | Negative/Trace | 01 |
| Glucose | Negative | | | Negative | 01 |
| Ketones | Negative | | | Negative | 01 |
| Occult Blood | Negative | | | Negative | 01 |
| Bilirubin | Negative | | | Negative | 01 |
| Urobilinogen,Semi-Qn | 1.0 | | EU/dL | 0.0 - 1.9 | 01 |
| Nitrite, Urine | Negative | | | Negative | 01 |
| Microscopic Examination | | | | | |
| Microscopic follows if indicated. | | | | | 01 |
| | | | | | |
| Lipid Panel | | | | | |
| Cholesterol, Total | 257 | High | mg/dL | 100 - 199 | 01 |
| Triglycerides | 173 | High | mg/dL | 0 - 149 | 01 |
| HDL Cholesterol | 45 | | mg/dL | >39 | 01 |
| Comment | | | | | 01 |

According to ATP-III Guidelines, HDL-C >59 mg/dL is considered a
negative risk factor for CHD.

| VLDL Cholesterol Cal | 35 | | mg/dL | 5 - 40 | |
| LDL Cholesterol Calc | 177 | High | mg/dL | 0 - 99 | |
| | | | | | |
| Prostate-Specific Ag, Serum | | | | | |
| Prostate Specific Ag, Serum | 0.6 | | ng/mL | 0.0 - 4.0 | 01 |

Roche ECLIA methodology.

According to the American Urological Association, Serum PSA should
decrease and remain at undetectable levels after radical
prostatectomy. The AUA defines biochemical recurrence as an initial
PSA value 0.2 ng/mL or greater followed by a subsequent confirmatory

**FINAL REPORT**          © 2007 Laboratory Corporation of America® Holdings
                                         All Rights Reserved

PATINO, RESTREPO          64782053     324-142-5924-0 Seq# 3528 11-23-09 10:05ET

Universal #    55C791al

(b)(6),(b)(7)(C),(b)(7)(F)

| Specimen # | Controlling Number | Pg 3 | | LabCorp® V 1.36 |
|---|---|---|---|---|
| 324-142-5924-0 | 60097414987 | | | |

| Fasting N/A | Micro Source | Total Urine Volume | Report Status S /Final | Clinical Information |
|---|---|---|---|---|
| Date Collected 11/20/09 | Time Collected 10:45 | Date Entered 11/21/09 | Date Reported 11/23/09 | |

| Patient ID Number 64782053 | Patient Phone Number | Patient SSN | Account 31761420 MDc Brooklyn 100 29th St Brooklyn NY 11232 718-840-4200 | B7 |
|---|---|---|---|---|
| Patient Name PATINO, RESTREPO | | Sex M | Date of Birth 04/23/64 | |

Comments
PATN AGE: 045/06/28

DR._____ PHY NAME:_____

Tests Requested: CBC With Differential/Platelet; Comp. Metabolic Panel (14); Urinalysis, Routine; Lipid Panel; Prostate-Specific Ag, Serum

PSA value 0.2 ng/mL or greater.
Values obtained with different assay methods or kits cannot be used interchangeably. Results cannot be interpreted as absolute evidence of the presence or absence of malignant disease.

01 RN    LabCorp Raritan          Dir:_____  MD
         69 First Avenue, Raritan, NJ 08869-1800
For inquiries,the physician may contact Branch: 800-745-0233 Lab: 800-631-5250

LAST PAGE OF REPORT

FINAL REPORT          © 2007 Laboratory Corporation of America® Holdings
All Rights Reserved

PATINO, RESTREPO          64782053     324-142-5924-0 Seq# 3528 11-23-09 10:05ET



**Federal Bureau of Prisons**

### FMC Butner
1000 Old Highway NC 75
BUTNER, NC 27509
919-575-3900 x5707

*** *Sensitive But Unclassified* ***

| Name | Reg Number | DOB | Sex | Location | Unit |
|------|-----------|-----|-----|----------|------|
| PATINO RESTREPO, CARLOS | 64782-053 | 4/23/1964 | M | USP Hazelton | |

| Provider | | Collection Date | | Received Date | | Sample ID |
|----------|---|----------------|---|---------------|---|-----------|
| (illegible) PA-C | | 6/4/2013   6:00 AM | | 6/5/2013   10:36 AM | | 156131326 |

| Test | | Result | | Reference Range | Units |
|------|---|--------|---|-----------------|-------|
| **BASIC METABOLIC PANEL** | | | | | |
| Sodium | | 140 | | 136-145 | mmol/L |
| Potassium | | 4.6 | | 3.5-5.1 | mmol/L |
| Chloride | | 105 | | 98-107 | mmol/L |
| CO2 | | 22 | | 21-32 | mmol/L |
| BUN | | 14 | | 7-26 | mg/dL |
| Creatinine | | 1.1 | | 0.6-1.3 | mg/dL |
| GFR IDMS est. | | >60 | | | |

GFR units measured as mL/min/1.73 m^2. If African American, multiply by 1.210. A calculated GFR <60 suggests a chronic kidney disease if found over a 3 month period.

| Test | | Result | | Reference Range | Units |
|------|---|--------|---|-----------------|-------|
| Calcium | | 9.5 | | 8.4-10.2 | mg/dL |
| Glucose | | 79 | | 70-109 | mg/dL |
| Anion Gap | | 12.8 | | 9.0-19.0 | |
| **LIPID PROFILE** | | | | | |
| Cholesterol | H | 209 | | <200 | mg/dL |
| Triglyceride | H | 151 | | <150 | mg/dL |
| HDL | L | 39 | | 40-60 | mg/dL |
| LDL calc | H | 140 | | <130 | mg/dL |
| Chol/HDL | H | 5.4 | | 0.0-4.0 | mg/dL |

JPB
6/6/13

| Legend | L=Low | Lt=Low Critical | H=High | Hi=High Critical | A=Abnormal | Al=Abnormal Critical | | |
|--------|-------|-----------------|--------|------------------|------------|----------------------|---|---|
| Name | | Reg Number | | Location | | Sample ID | | Report Date |
| PATINO RESTREPO, CARLOS | | 64782-053 | | USP Hazelton | | 156131326 | | 6/5/2013 3:56 |

## Bureau of Prisons
## Health Services
## Inmate ISDS Report

| Reg #: 64782-053 | Inmate Name: PATINO RESTREPO, CARLOS ARTURO |
|---|---|

SENSITIVE BUT UNCLASSIFIED – This information is confidential and must be appropriately safeguarded.

Transfer To: _____     Transfer Date: _____

**Health Problems**

| Type | Health Problem | Status |
|---|---|---|
| Chronic | Calculus of kidney | Current |
| Chronic | Other and unspecified hyperlipidemia | Current |
| Chronic | Swelling, mass, or lump in head and neck | Current |
| Chronic | Gingival recession, generalized | Current |
| Chronic | Pulpitis | Remission |
| Chronic | Deferred | Remission |
| Chronic | Psychosocial and environmental problems | Remission |
| Chronic | Cholesteatoma, unspecified | Current |
| Temporary/Acute INH. | History of noncompliance with medical treatment | Current |
| Temporary/Acute | PPD+ Prophy Incomplete | Current |
| Temporary/Acute | Urinary tract infection, site not specified | Current |
| Temporary/Acute | Memory loss | Current |
| Temporary/Acute | Renal colic | Remission |
| Temporary/Acute | Unspecified monoarthritis | Current |
| History/Resolved | Depressive DO, not elsewhere classified | Remission |

**Medications:  All medications to be continued until evaluated by a physician unless otherwise indicated. Bolded drugs required for transport.**
   None

**OTCs:  Listing of all known OTCs this inmate is currently taking.**
   None

**Pending Appointments**

| Date | Time | Activity | Provider |
|---|---|---|---|
| 06/12/2014 | 00:00 | PPD Administration | Nurse |

**TB Clearance:**

| | | |
|---|---|---|
| Last PPD Date: 06/12/2013 | Induration: 0mm | |
| Last Chest X-Ray Date: | Results: | |
| TB Treatment: | Sx free for 30 days: Yes | |
| TB Follow-up Recommended: No | | |

**Sickle Cell:**
   Sickle Cell Trait/Disease:     Not applicable.
                 FOR ISDS ONLY

**Limitations/Restrictions/Diets:**
   Cleared for Food Service: Yes
   Special instructions: NPO AFTER MIDNIGHT ON MONDAY 9/12/11.

**Comments:**

**Allergies**
   No Known Allergies

**Devices / Equipment**
   No Data Found

Generated 06/20/2013 14:11 by [_____] PA-C          Bureau of Prisons - SCH          Page 1 of 2

| Reg #:  64782-053 | Inmate Name:  PATINO RESTREPO, CARLOS ARTURO |
|---|---|

SENSITIVE BUT UNCLASSIFIED – This information is confidential and must be appropriately safeguarded.

**Travel:**
    Direct Travel: No
Travel Restrictions:

**UNIVERSAL PRECAUTIONS OBSERVED WHEN TRANSPORTING ANY INMATE:**

Transfer From Institution: SCHUYLKILL FCI    Phone Number: 5705447100
    Address 1: INTERSTATE 81 & 901 W
    Address 2:
    City/State/Zip: MINERSVILLE, Pennsylvania 17954

Name/Title of Person Completing Form: PA-C    Date: 06/20/2013

Inmate Name: PATINO RESTREPO, CARLOS    Reg #: 64782-053    DOB: 04/23/1964    Sex: M

11-03-10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X    Case Number: 02-CR-1188(S-13) (LDW)
UNITED STATES OF AMERICA

-v-                                                          ORDER

CARLOS ARTURO PATINO RESTREPO
A/K/A PATEMURO,

                              Defendant.
-----------------------------------------------------X

# 64782
D53

Upon the application of defense Counsel Jose A. Muniz, it is

**HEREBY ORDERED**, that the defendant Carlos Arturo Patino Restrepo shall be given a full medical examination at the Metropolitan Correctional Center (MCC), including blood and urine test, to determine his Renal problems and the severity of any Tuberculosis (TB); and

**IT IS FURTHER ORDERED**, that a report of such examination shall be filed with the Court and copies provided to counsel for the government and the defendant on or before the close of business on February 25, 2011.

Dated:   Central Islip, NY
         January 28, 2011

                                   SO ORDERED

                                   THE HONORABLE LEONARD D. WEXLER
                                   U.S. DISTRICT JUDGE
                                   EASTERN DISTRICT OF NEW YORK

scheduled 02 08 2011

A TRUE COPY
ATTEST
DATED 1/31/20 11
RUFUS G. HINEMAN

BY _____ CLERK
                 DEPUTY CLERK

PAGE 03/03

01/28/2011  14:01    212227...    JOSE A MUNIZ PC    PAGE 03/03



ID:        64782052
DOB:
Gender:

Name   Patino   R53
64782-053

Clinical Director
MCC New York

0208/2011

P/PR:       116/150 ms
QRS:        82 ms
QT/QTc:     408/383 ms
P/QRS/T Axis:  18/16/26 deg
Heart Rate:  53 BPM

warning: age not available, assumed 35 years
warning: sex not available, assumed male
sinus rhythm (slow)
Normal ECG

Unconfirmed Report

25 mm/s   10 mm/mV   Frequency Response 0.05-150 Hz   60 Hz   2/8/2011   14:23:36   P/N 94016-0000

Version 23.0



Patinorestrepo, Carlos (MR # 5844825)                                    DOB: 04/23/1964

6 4 7 8 2 - 0 5 3

**Patient Information**

| Patient Name Patinorestrepo, Carlos | MRN 5844825 | Gender Male | DOB (Age) 4/23/1964 (51 year old) |
|---|---|---|---|
| Claudine Dumandan, MD    . Resident | Signed | Cardiology | Discharge Instructions    07/13/15 0829 |

## DISCHARGE INSTRUCTIONS
## GMC-GEISINGER MEDICAL CENTER
### 100 North Academy Ave
### Danville PA 17822

**Patient Name:** Carlos Patinorestrepo     **MRN:** 5844825
**Discharge Date:** 7/13/2015

**You may call Dr. Burnside of the Department of Cardiology at 570-214-6950 during business hours for any questions or test results. For after-hours emergencies call 570-271-6211 and have your doctor paged.**

For routine questions, your Geisinger Cardiology Team prefers the use of MyGeisinger. MyGeisinger is an online internet tool to help you meet your health care needs quickly by providing a secure, confidential way to view your health records and communicate with your Geisinger Cardiology Team. To sign up for MyGeisinger go to www.MyGeisinger.org, "Click" Register Now on the right side of the screen and complete the user registration information.

The information below provides you with the instructions and the list of medications you need to be taking following discharge from the hospital. If you have any questions, please ask before leaving. Please carry this letter with you when you see your doctor in the clinic. If you have questions, you can reach us at the numbers above.

**Brief summary of your inpatient care:** You were admitted for chest pain which was due to inflammation of the lining of your heart. You were placed on high dose NSAID and Colchicine which helped improve your pain significantly. You had an ultrasound of your heart which did not show significant amount of fluid around your heart. You remained stable overnight and are now ready to be discharged.

Your primary diagnosis at discharge was acute pericarditis.

**Your doctors during this hospitalization included:**
Dr. Burnside of Cardiology

**Inpatient test results pending:** None

7/14/15 mL

M. Lingenfelter, MS, PA-C
FCI/FPC Schuylkill

Printed 7/13/15 2:15 PM          Geisinger          Page 1 of 5

Ramirestrepo, Carlos [MR # 5844825]                                    DOB: 04/23/1964

**Operations & Procedures:** None
**Complications:** none significant

**Advance Directive Documented:**
Advance Directive
    Does the Patient have an Advance Directive?          **No**

**Allergies:** Review of patient's allergies indicates no known allergies.

**Diet:** Heart healthy diet

**Activity:** no strenuous activity for 7 days then gradually increase activity as tolerated

**Driving:** You may resume driving once you have been cleared to do so by your PCP.

**Date you may return to work or school:** N/A

**Return appointments:**
    Laboratory tests: None
    Please call your primary care physician for an appointment within 7 day(s).

**These follow-up appointments have been scheduled or are in the process of being scheduled. If you have questions about your appointments, please call 1-800-275-6401. When asked to state the name of the physician, please say "Hospital Discharge".**

There are no future Geisinger appointments scheduled at this time.
There are no future non-Geisinger appointments scheduled at this time.

A follow up appointment with Dr. Kumar of Cardiology in 1 month has been requested for. You will be notified once this appointment has been made.

**Special Instructions:**
- You were started on Ibuprofen 800mg three times a day to help treat the inflammation in the lining of your heart. You need to be on this medication for the next 6 weeks.

- You were started on Colchicine 0.6mg twice a day to help treat the inflammation in the lining of your heart. You need to be on this medication for the next 6 weeks.

7/14/15

Printed 7/13/15 2:15 PM                    Geisinger

M. Lingenfelter, MS, PA-C
ECT/EPC Sch... Bill

Paumoresirepo, Carlos (MR # 5844825)                              DOB: 04/23/1964

- You were started on Omeprazole 40mg twice daily to help protect your gut while you are taking Ibuprofen. You should remain on this medication as long as you are still taking Ibuprofen.

- Please proceed to the nearest emergency room if you develop chest pain, shortness of breath, light headedness, loss of consciousness or any other severe symptom.

## Cardiovascular RISK FACTOR control
### Do not smoke or use tobacco products in any way!

- **Tobacco** - Tobacco is poison to your arteries. It will cause blockages. Continuing to smoke tobacco may lead to heart attacks, strokes, or leg amputation. You should avoid tobacco. Your goal is to not smoke at all. Talk with your primary care provider about counseling and medications to help you stop smoking. If you are having trouble stopping smoking, you can call the Pennsylvania Tobacco Quit Line at **1-800-227-2345** for additional assistance.
- **Exercise** - The American Heart Association recommends walking 30 minutes a day most days of the week; if you have to lose weight you should walk 60-90 minutes a day. Remember that if you develop chest pain, you should stop what you are doing. Do not continue to exercise if you have chest pain. See your special activity instructions above.
- **Ideal weight** - Your BMI (a measure of ideal body weight) is BMI: 25.78 kg/m². Your BMI should be less than 25. Your waist size also predicts risk of heart attack: a woman's waist should be less than 35 inches and a man's waist less than 40. Maintaining your ideal body weight will help your heart, reduce blood pressure, blood sugar, and cholesterol, improve or help prevent diabetes, and improve or help prevent congestive heart failure.

## Medications:
### Current Discharge Medication List

#### START taking these medications

| | Details |
|---|---|
| Ibuprofen (MOTRIN) 800 MG Tablet | Take 1 Tab by mouth 3 times a day. |
| colchicine 0.6 MG Tablet | Take 1 Tab by mouth 2 times a day. |
| omeprazole (PRILOSEC) 40 MG CPDR | Take 1 Cap by mouth 2 times a day. |

7/14/15
M. Lingenfelter, MS, PA-C
FCI/FPC Schuylkill

Patinorestrepo, Carlos (MR # 5844825)                                DOB: 04/23/1964

**STOP taking these medications**

NO KNOWN MEDICATIONS

If you feel suicidal or homicidal, please call the crisis hotline at 1-800-273-TALK (8255).

**Discharge Checklist:**

\_\_\_\_\_ I have my prescriptions.
\_\_\_\_\_ I was given medication instructions (if applicable).
\_\_\_\_\_ I have all of my personal belongings.
\_\_\_\_\_ I have my medications I brought from home (if applicable).

To understand how well we have prepared you (the Patient or Caregiver) for your discharge, can you answer the following teach-back questions?

1. \_\_\_\_\_ Why was I in the hospital?
2. \_\_\_\_\_ What do I need to do to care for myself after discharge? (Example: diet, activity, follow up appointments, medications, when to call the doctor, etc.)
3. \_\_\_\_\_ Why is this important to my health?

**Acknowledgement:**  I have had these instructions explained to me, was given a copy and had a chance to ask questions.

Patient Signature
_____

Date & Time:
_____

Nurse Signature
_____

Date & Time:
_____

**If the patient is unable to sign:**

Responsible Adult
_____

Date & Time:
_____

Relationship to Patient
_____

7/14/15
M. Lingenfelter PA
M. Lingenfelter, MS, PA-C
FCI/FPC Schuylkill

Patinorestrepo, Carlos (MR # 5644825)                                    DOB: 04/23/1964

**\* PLEASE TAKE THIS FORM TO YOUR NEXT VISIT WITH YOUR PRIMARY CARE PHYSICIAN.**

**Claudine Dumandan, MD**
**Resident**
**GMC-GEISINGER MEDICAL CENTER**
**07/13/15 1401**

Revision History

Chart Review Routing History
No Routing History on File

M. Lingenfelter, MS, PA-C
FCI/FPC Schuylkill

**Bureau of Prisons**
**Health Services**
**Cosign/Review**

| | | | |
|---|---|---|---|
| Inmate Name: | PATINO RESTREPO, CARLOS ARTURO | Reg #: | 64782-053 |
| Date of Birth: | 04/23/1964 | Sex: M | Race: | WHITE |
| Scanned Date: | 07/14/2015 13:00 | | Facility: | SCH |

Reviewed by Mace-Leibson, Ellen DO CD on 07/14/2015 13:01.

Patinorestrepo, Carlos (MR # 5844825)                                    DOB: 04/23/1964

64782-053

## Patient Information

| Patient Name<br>Patinorestrepo, Carlos | | MRN<br>5844825 | Gender<br>Male | DOB (Age)<br>4/23/1964 (51 year old) | |
|---|---|---|---|---|---|
| Megan E Van Der Pool, RN | Registered Nurse | Signed | | Nursing Progress Note | 07/13/15 1423 |

# NURSING DISCHARGE ASSESSMENT
### Geisinger Medical Center
### Danville, PA 17822

Carlos Patinorestrepo
5844825
Discharge Date and Time: 7/13/2015 1500
Accompanied by: Prison guards
Destination: Schuykill prison

**BELONGINGS PRESENT AT DISCHARGE:**
Belongings present at discharge: Clothes/shoes

**REASON FOR HOSPITALIZATION:** Acute Pericarditis
Resolved: Patient Problems: See summary note
Unresolved: Patient Problems (explain): See summary note

**FUNCTIONAL INDEPENDENCE MEASURE** (must be completed for all patients on discharge):
Feeding: 4 = Complete independence
Locomotion: 4 = Complete independence
Expression: 4 = Complete independence
Transfer Mobility: 4 = Complete independence
Social Interaction: 4 = Complete independence
Dressing: 4 = Complete independence
Hygiene: 4 = Complete independence

**COMFORT:**
Pain/Discomfort: Yes SELECT EACH ONE BELOW:
Level of Pain: 3/10
Pain Scale Type: Numeric Scale - peds/adults self report
Type of Pain: Tightness
Location Midsternal
Radiation No
Pain Intervention: Medication

**NEUROLOGICAL:**
Age Appropriate Glascow Coma Scale:
  Eyes Open: 4 = Spontaneous
  Best Verbal Response: 5 = Verbally appropriate for age
  Best Motor Response: 6 = Obeys commands appropriate for age
  Coma Scale TOTAL: 15
Extremity Movement:
  Right Arm: 5 - Active movement with full resistance
  Left Arm: 5 - Active movement with full resistance
  Right Leg: 5 - Active movement with full resistance
  Left Leg: 5 - Active movement with full resistance

M. Lingenfelter, MS, PA-C
FCI/FPC Schuylkill

Printed 7/13/15 2:33 PM                    Geisinger                    Page 1 of 3

Patinorestrepo, Carlos (MR # 5844825)                                      DOB: 04/23/1964

Requires restraints:  No
Impairment:  None

**OXYGENATION:**
Discharged with O2:  No
Ventilator:  No
Trach:  No
Breathing:  Unlabored breath sounds

**CARDIOVASCULAR:**
Cardiovascular Observations: Monitor Rhythm: SB

**Pulses:**  (P=palpable, D=doppler)

|        | Carotid | Brachial | Radial | Femoral | Dorsalis Pedis | Posterior Tibial | Popliteal |
|--------|---------|----------|--------|---------|----------------|------------------|-----------|
| Right  |         |          | P      |         | P              |                  |           |
| Left   |         |          | P      |         | P              |                  |           |

**INTEGUMENTARY:**
Integumentary Observations: None

**INFECTIOUS DISEASE:**
None

**MUSCULOSKELETAL:**
Positioning Devices:  No

**NUTRITION:**
Diet:  PO, explain:  Heart healthy

**GI ELIMINATION:**
Care:  Self
Bowels Normal for Patient:  Yes
Constipated:  No
Diarrhea:  No
Date of Last BM:  7/11/15
Incontinent:  No
Ostomy Present:  No

**URINARY ELIMINATION:**
Care:  Self
Voiding:  Yes, Continent
Catheter:  No
Ostomy Present:  No

**REPRODUCTIVE:**
Reproductive/Sexual Concerns:  No
Drainage:  No

7/14/15 (ML)

M. Lingenfelter, MS, PA-C
FCI/FPC Schuylkill

Fraulorestrepo, Carlos (MR # 5844825)                                    DOB: 04/23/1964

**COPING:**
Family/Community Support Systems in place:  N/A

**ADDITIONAL COMMENTS:**


Megan E Van Der Pool, RN
Registered Nurse
GMC-GEISINGER MEDICAL CENTER
07/13/15 1430

<u>Chart Review Routing History</u>
No Routing History on File

7/14/15 (ML)

M. Lingenfelter, MS, PA-C
FCI/FPC Schuylkill

# Bureau of Prisons
## Health Services
## Cosign/Review

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | PATINO RESTREPO, CARLOS ARTURO | | | Reg #: | 64782-053 |
| Date of Birth: | 04/23/1964 | Sex: | M | Race: | WHITE |
| Scanned Date: | 07/14/2015 12:58 | | | Facility: | SCH |

Reviewed by Mace-Leibson, Ellen DO CD on 07/14/2015 13:00.

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | |
|---|---|---|
| Inmate Name:  PATINO RESTREPO, CARLOS ARTURO | | Reg #:  64782-053 |
| Date of Birth:  04/23/1964 | Sex:  M | Race:  WHITE |
| Encounter Date:  03/09/2009 15:34 | Provider: (b)(6),(b)(7)(C),(b)(7)(F) MD | Facility:  BRO |

Chronic Care Visit encounter performed at Special Housing Unit.

**SUBJECTIVE:**

**COMPLAINT 1**     Provider: (b)(6),(b)(7)(C),(b)(7)(F) MD

    **Chief Complaint:**  Mental Health Complaint

    **Subjective:**  IM Patino reports severe;y depressed and hopeless mood, poor sleep, + SI with consideration of plan to hang himself but denies acting on plan and denies current intent to die. He reports he keeps living because of his 3 children. He reports + AH and + VH of " legs with white shoes". He denies current CAH to hurt self or others. He reports moderate appetite, po intake, low energy, poor concentration and memory. Discussed pan to start antidepressant and antipsychotic; pt reports agreement with plan. Pt also contracts for safety to tell staff if suicidality worsens.

        Pt interviewed in Spanish with psychology services staff interpreting.

    **Pain Location:**
    **Pain Scale:**
    **Pain Qualities:**
    **History of Trauma:**     No
    **Onset:**
    **Duration:**
    **Exacerbating Factors:**
    **Relieving Factors:**
    **Comments:**

**ROS:**
    **Psychiatric**
        **General**
            Anxiety-Moderate (yes), Appetite-Decreased (yes), Concentration-Decreased (yes), Energy-Decreased (yes), Hallucinations-Auditory (yes), Hallucinations-Olfactory (no), Hallucinations-Tactile (no), Hallucinations-Visual (yes), Homicide/Other Harm Thoughts (no), Memory-Decreased (yes), Mood-Down (yes), Sleep-Decreased (yes), Suicide/Self-Harm Thoughts (yes), Nightmares (no), Psychiatric Hospitalizations (no), Weight Loss (no)

**OBJECTIVE:**

**Exam:**
    **Mental Health**
        **Posture**
            Slumped (yes)
        **Grooming/Hygiene**
            Normal (yes), Appropriate Grooming (yes)
        **Facial Expressions**
            Normal Expression (yes), Appropriate Expression (yes)
        **Affect**
            Constricted (yes), Depression (yes)
        **Speech/Language**
            Normal (yes), Appropriate (yes)

BOP-FOIA2015-06641 87 of 773

Inmate Name: PATINO RESTREPO, CARLOS ARTURO
Date of Birth: 04/23/1964
Encounter Date: 03/09/2009 15:34
Sex: M
Provider: (b)(6),(b)(7)(C),(b)(7)(F) MD
Reg #: 64782-053
Race: WHITE
Facility: BRO

**Exam:**

**Mood**

Sadness (yes), Melancholy (yes), Anxiety (yes), Worry (yes), Dysphoric (yes)

**Thought Process**

Normal (yes), Appropriate (yes)

**Thought Content**

Anxious (yes)

**Perceptions**

Hallucinations-Auditory (yes), Hallucinations-Visual (yes), Hallucinations - Tactile (no), Hallucinations - Olfactory (no)

**Orientation**

Alert and Oriented x 3 (yes)

**Attention**

Normal (yes), Appropriate (yes)

**Recent Memory**

Normal (yes), Appropriate (yes)

**Remote Memory**

Normal (yes), Appropriate (yes)

Past Pscy Hx: denies hx psych tx, including psych hosp and medicaitons but reprots prior experiences of AH/VH

Substance Use: denies, social ETOH

MEdical Hx: reprots hx kidney nephritis with subsequent rreduction in function to 10%

Social Hx: wife, 3 children supportive, worked in cattle/agriculture/coffee business, HS diploma

Legal sit: drug conspiracy, pre-trial

A:
I: MDD with psychotic fx
II: deferred
III: reprots hx L kidney nephritis
IV: legal sit
V: 45

P:
1. Start Prozac 20mg po daily x 90d.
2. Start zyprexa 5mg po qbedtime x 90d.
3. RTC approx 2 weeks.
4. Case discussed with psychology services who will continue to monitor pt.

E: Pt educated re tx plan, regimen, diet, exercise.

**ASSESSMENT:**

| Description | ICD9 | Status | Status Date | Progress | Type |
|---|---|---|---|---|---|
| Axis I: Depressive type psychosis | 298.0 | Current | 03/09/2009 | Initial | Temporary/Acute |

**PLAN:**

**New Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|

| Inmate Name: | PATINO RESTREPO, CARLOS ARTURO | | Reg #: | 64782-053 |
|---|---|---|---|---|
| Date of Birth: | 04/23/1964 | Sex: M | Race: | WHITE |
| Encounter Date: | 03/09/2009 15:34 | Provider: (b)(6),(b)(7)(C),(b)(7)(F) MD | Facility: | BRO |

**New Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | Olanzapine Tablet | 03/09/2009 15:34 | 5mg Orally at bedtime x 90 day(s) Pill Line Only |
| | Indication: Axis I: Depressive type psychosis | | |
| | Fluoxetine Capsule | 03/09/2009 15:34 | 20mg Orally daily x 90 day(s) |
| | Indication: Axis I: Depressive type psychosis | | |

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 03/09/2009 | Counseling | Compliance - Treatment | McLean, Diane | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** No

**Telephone/Verbal Order:** No

Clinical Encounter completed on PATINO RESTREPO, CARLOS ARTURO by (b)(6),(b)(7)(C),(b)(7)(F) MD on 03/09/2009 15:34.

BOP-FOIA2015-06641 89 of 773

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | PATINO RESTREPO, CARLOS ARTURO | | | Reg.#: | 64782-053 |
| Date of Birth: | 04/23/1964 | Sex: | M | Race: | WHITE |
| Note Date: | 01/28/2009 10:35 | Provider: | (b)(6),(b)(7)(C),(b)(7)(F)   MD | Facility: | BRO |

Admin Note encounter performed at Health Services.

**Administrative Notes:**

**ADMINISTRATIVE NOTE   1      Provider:** (b)(6),(b)(7)(C),(b)(7)(F)   MD

NEEDS CHOLESTEROL TEST.

**ASSESSMENTS:**

New Laboratory Requests:

| Details | Frequency | End Date | Due Date | Priority |
|---|---|---|---|---|
| Profile tests-General-Lipid Profile | One Time | | 01/30/2009 00:00 | Routine |

Additional Information:
   FASTING

**Cosign Required:**   No
**Telephone/Verbal Order:**   No

Administrative Note completed on PATINO RESTREPO, CARLOS ARTURO by (b)(6),(b)(7)(C),(b)(7)(F)   MD on
01/28/2009 10:35

Generated 01/28/2009 10:36 by (b)(6),(b)(7)(C),(b)(7)(F)        Bureau of Prisons - BRO        Page 1 of 1

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | |
|---|---|---|---|---|
| Inmate Name: | PATINO RESTREPO, CARLOS ARTURO | | Reg #: | 64782-053 |
| Date of Birth: | 04/23/1964 | Sex: M | Race: | WHITE |
| Note Date: | 01/07/2009 07:40 | Provider: (b)(6),(b)(7)(C),(b)(7)(F) MD | Facility: | BRO |

Admin Note encounter performed at Health Services.

**Administrative Notes:**

**ADMINISTRATIVE NOTE   1**    Provider: (b)(6),(b)(7)(C),(b)(7)(F) MD
　　NEEDS CT OF KIDNEYS

**ASSESSMENTS:**

**New Consultation Requests:**

| Consultation/Procedure | Due Date | Priority | Translator | Language |
|---|---|---|---|---|
| Radiology | 01/15/2009 | Routine | No | |

　　**Reason for Request:**
　　　UNENHANCED HELICAL CT OF KIDNEYS, URETHRA AND BLADDER
　　**Provisional Diagnosis:**
　　　BILATERAL KIDNEY STONES.  LEFT MEASURES 1 CM AND RIGHT SMALLER ON X-RAY

**Cosign Required:**   No
**Telephone/Verbal Order:**   No

Administrative Note completed on PATINO RESTREPO, CARLOS ARTURO by (b)(6),(b)(7)(C),(b)(7)(F) MD on 01/07/2009 07:40

# Bureau of Prisons
# Health Services
## Clinical Encounter - Administrative Note

| | | |
|---|---|---|
| Inmate Name: | PATINO RESTREPO, CARLOS ARTURO | |
| Date of Birth: | 04/23/1964 | Sex: M |
| Note Date: | 12/24/2008 08:04 | Provider: (b)(6),(b)(7)(C),(b)(7)(F) MD |
| Reg #: | 64782-053 | |
| Race: | WHITE | |
| Facility: | BRO | |

Admin Note encounter performed at Health Services.

**Administrative Notes:**

**ADMINISTRATIVE NOTE   1        Provider:** [(b)(6),(b)(7)(C),(b)(7)(F)] MD

NEEDS CONSULTATION FOR ULTRASOUND.

**ASSESSMENTS:**

**New Consultation Requests:**

| Consultation/Procedure | Due Date | Priority | Translator | Language |
|---|---|---|---|---|
| Radiology | 01/09/2009 | Routine | No | |

   **Reason for Request:**
      SCHEDULE ULTRASOUND OF KIDNEYS. URETERS AND BLADDER.
   **Provisional Diagnosis:**
      BILATERAL RENAL STONES SEEN ON ABDOMINAL X-RAY.  LEFT STONE MEASURES 1 CM.  RIGHT
      IS SMALLER

**Cosign Required:**   No
**Telephone/Verbal Order:**   No

**Administrative Note completed on PATINO RESTREPO, CARLOS ARTURO by** [(b)(6),(b)(7)(C),(b)(7)(F)] MD on
**12/24/2008 08:04**

FROM:

Carlos A Rufino Restrepo
FCI Reg # 64792-053
FCI Schuylkill
P.O. Box 759
Minersville, PA 17954

TO:

Clerk of Court
U.S. District Court
225 Cadman Plaza, East
Brooklyn N.Y. 11201

LEGAL MAIL

To schedule free
Package Pickup,
scan the QR code.

USPS.COM/PICKUP

EP14F Oct 2018
OD: 12 1/2 x 9 1/2

**UNITED STATES POSTAL SERVICE** ®

**PRIORITY MAIL**

**UNITED STATES POSTAL SERVICE** ®

**USPS TRACKING #**

9114 9999 4431 3936 2397 94

LAB400R Aug. 2013
7690-17-000-0669

PS00001000014

FOREVER / USA

■ Date
■ USPS
  inter
■ Limit
■ Pick
■ Ordi
■ Wh
  dec
* D